No. 25-50319

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

---

Lucid Group USA, Inc.,

*Appellant*,

v.

Monique Johnston, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles, *et al.*

*Appellees.*

---

On Appeal from the United States District Court for the Western District of Texas, Civil Action No. 1:22-cv-1116-RP

---

**Opening Brief of Appellant Lucid Group USA, Inc.**

---

BILLY M. DONLEY
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1382
bdonley@bakerlaw.com

ANDREW M. GROSSMAN
KRISTIN A. SHAPIRO
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., NW,
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

*Counsel for Lucid Group USA, Inc.*

## Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that Appellant's parent company is Atieva, Inc., and no publicly traded company owns 10% or more of Appellant's stock.

**A.    Appellant**

Lucid Group USA, Inc.

**B.    Attorneys for Appellant**

Andrew Michael Grossman
Kristin Shapiro
Baker & Hostetler LLP
1050 Connecticut Avenue N.W., Suite 1100
Washington, D.C. 20036

Billy M. Donley
Rachel Palmer Hooper
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002

**C.    Appellees**

Monique Johnston

Daniel Avitia

Corrie Thompson

**D.    Attorneys for Appellees**

Daniel Ortner
Jacob Przada
Kelsey Warren
Office of the Texas Attorney General
P.O. Box 12548
Austin, TX 78711

Zachary Louis Rhines
Office of the Texas Attorney General
300 W. 15th Street, 6th Floor
Austin, TX 78701

**E.    Intervenor-Appellee**

Texas Automobile Dealers Association

**F.    Attorneys for Intervenor-Appellee Texas Automobile Dealers Association**

W. Scott Hastings
Chase Tyler Cobb
Daron L. Janis
Robert Thompson Mowrey
Thomas George Yoxall
Troutman Pepper Locke, LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201

**G.    Amici**

Pacific Legal Foundation

Professor Daniel Crane

Americans For Prosperity Foundation

**H.    Attorneys for Amicus Pacific Legal Foundation**

Anastasia P. Boden
Andrew R. Quinio

Erin E. Wilcox
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814

## I.　　Attorney for Amicus Professor Daniel Crane

J. Christopher Byrd
Chris Byrd Law Firm
P.O. Box 359
2631 Bulverde Rd., Suite 105
Bulverde, TX 78163

## J.　　Attorney for Amicus Americans For Prosperity Foundation

Michael E. Lovins
Lovins Troslcair, PLLC
1301 S. Capital of Texas Highway, Building A, Suite 136
Austin, TX 78746

/s/ Andrew M. Grossman
Andrew M. Grossman
*Attorney of record for Plaintiffs-Appellants*

## Statement in Support of Oral Argument

Lucid Group USA, Inc. ("Lucid"), respectfully requests oral argument. Lucid challenges Texas's prohibition of manufacturer-direct sales as applied to automotive companies, like Lucid, that have no independent dealers. This appeal raises substantial constitutional questions, including whether Lucid has satisfied its "burden … to dispel the notion that fear of vertical integration is not a *conceivable* rational basis" for that prohibition, *Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*, 113 F.4th 511, 531 (5th Cir. 2024), as well as the proper interpretation of *Tesla* in light of controlling Supreme Court and Fifth Circuit precedent and the rule of orderliness. Lucid respectfully submits that oral argument would significantly aid in the decisional process.

Dated: August 14, 2025        /s/ *Andrew M. Grossman*
                               Andrew M. Grossman

# Table of Contents

Certificate of Interested Persons.......................................................... i

Statement in Support of Oral Argument ........................................ iv

Table of Contents.................................................................... v

Table of Authorities ................................................................ vi

Jurisdictional Statement .......................................................... 1

Statement of Issues................................................................. 1

Statement of the Case............................................................. 1

    A. Background................................................................ 5

    B. Proceedings Below ...................................................... 8

Summary of Argument............................................................ 10

Argument .............................................................................. 13

I.    The Prohibition Violates Lucid's Due Process Rights ........................ 13

    A. Lucid Has a Protected Liberty Interest ......................................... 13

    B. Lucid Demonstrated that Texas Lacks a Rational Basis for
        Application of the Prohibition to Lucid ......................................... 20

    C. *Tesla* Does Not Control Lucid's As-Applied Due Process Claim ..... 34

II.    The Prohibition Violates Lucid's Equal Protection Rights.................. 43

    A. Lucid Demonstrated the Prohibition Violates Its Equal
        Protection Rights.......................................................... 44

    B. *Tesla* Does Not Control Lucid's Equal Protection Claim ................ 47

Conclusion ............................................................................. 50

# Table of Authorities

## Cases

*Adams v. City of Harahan*,
   95 F.4th 908 (5th Cir. 2024) ................................................................. 17

*Allgeyer v. State of La.*,
   165 U.S. 578 (1897) ............................................................................. 19

*Arceneaux v. Treen*,
   671 F.2d 128 (5th Cir. 1982) ................................................................. 48

*Ayotte v. Planned Parenthood of N. New England*,
   546 U.S. 320 (2006) ............................................................................. 40

*Big Tyme Invs., L.L.C. v. Edwards*,
   985 F.3d 456 (5th Cir 2021) ..........................................................44, 46

*Bolling v. Sharpe*,
   347 U.S. 497 (1954) ............................................................................. 15

*Burkette v. Lutheran Gen. Hosp.*,
   595 F.2d 255 (5th Cir. 1979) ................................................................. 18

*City of Cleburne, Tex. v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985)............................................................................. 48

*Conn v. Gabbert*,
   526 U.S. 286 (1999) ............................................................................. 17

*Cowan v. Corley*,
   814 F.2d 223 (5th Cir. 1987) ................................................................. 18

*Craigmiles v. Giles*,
   312 F.3d 220 (6th Cir. 2002) .....................................22, 24, 25, 27, 33, 34

*Cripps v. Louisiana Dep't of Agric. & Forestry*,
   819 F.3d 221 (5th Cir. 2016) ................................................................. 20

*Delaware River Basin Comm'n v. Bucks Cnty. Water & Sewer Auth.*,
   641 F.2d 1087 (3d Cir. 1981)................................................................. 42

*Dent v. State of W.Va.*,
129 U.S. 114 (1889) ........................................................... 14, 19

*England v. Louisiana State Bd. of Med. Examiners*,
263 F.2d 661 (5th Cir. 1959) ................................................ 50

*Ferrell v. Dallas Indep. Sch. Dist.*,
392 F.2d 697 (5th Cir. 1968) ................................................ 17

*Ford Motor Co. v. Texas Dep't of Transp.*,
264 F.3d 493 (5th Cir. 2001) ............................................ 36, 47

*Ghedi v. Mayorkas*,
16 F.4th 456 (5th Cir. 2021) ................................................ 17

*Hines v. Quillivan*,
982 F.3d 266 (5th Cir. 2020) ................................................ 20

*Howard v. City of Garland*,
917 F.2d 898 (5th Cir. 1990) ................................................ 48

*In re Cao*,
619 F.3d 410 (5th Cir. 2010) ................................................ 37

*Jackson Women's Health Org. v. Currier*,
760 F.3d 448 (5th Cir. 2014) ................................................ 16

*Maceluch v. Wysong*,
680 F.2d 1062 (5th Cir. 1982) .............................................. 48

*Mahone v. Addicks Util. Dist. of Harris Cnty.*,
836 F.2d 921 (5th Cir. 1988) ................................................ 45

*Malagon de Fuentes v. Gonzales*,
462 F.3d 498 (5th Cir. 2006) ............................................ 40, 48

*Martin v. Memorial Hosp. at Gulfport*,
130 F.3d 1143 (5th Cir. 1997) ............................................... 16

*Martinelli v. Hearst Newspapers, L.L.C.*,
65 F.4th 231 (5th Cir. 2023) ............................................ 39, 41

*Metro. Life Ins. Co. v. Ward*,
    470 U.S. 869 (1985) ................................................................. 30

*Morf v. Bingaman*,
    298 U.S. 407 (1936)................................................................. 48

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*,
    439 U.S. 96 (1978) ...............................................................6, 21

*Nivelo Cardenas v. Garland*,
    70 F.4th 232 (5th Cir. 2023) .................................................. 37

*Phillips v. Vandygriff*,
    711 F.2d 1217 (5th Cir. 1983)...........................................11, 14

*Reed v. Goertz*,
    136 F.4th 535 (5th Cir. 2025) ............................................37, 40

*San Jacinto Sav. & Loan v. Kacal*,
    928 F.2d 697 (5th Cir. 1991) .................................................. 18

*Schware v. Bd. of Bar Exam. of State of N.M.*,
    353 U.S. 232 (1957) ................................................................ 14

*Shaw v. Hosp. Auth. of Cobb Cnty.*,
    507 F.2d 625 (5th Cir. 1975) .................................................. 14

*Simi Inv. Co. v. Harris Cnty.*, Tex.,
    236 F.3d 240 (5th Cir. 2000) .................................................. 13

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013) ...........................................passim

*State of Tex. v. Thompson*,
    70 F.3d 390 (5th Cir. 1995) .................................................... 18

*Stidham v. Texas Comm'n on Priv. Sec.*,
    418 F.3d 486 (5th Cir. 2005) .................................................. 14

*Sys. Contractors Corp. v. Orleans Par. Sch. Bd.*,
    148 F.3d 571 (5th Cir. 1998) .................................................. 19

*Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*,
677 F. Supp. 3d 417 (E.D. La. 2023) ...................................................... 35

*Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*,
113 F.4th 511 (5th Cir. 2024) ............................................................ passim

*Traux v. Raich*,
239 U.S. 33 (1915) ................................................................................. 18

*Treme v. St. John the Baptist Par. Council*,
93 F.4th 792 (5th Cir. 2024) ................................................................ 13

*United States v. Carolene Products*,
304 U.S. 144 (1938) ............................................... 4, 12, 32, 39, 48

*United States v. Salerno*,
481 U.S. 739 (1987) .......................................................................... 37, 49

*U.S. Dep't of Agric. v. Moreno*,
413 U.S. 528 (1973) ............................................................................. 42

*U.S. R.R. Ret. Bd. v. Fritz*,
449 U.S. 166 (1980) ............................................................................. 43

*W. Coast Hotel Co. v. Parrish*,
300 U.S. 379 (1937) ............................................................................. 19

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*,
945 F.3d 206 (5th Cir. 2019) ................................................................ 41

*Walsh v. Louisiana High Sch. Athletic Ass'n*,
616 F.2d 152 (5th Cir. 1980) ................................................................ 48

*Washington v. Glucksberg*,
521 U.S. 702 (1997) ............................................................................. 40

*Williams v. Illinois*,
399 U.S. 235 (1970) ............................................................................. 48

*Williams v. Vermont*,
472 U.S. 14 (1985) .......................................................................... 12, 45

*Yates v. Stalder*,
217 F.3d 332 (5th Cir. 2000) ................................................... 46

*Zobel v. Williams*,
457 U.S. 55 (1982) ................................................................. 42

## Constitutional, Statutory and Regulatory Authorities

28 U.S.C. § 1291 ...................................................................... 1

28 U.S.C. § 1331 ...................................................................... 1

43 Tex. Admin. Code chap 215, subtitle F ..................................... 7

43 Tex. Admin Code § 215.181 ................................................... 7

Tex. Occ. Code § 2301.002 ........................................................ 7

Tex. Occ. Code § 2301.476 ................................................. 6, 7, 9

Tex. Occ. Code § 2301.603 ............................................. 8, 26, 29

Tex. Occ. Code § 2301.605 ...................................................... 29

Tex. Occ. Code § 2301.652 ...................................................... 25

U.S. Const. amend. XIV, § 1 ............................................... passim

## Other Authorities

DOJ, Economic Analysis Group, Competition Advocacy Paper,
Economic Effects of State Bans on Direct Manufacturer Sales to
Car Buyers (May 2009) ....................................................... 3, 24

Federal Trade Commission, Combating Auto Retail Scams Trade
Regulation Rule, 89 Fed. Reg. 590 (2024) ............................... 28

Friedrich Kessler & Richard H. Stern,
Competition, Contract, and Vertical Integration,
69 Yale L.J. 1 (1959) .......................................................... 22

Giovana Shay, Similarly Situated,
18 Geo. Mason L. Rev. 581 (2011) ......................................... 46

Lina M. Khan, Amazon's Antitrust Paradox,
126 Yale L.J. 710 (2017) .......................................................................... 21

Mike Dovorany, *Despite Tesla's Retail Model Revolution, People Still
Prefer Traditional Car Dealers*, Escalent (Sept. 23, 2021) ............................. 31

Note, Legislative Purpose, Rationality, and Equal Protection,
82 Yale L.J. 123 (1972) ............................................................................ 42

Texas Attorney General, Buying a New or Used Car .................................... 28

Tex. House Research Org., Revising the Texas Motor Vehicle
Commission Code: Analysis of H.B. 3092 (1999)...................................... 7

## Jurisdictional Statement

This district court had jurisdiction over this action under 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States. This Court has jurisdiction under 28 U.S.C. § 1291 because Lucid Group USA, Inc., appeals a final order and judgment of the district court that disposes of all parties' claims entered on March 31, 2025. ROA.4177. Lucid timely filed a notice of appeal on April 21, 2025. ROA.4179.

## Statement of Issues

1.    Whether Texas's prohibition of manufacturer-direct vehicle sales as applied to Lucid violates the Due Process Clause.

2.    Whether Texas's prohibition of manufacturer-direct vehicles sales as applied to Lucid violates the Equal Protection Clause.

## Statement of the Case

Lucid is an American automotive company that sells its electric vehicles directly to consumers, just like Apple sells iPhones and Tiffany sells diamond rings.[1] It does so through licensed dealerships in seven states. But Lucid cannot sell its new vehicles from dealerships in Texas because the State maintains that a law intended to prevent the likes of Ford and General Motors from unfairly competing against their own franchised dealers applies to automotive companies

---

[1] Plaintiff Lucid Group USA, Inc., is the sales and service entity for Lucid vehicles. ROA.1461. Lucid USA, Inc., designs and manufactures Lucid vehicles. ROA.1461. Atieva, Inc., is the parent to both. ROA.1461. For ease of reference, this brief will refer to these entities collectively as "Lucid" unless otherwise specified.

1

like Lucid with no independent dealers and bars them from selling directly. That is irrational in the extreme: it undermines competition, undermines consumer protection, reduces consumer choice, drives up prices, and inconveniences consumers, with no countervailing benefit whatsoever. Texas's prohibition on Lucid selling its vehicles directly to consumers is indistinguishable from Louisiana's ban on manufacturer-direct casket sales that this Court struck down in *St. Joseph Abbey v. Castille*, 712 F.3d 215 (2013). Both laws have no conceivable purpose besides protecting incumbent dealers from competition by new market entrants. And "mere economic protection of a particular industry is [not] a legitimate governmental purpose" capable of supporting economic regulation under the Due Process and Equal Protection Clauses. *Id*. at 222.

The district court nonetheless held that this prohibition permissibly furthers Texas's interest in "preventing vertical integration." ROA.4169 (quotation marks omitted). But Texas law does not do that: it allows automotive companies like Lucid to do practically everything that dealers do. They can lease new vehicles and rent new vehicles and then sell those vehicles directly to consumers within Texas, provide demonstration drives, and provide warranty and repair service. Texas consumers can even purchase new vehicles from Lucid's out-of-state dealerships for delivery to them in Texas. In any instance, prohibiting Lucid from selling its vehicles to consumers within Texas does not promote but only undermines competition. As the record reflects, the U.S. automotive market is highly competitive, and direct-sales-only automotive companies like Lucid cannot abuse their non-existent market power simply by

selling their own vehicles. And forcing consumers to purchase through a middleman only denies consumers the benefit of competition by driving up prices for consumers—by an average of over $2,000 per vehicle, according to a U.S. Department of Justice analysis.[2]

The district court was wrong to hold that this case was governed not by *St. Joseph Abbey* but by *Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*, 113 F.4th 511 (5th Cir. 2024), which facially upheld Louisiana's prohibition of manufacturer-direct sales and service. But *Tesla* explicitly refused to consider whether there was a rational basis for applying the law specifically to direct-sales-only automotive companies. *Id.* at 530 ("The legislative classification that we are examining is the class of all vehicle manufacturers."). And it ultimately held that Tesla failed to satisfy its "burden" to negate every conceivable state interest for Louisiana's law. *Id.* at 531. *Tesla* is not controlling here, where Lucid challenges Texas's distinct prohibition as applied to direct-sales-only automotive companies like Lucid and has satisfied its burden to negate every potential state interest for that prohibition.

The district court refused to consider the rationality of Texas's prohibition as applied to direct-sales-only automotive companies, reasoning that any "lack of a logical fit" does not matter because "rational-basis review does not require a law to be perfectly logical as applied to every business or person in its scope."

---

[2] DOJ, Economic Analysis Group, Competition Advocacy Paper, Economic Effects of State Bans on Direct Manufacturer Sales to Car Buyers 4 (May 2009), *available at* https://www.justice.gov/atr/public/eag/246374.pdf.

ROA.4173–74. That is dead wrong. No less than *United States v. Carolene Products*—the Supreme Court decision that established modern rational-basis review—holds that "the constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the prohibited class, is so different from others of the class as to be without the reason for the prohibition." 304 U.S. 144, 153–54 (1938). Here, there is no basis to apply Texas's prohibition to direct-sales-only automotive companies like Lucid that, unlike traditional manufacturers, have no independent dealers against whom they could wield their market power. Extending the direct-sales ban to Lucid makes as much sense as requiring a taxidermied dog to be leashed at all times.

"The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey*, 712 F.3d at 226. Texas's explanation that prohibiting Lucid from selling its own vehicles to consumers within the state actually promotes competition is nonsensical. The only interest advanced by Texas's prohibition is lining the pockets of the state's existing dealers at the expense of Texas consumers, and that is not a *legitimate* state interest. Texas's prohibition is unconstitutional as applied to Lucid, and this Court should reverse the district court's judgment upholding application of Texas's direct-sales ban to Lucid.

**A.    Background**

**1.**    Lucid is an automotive company with a headquarters in California and a manufacturing facility in Arizona. ROA.1461; ROA.2939. Lucid was founded in 2007 to advance state of the art electric-vehicle battery and powertrain technology. ROA.1461. After a decade of success developing and manufacturing electric-vehicle components, Lucid announced its first electric vehicle, the Lucid Air, and began deliveries in 2021. ROA.1461–62.

Lucid determined early on that the franchised-dealer model—in which vehicles are sold to independent dealers that, in turn, sell to consumers—was not a viable way to market its vehicles. ROA.1463. For one thing, the well-known pathologies of that sales model, like higher prices, high-pressure sales tactics, price-haggling, hidden fees, and upselling, are inconsistent with Lucid's values and brand. ROA.1462–63. Lucid sells its vehicles at uniform and transparent prices, so there is no pressure and nothing to negotiate. ROA.1464. Lucid also needed a sales model that would emphasize education about electric vehicles and Lucid's advanced technologies, because Lucid is still relatively new to the market; that would be responsive to consumer needs, even when that required going straight to the product design and engineering teams; and that would allow it to continuously improve its products in response to customer feedback. ROA.1462–63. To achieve these things, Lucid needed to take full responsibility for every contact that a customer has with its brand, from a customer's initial expression of interest through sale and after-sale support and service. ROA.1462–63.

Then there was the economics: it would be impossible to stand up a network of independent dealers when their expected revenue and ability to make a profit would be compromised by Lucid's uniform and transparent prices, the relatively few vehicles that might need service or result in used-vehicle sales, and the reduced service needs of electric vehicles. ROA.1463. Selling vehicles through independent dealers also adds another layer of markup, costing consumers thousands of dollars more per vehicle, with no corresponding benefit. ROA.1525; ROA.1568.

Accordingly, Lucid sells its vehicles directly to consumers across the country and has no independent dealers. ROA.1525. In states that allow manufacturer-direct sales, Lucid's vehicles are available for purchase through its dealerships (which Lucid calls "Studios") that Lucid owns and operates. ROA.1463–64.

**2.** Texas does not permit Lucid to sell its vehicles in the state directly to consumers. The State's position is premised on the Texas Occupations Code, which regulates the relationship between motor-vehicle manufacturers and their franchised dealers. Like other states, Texas initially regulated that relationship to prevent manufacturers' perceived abuses of their franchised dealers. *See generally New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 439 U.S. 96, 100–02 & n.7 (1978) (describing historical genesis of such laws); ROA.1479.

As relevant here, section 2301.476(c) of the Texas Occupations Code provides that a motor vehicle "manufacturer"—which is defined to include any "affiliate[]" of a manufacturer—may not: "own," "operate or control," or "act

in the capacity of" (1) "a franchised dealer or dealership" for the same type of motor vehicles that it manufactures or (2) "a nonfranchised dealer." Tex. Occ. Code § 2301.476(c). Although this provision was intended to prevent manufacturers from competing against their own franchised dealers, *see* Tex. House Research Org., Revising the Texas Motor Vehicle Commission Code: Analysis of H.B. 3092 (1999), the State maintains that it also bars manufacturers without independent dealers from selling cars in Texas. Solely as applied to direct-sales-only automotive companies like Lucid, that law is referred to herein as "**the Prohibition**."

The Prohibition is exceedingly narrow, limited to the sale of new motor vehicles in Texas. As the State admits, Texas permits a direct-sales-only automotive company like Lucid to do everything else that a dealer does: (1) lease new vehicles and rent new vehicles in Texas directly to consumers;[3] (2) sell those previously leased or rented vehicles in Texas directly to consumers;[4] (3) own and operate "galleries" in Texas where consumers can learn about its vehicles and take demonstration drives;[5] (4) sell parts and accessories in Texas directly to consumers;[6] (5) provide repairs and service, including warranty service, in

---

[3] See 43 Tex. Admin. Code chap 215, subtitle F; ROA.1590 (Lucid's lessor license).

[4] *E.g.*, 43 Tex. Admin. Code § 215.181.

[5] *See* Tex. Occ. Code §§ 2301.002(7), 2301.002(8) (defining "dealer" and "dealership"), 2301.476(c) (prohibiting ownership, control of, or acting in the capacity of only a "dealer" or "dealership").

[6] *E.g.*, 43 Tex. Admin. Code § 215.181.

Texas;[7] and (6) arrange for financing in Texas for vehicle sales.[8] Direct-sales-only automotive companies like Lucid also can sell new vehicles to Texas consumers from out-of-state dealerships, either in person or over the internet, and deliver them directly to the Texas consumer at a location of the consumer's choice in Texas.[9] So Texas consumers can lease-to-own new Lucid vehicles from Lucid's Texas-based Studios and can purchase new Lucid vehicles for delivery to their homes but they cannot simply visit a Lucid Studio in Texas and purchase a new vehicle off the lot.

Over the past decade, various proposals to repeal or loosen the Prohibition have been put to the Texas Legislature. Each, in turn, has been met by the lobbying might of the Texas Automobile Dealers Association ("TADA"), which has made preserving the Prohibition its "#1" legislative priority. ROA.1793. TADA boasts that its lobbying has succeeded in defeating every proposal to date that would allow new market entrants like Lucid to compete with TADA's members by selling vehicles in Texas. ROA.1795–98.

### B.  Proceedings Below

**1.**  Lucid filed suit against Monique Johnston, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles, and other DMV officials in the Western District of Texas on November 1, 2022. ROA.19. Lucid's complaint alleged that the Prohibition violates the Due

---

[7] *See, e.g.*, Tex. Occ. Code § 2301.603(a); ROA.1826; ROA.27–28.

[8] *See* ROA.1826; ROA.27–28.

[9] ROA.1791 (over a hundred thousand Texans own vehicles made by direct-sales-only automotive companies like Lucid, Rivian, and Tesla).

Process and Equal Protection Clauses of the Fourteenth Amendment of the U.S. Constitution (Counts I and II, respectively). ROA.33–35. Lucid's claims do not challenge any regulatory requirement or other law applicable to licensed dealerships and do not challenge section 2301.476(c)'s facial validity or application to manufacturers that sell through independent dealers. Lucid's complaint contained allegations detailing why the Prohibition does not rationally relate to any legitimate state interest as applied to direct-sales-only automotive companies like Lucid. ROA.28–33.

TADA intervened as a defendant, ROA.520, and the district court denied defendants' motion to dismiss, ROA.561–74. The court held that the allegations in Lucid's complaint plausibly negated "the rational connection between Section 2301.476(c), as applied, and the legitimate interests articulated by Defendants." ROA.572–73. After discovery, the parties filed cross-motions for summary judgment. ROA.1828–3989. Lucid's motion for summary judgment similarly negated any conceivable legitimate state interest that might support the Prohibition. ROA.1427–51.

**2.** The district court adopted a magistrate judge's report and recommendation (ROA.4000–14) and granted defendants' motions for summary judgment and denied Lucid's motion for summary judgment. ROA.4159–76. The court reasoned that this Court's intervening decision in *Tesla* required it to hold "as a matter of law" that there is a rational basis for the Prohibition. ROA.4170 (quotation marks omitted). The court interpreted *Tesla* to hold that "preventing vertical integration … is a sufficient rational basis to

9

uphold" a direct-sales ban. ROA.4169 (quoting *Tesla*, 113 F.4th at 530). The court did not address Lucid's argument that the Prohibition does not actually prevent vertical integration given that Texas permits direct-sales-only manufacturers to do everything that a dealership does but for selling new vehicles in Texas. The court also refused to consider Lucid's as-applied argument regarding the "lack of a logical fit" between the Prohibition and direct-sales-only automotive companies like Lucid, stating that "rational-basis review does not require a law to be perfectly logical as applied to every business or person in its scope." ROA.4173–74.

Specifically as to Lucid's due process claim, the court further held that Lucid lacked a protectible liberty interest because the Prohibition does not "effectively foreclose[]" Lucid from operating its business in Texas where it could "sell its cars in other ways"—*i.e.*, through independent dealers in Texas or through Lucid's out-of-state dealerships. ROA.4168–69; ROA.4008. And as to Lucid's equal protection claim, the court held that Lucid was not being treated differently from a similarly situated party because Texas law prohibits all manufacturers from selling directly. ROA.4171.

<u>**Summary of Argument**</u>

The district court erred in granting the defendants' motions for summary judgment and denying Lucid's.

**I.**    The Prohibition violates the Due Process Clause. The right to pursue an occupation of one's choice "is of the very essence of the personal freedom and opportunity" the Fourteenth Amendment was meant to secure,

*Phillips v. Vandygriff*, 711 F.2d 1217, 1222 (5th Cir. 1983) (quotation marks omitted), and a state can only deprive a person of that right if it is "rationally related" to a "legitimate state purpose," *Tesla*, 113 F.4th at 529. Prohibiting Lucid from directly selling its own vehicles in Texas does not rationally relate to *any* legitimate state interest.

In reaching the contrary conclusion, the decision below made two fundamental errors. First, rather than follow *St. Joseph Abbey*, the district court misinterpreted *Tesla* to hold "as a matter of law" that there is a rational basis for the Prohibition. ROA.4170 (quotation marks omitted). But *Tesla* explicitly only considered the facial rationality of a Louisiana direct-sales prohibition as applied to "*all* vehicle manufacturers," *Tesla*, 113 F.4th at 530, and ultimately held that Tesla had not satisfied its "burden" to dispel every conceivable rational basis for the law it. *Tesla* is not controlling in this case, which involves a different law challenged on an as-applied basis by a different litigant that failed to carry its burden on a different record.

Second, the district court refused to consider Lucid's argument that the Prohibition was irrational as-applied to Lucid because "rational-basis review does not require a law to be perfectly logical as applied to every business or person in its scope." ROA.4173–74. That reasoning directly conflicts with governing precedent including *Carolene Products*, which makes clear that "the constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the prohibited class, is so

11

different from others of the class as to be without the reason for the prohibition." 304 U.S. at 153–54. Texas's prohibition of manufacturer-direct sales may make sense as applied to traditional manufacturers with franchisees, as it prevents those manufacturers from competing against their own franchisees. But direct-sales-only automotive companies like Lucid, which have no franchisees, are entirely "without the reason for the prohibition," *id.* at 154, and thus applying the Prohibition to Lucid violates the Due Process Clause.

**II.** The Prohibition likewise violates the Equal Protection Clause. The district court reasoned that Lucid was not being treated differently from similarly situated entities because Texas equally prohibits all manufacturers from selling vehicles. But courts cannot rely on the challenged classification itself to hold that a plaintiff is not similarly situated. As the Supreme Court explained in *Williams v. Vermont*, "[a] State cannot deflect an equal protection challenge by observing that in light of the statutory classification all those within the burdened class are similarly situated," because the existence of a classification "has no bearing on the legitimacy of that classification in the first place." 472 U.S. 14, 27 (1985). Plaintiff Lucid Group USA, Inc., is an automotive dealer, and Texas law treats it differently from the other dealers that are permitted to sell vehicles in the state.

Like Lucid's due process claim, Lucid's equal protection claim "insist[s] only that [Texas's] regulation not be irrational." *St. Joseph Abbey*, 712 F.3d at 227. If Texas is going to prohibit Lucid from selling its own vehicles—forcing consumers to spend thousands of dollars more per vehicle to line the pockets of state-mandated middlemen—the Constitution requires there be at least some

reason why. Yet every conceivable basis for the Prohibition proffered by defendants not only is belied by the record but defies basic common sense. Holding the Prohibition invalid under such circumstances is "well within Article III's confines of judicial review." *Id.*

## Argument

The Court reviews the district court's summary-judgment order "*de novo,* applying the same standards as the district court." *Treme v. St. John the Baptist Par. Council*, 93 F.4th 792, 796 (5th Cir. 2024) (quotation marks omitted). "Summary judgment should be granted when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). The Court "views all facts and inferences in the light most favorable to the nonmoving party." *Id.* (quotation marks omitted).

## I.    The Prohibition Violates Lucid's Due Process Rights

The district court erred in granting defendants' motions for summary judgment and denying Lucid's motion for summary judgment on Lucid's claim that the Prohibition violates the Due Process Clause. To establish a substantive due process claim, the plaintiff must show (1) that the challenged action "works a deprivation of a constitutionally protected interest" and (2) that the "action is [not] rationally related to a legitimate governmental interest." *Simi Inv. Co. v. Harris Cnty., Tex.*, 236 F.3d 240, 249 (5th Cir. 2000) (quotation marks omitted). Lucid satisfied both requirements.

### A.    Lucid Has a Protected Liberty Interest

The Prohibition deprives Lucid of a protected liberty interest.

13

**1.** It is undisputed that "state law prohibits Lucid Group USA, Inc., as an affiliate of a motor-vehicle manufacturer, from obtaining the license necessary to sell motor vehicles from an established physical location in the state." ROA.1466. By barring Lucid from selling new vehicles in Texas, the Prohibition deprives Lucid of its "protectible liberty interest in pursuing an occupation of [its] choice." *Stidham v. Texas Comm'n on Priv. Sec.*, 418 F.3d 486, 491–92 (5th Cir. 2005). "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose." *Dent v. State of W.Va.*, 129 U.S. 114, 121 (1889); *see, e.g.*, *Shaw v. Hosp. Auth. of Cobb Cnty.*, 507 F.2d 625, 628 (5th Cir. 1975) ("Appellant, in seeking staff privileges at appellees' hospital, seeks to engage in his occupation as a podiatrist and this is a liberty interest protected by the Fourteenth Amendment."). Indeed, "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure." *Phillips*, 711 F.2d at 1222 (quotation marks omitted).

Because the right to pursue an occupation is a protected liberty interest, "[a] State cannot exclude a person … from any … occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment." *Schware v. Bd. of Bar Exam. of State of N.M.*, 353 U.S. 232, 238–39 (1957). Occupational liberty "may in many respects be considered as a distinguishing feature of our republican institutions." *Dent*, 129 U.S. at 121. In our republic, "all vocations are open to every one" and this freedom "cannot

arbitrarily be taken from them any more than their real or personal property can be thus taken." *Id.* The Prohibition deprives Lucid of its ability to engage in the business of new motor vehicles sales in Texas, plainly infringing Lucid's protected liberty interest in following an occupation of its choice.

**2.**    The district court held that the Prohibition does not deprive Lucid of a protected liberty interest because Lucid can "still sell its cars to Texas consumers in other ways." ROA.4168–69. Specifically, the court adopted the magistrate judge's holding that Lucid can sell its cars to Texas consumers: (1) through independent dealers in Texas, or (2) through its Studios in other states. ROA.4008; ROA.4169. Putting aside the fact that neither opinion addressed Lucid's evidence that selling its cars through independent dealers was not economically viable[10]—so in fact it would not be feasible for Lucid to sell its vehicles through independent dealers even if it wanted to do so—this conception of the liberty protected by the Due Process Clause is astonishingly narrow. *Contra Bolling v. Sharpe*, 347 U.S. 497, 499–500 (1954) ("Liberty under law extends to the full range of conduct which the individual is free to pursue.").

Take the district court's reasoning that Lucid can sell its vehicles through independent dealers. "Liberty" is a hollow term if it means that one must rely on someone else to do something that he or she is not free to do. By this logic, this Court's opinion in *St. Joseph Abbey* was wrongly decided. That decision

---

[10] *See, e.g.*, ROA.1463 (declaration of Lucid's Vice President of Sales and Service); ROA.1522–23 (expert report of Dr. Fiona Scott Morton); ROA.1485 (expert report of Herbet E. Walter).

invalidated as irrational a Louisiana rule providing that "intrastate sales of caskets to the public may be made only by a state-licensed funeral director and only at a state-licensed funeral home." 712 F.3d at 218. The rule was challenged by the Abbey, which made caskets in Louisiana that it sought to sell directly to Louisiana consumers. *Id.* at 217. But apparently the suit should have failed at the outset because the rule did not deprive the Abbey of a protected liberty interest. After all, the monks could still sell their caskets through licensed funeral directors or from locations out of state.

The court's reliance on Lucid's ability to sell vehicles in other states is even more perplexing. This Court has recognized that state actions preventing people from doing business in a geographic "area" impinges their liberty interests. *Martin v. Memorial Hosp. at Gulfport*, 130 F.3d 1143, 1148–49 (5th Cir. 1997). Undersigned counsel is aware of no precedent supporting the proposition that a state may prohibit protected activity within its borders because other states permit the activity. That unlikely conclusion is inconsistent with this Court's precedent making clear that state lines matter for purposes of assessing whether a state has deprived its citizens of a protected liberty interest. In *Jackson Women's Health Org. v. Currier*, this Court categorically rejected the argument that a Louisiana abortion regulation did not impose an undue burden because women could obtain an abortion in another state. 760 F.3d 448 (5th Cir. 2014). The Court held that "courts do not look to the availability of abortions in neighboring states to determine whether a regulation imposed an undue burden." *Id.* at 455–56. "It would be exceedingly difficult for courts to engage in an as-applied

analysis" of a challenged state law "if we were required to consider not only the effect on abortion clinics in the regulating state, but also the law, potential changes in the law, and locations of abortion clinics in neighboring states." *Id.* at 456 n.8.

The district court cited *Ghedi v. Mayorkas*, 16 F.4th 456 (5th Cir. 2021), but that decision is inapposite. ROA.4168. The plaintiff in *Ghedi* alleged that enhanced airport security screenings made it difficult for him to do business. 16 F.4th at 467. The Court held that his complaint's "threadbare allegations do not give rise to a reasonable inference that the Government has effectively foreclosed Ghedi from serving as president of his company" because of the screenings and thus it "failed to plausibly allege a deprivation of a constitutionally protected liberty interest." *Id. Ghedi* involved only an incidental burden (if that) on the plaintiff's occupation. *See also, e.g.*, *Adams v. City of Harahan*, 95 F.4th 908, 916 (5th Cir. 2024) ("Adams has not sufficiently pleaded that the actions Chief Walker took to get him placed on JPDA's Giglio list prevent him from working in his desired careers"); *Ferrell v. Dallas Indep. Sch. Dist.,* 392 F.2d 697, 703–04 (5th Cir. 1968) (students challenging school rule prohibiting long hair that they claimed interfered with "their chosen occupation of professional rock and roll musicians"). The Supreme Court has distinguished such incidental burdens, explaining that the "liberty right to choose and follow one's calling … is simply not infringed by the inevitable interruptions of our daily routine … which all of us may experience from time to time." *Conn v. Gabbert*, 526 U.S. 286, 291–92 (1999).

17

Unlike in *Ghedi*, there is nothing incidental about the effect of the Prohibition: it directly and completely forecloses Lucid from selling cars in Texas. The Supreme Court has refused to apply the district court's approach to direct occupational regulations. In *Traux v. Raich*, the plaintiff challenged an Arizona law providing that businesses with over five employees could have no more than 20 percent of their workforce comprised of noncitizens. 239 U.S. 33, 42–43 (1915). Arizona argued that the law did not deprive noncitizens of a protected liberty interest because "the restriction is limited to those businesses in which more than five workers are employed, and to the ratio fixed," and thus the law was "not a total deprivation of the right of the alien to labor." *Id.* at 42 (quotation marks omitted). The Court rejected that argument as pure "fallacy." *Id.* So too here: the Prohibition does not regulate *how* Lucid may deal new vehicles within Texas but bars it from doing so entirely.

Moreover, even regulations that fall short of requiring a business to shutter its doors still deprive persons of a protected liberty interest when they "remove or *significantly alter*" the ability to engage in an occupation. *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701–03 (5th Cir. 1991) (emphasis added); *State of Tex. v. Thompson*, 70 F.3d 390, 392–93 (5th Cir. 1995) (same); *cf. Cowan v. Corley*, 814 F.2d 223, 227 (5th Cir. 1987) (plaintiff deprived of a protected liberty interest even though he could still operate three wreckers); *Burkette v. Lutheran Gen. Hosp.*, 595 F.2d 255, 256 (5th Cir. 1979) (denial of hospital staff privileges deprives physicians of a protected liberty interest because it "seriously limit[s]" their private practice). The Prohibition does at least that by requiring

18

Lucid to sell through independent dealers and thereby upend its sales model and transform itself from a dealer into a distributor—an entirely different occupation. Based on the economics alone, that is not something Lucid could do as a business. ROA.1463; ROA.1522–23; ROA.1485.

The district court's reasoning, if accepted, would shut the door to all constitutional scrutiny of state economic regulation, because any plaintiff could always pursue some other economic activity. That should be rejected in favor of the long-settled understanding that liberty includes a person's right to pursue "any lawful calling, business, or profession he may choose." *Dent*, 129 U.S. at 121.

**3.** Even if there were room for debate whether the Prohibition deprives Lucid of a protected liberty interest in pursuing an occupation of its choice, there can be no dispute that the Prohibition deprives Lucid of the freedom to contract and to sell its property. Those, too, are protected liberty interests. *See W. Coast Hotel Co. v. Parrish*, 300 U.S. 379, 392 (1937) ("This essential limitation of liberty in general governs freedom of contract in particular."); *Allgeyer v. State of La.*, 165 U.S. 578, 589–90 (1897) (protected liberty interests include the freedom "to enter into all contracts which may be proper, necessary, and essential" to one's occupation and the freedom of "airing, holding, and selling property"); *Sys. Contractors Corp. v. Orleans Par. Sch. Bd.*, 148 F.3d 571, 575 (5th Cir. 1998) (describing a "protected liberty interest in bidding on future contracts" as "a significant one"). The Prohibition also renders Lucid ineligible for the license necessary to sell cars in Texas, and "the denial of a license to practice one's

19

profession can be a deprivation of a liberty interest if the reasons for the denial offend due process." *Cripps v. Louisiana Dep't of Agric. & Forestry*, 819 F.3d 221, 232 (5th Cir. 2016).

**B.    Lucid Demonstrated that Texas Lacks a Rational Basis for Application of the Prohibition to Lucid**

Lucid carried its burden to negate every conceivable rational basis for the Prohibition as applied to direct-sales-only automotive companies like Lucid. "[R]ationality analysis requires more than just a determination that a legitimate state purpose exists; it also requires that the classification chosen by the state actors be rationally related to that legitimate state purpose. Although the legitimate purpose can be hypothesized, the rational relationship must be real." *Tesla*, 113 F.4th at 529 (quotation marks omitted); *see also Hines v. Quillivan*, 982 F.3d 266, 278 (5th Cir. 2020) (Elrod, J., concurring) ("Rational basis review is a level of scrutiny, not a rubber-stamping exercise.").

1.    The Prohibition does not, as the district court concluded, further any legitimate state interest related to "preventing vertical integration or analogous consolidations of monopoly power." ROA.4169 (quoting *Tesla*, 113 F.4th at 530). The "crucial" consideration as to this potential state interest is whether the Prohibition rationally prevents direct-sales-only automotive companies like Lucid "from taking advantage of their incongruous market position" and "abusing the resulting power." *Tesla*, 113 F.4th at 531 (quotation marks omitted). Lucid readily satisfied its burden to negate any such concern.

*Compare id.* ("It is Tesla's burden, not defendants', to dispel the notion that fear of vertical integration is not a *conceivable* rational basis.").

One potential concern with vertical integration is that it might enable a vertically integrated company "to leverage cross-sector advantages in ways that are potentially anticompetitive." ROA.3322 (the State citing Lina M. Khan, *Amazon's Antitrust Paradox*, 126 Yale L.J. 710, 780 (2017)). For example, Amazon is a dominant online commercial platform on which many independent merchants rely to market their wares. ROA.3323. But Amazon also manufactures its own goods, leveraging its "swaths of data" to "increase sales while shedding risks" because "Amazon gets to sell products only once their success has been tested." ROA.3323.

This concern might be implicated by a *traditional* manufacturer—one like Ford or General Motors that sells through independent franchisees—entering into competition with its own dealers by selling vehicles directly to consumers. *See* ROA.3307 ("A flourmill that also owned a bakery could hike prices or degrade quality when selling to rival bakers—or refuse to do business with them entirely."). Such manufacturers could potentially leverage the franchisees' sales data and brand-marketing efforts to undercut their franchisees' businesses. In fact, such concerns over the "disparity in bargaining power between automobile manufacturers and their dealers" and "protect[ing] retail car dealers from perceived abusive and oppressive acts by the manufacturers" are precisely what prompted states to enact direct-sales prohibitions in the first place. *Orrin W. Fox Co.*, 439 U.S. at 100–01. To state the obvious, this concern is categorically

inapplicable to direct-sales-only automotive companies like Lucid, which have no franchisees to abuse.

Another potential concern with vertical integration might arise where "a firm can use its dominance in one line of business to establish dominance in another," ultimately undermining competition and consumer choice. ROA.3304 (citing Friedrich Kessler & Richard H. Stern, Competition, Contract, and Vertical Integration, 69 Yale L.J. 1 (1959)). "For example, suppose a refiner could gain control of the world's ore deposits. He could thus bar entry into refining (of which he has no monopoly)." Kessler & Stern, 69 Yale L.J. at 17.

This concern is not implicated merely by a vehicle manufacturer selling its own cars, as the manufacturer is not establishing "dominance" in two separate lines of business. In any event, there is no dominant firm—like a Google or Amazon—when it comes to the automotive industry. The U.S. automotive market is highly competitive, with "at least 15–20 major manufacturer groups selling cars in the U.S.," before even counting emerging automotive companies like Lucid. ROA.1479. And "the dealership system has grown from its 'mom and pop' roots to one where enormous companies operate large dealer networks": "The top 10 dealership groups alone earn over $96 billion in annual revenue." ROA.1479. The idea that Lucid might leverage its non-existent dominance as a manufacturer to establish dominance as a dealer reeks with "the force of a five-week-old, unrefrigerated dead fish." *Craigmiles v. Giles*, 312 F.3d 220, 225 (6th Cir. 2002) (quotation marks omitted).

22

Finally, even if vertical integration of direct-sales-only automotive companies could risk abuse of market power, Texas's Prohibition cannot reasonably be described as preventing vertical integration because Texas law allows manufacturers to perform nearly every activity traditionally performed by dealers. As discussed above, *see* pp. 7–8, Texas permits Lucid to perform service, including warranty service, on Lucid vehicles. *See* ROA.1826. Texas permits Lucid to lease and rent new vehicles directly to consumers and then *sell those previously leased or rented vehicles* directly to consumers. *See, e.g.*, ROA.1590. Texas permits Lucid to sell parts and accessories directly to consumers and arrange financing for vehicle sales. *See* ROA.1826. Texas also permits Lucid to own and operate "galleries" where consumers see and learn about its vehicles and take demonstration drives. *See* ROA.1465. Consumers can then order a Lucid vehicle through an out-of-state Lucid-owned dealership, either in person or online, which Lucid can then deliver to the consumer in Texas. ROA.1465.

In other words, Lucid can do everything in Texas that a traditional dealership does—even allowing a consumer to roll off the lot in a leased new vehicle that the consumer can later purchase—except for actually selling new vehicles. Prohibiting Lucid from selling new vehicles in Texas under the guise of nonexistent concerns about "vertical integration" is nonsensical.

**2.** The State and TADA argued that the Prohibition promotes "intra-brand competition" between independent franchised dealers. ROA.1845; ROA.2138. For example, when one Ford dealer faces competition from a different Ford dealer, their prices may be lower than a Ford dealer who faces no

intrabrand competition. ROA.2138. That does not, however, support restricting competition from direct-sales-only manufacturers, for several reasons.

First, the assumption that intrabrand competition benefits consumers over manufacturer-direct sales is wrong. Intrabrand competition between dealers is limited to *competition over the size of the added dealer markup*. As Dr. Fiona Scott Morton explained in her expert report: "Under the traditional auto retail sales model, two independent parties strive to maximize their profits—the auto manufacturer and its dealers. The wholesale price is an input cost for the independent dealer. The dealer then sets a retail price that reflects the wholesale vehicle price, dealership costs, and '*intra*brand' competition." ROA.1525. Intrabrand competition over the added dealer markup does not reflect a savings to the consumer compared to a business model that does not entail a dealer markup. To the contrary, "[t]his situation results in what economists term 'double marginalization,'" in that consumers have to pay for the dealer's profit margin in addition to the manufacturer's. ROA.1525. Indeed, an analysis by the Department of Justice concluded that forcing manufacturers to sell through independent dealers costs consumers an average of $2,225 more per vehicle due to the added dealer markup (in year 2000 dollars).[11] So far as competition is concerned, application of the prohibition to direct-sales-only manufacturers only drives up prices for consumers and is therefore irrational. *See Craigmiles*, 312 F.3d

---

[11] DOJ, Economic Analysis Group, Competition Advocacy Paper, Economic Effects of State Bans on Direct Manufacturer Sales to Car Buyers 4 (May 2009), *available at* https://www.justice.gov/atr/public/eag/246374.pdf.

at 228 (reasoning that similar direct-sales ban "imposes a significant barrier to competition in the casket market" to protect incumbents and thereby irrationally "harms consumers in their pocketbooks").

Second, franchised dealers have successfully lobbied states to restrict their manufacturers' ability to establish new franchises that would compete against them. ROA.3133 ("Restrictions on the establishment of new dealerships are common."). That includes Texas. *See* Tex. Occ. Code § 2301.652 (affording franchised dealers the right to protest establishment of new dealership in the same county where they are located or within a 15-mile radius of the dealer). It is eyebrow raising, to say the least, for the State to assert an interest in intrabrand competition while expressly authorizing dealers (i.e., TADA's members) to suppress it. *See St. Joseph Abbey*, 712 F.3d at 226 ("This matrix of Louisiana law, while not dispositive of our inquiry, sheds much light on the disconnect between the post hoc hypothesis of consumer protection and the grant of an exclusive right of sale to funeral homes.").

Third, the Prohibition is unrelated to intrabrand competition. No provision of Texas law requires manufacturers to sell through multiple independent dealers which might compete with one another. *See St. Joseph Abbey*, 712 F.3d at 226; *Craigmiles*, 312 F.3d at 225. A manufacturer may, for example, authorize a single Texas dealership (as Bugatti has), multiple dealerships all owned by the same entity, or only a few dealerships located in non-competing geographic markets (as many high-end manufacturers have done). *See, e.g.*, ROA.1510. Texas also permits manufacturers to eliminate intrabrand

competition by setting fixed prices for their vehicles—as Saturn famously did. ROA.3431.

The 50,000-foot view confirms the irrationality of defendants' position. If the direct-sales-only business model actually were an inefficient form of distribution that increased vehicle prices, TADA would be *thrilled* that Lucid has adopted it. Higher prices, after all, would make it harder for Lucid to compete against TADA's members. The idea that franchised dealers have spent countless sums of money lobbying Texas to require their competitor to make better business decisions is absurd.

**3.**    The State and TADA also argued that the Prohibition furthers a legitimate state interest in preventing "fraud, waste, and abuse." ROA.1848; ROA.2133. Specifically, they argued that manufacturers face an "inherent conflict of interest" regarding "warranty and recall services," which are a source of cost to the manufacturer but represent a substantial profit center for independent franchised dealers. ROA.1848; ROA.2133; ROA.1580–84.

This argument fails at the outset because the Prohibition applies to selling new vehicles, not warranty and repair work. *See St. Joseph Abbey*, 712 F.3d at 223 ("[T]he State Board's argument obscures the actual structure of the challenged law."). As the State has admitted, nothing in Texas law prevents manufacturers from performing warranty work, repair work, and recall work. *See, e.g.*, Tex. Occ. Code § 2301.603(a); ROA.1826; ROA.27–28. Lucid even "operates a facility in Houston where it provides warranty and repair service to Lucid owners." ROA.1465.

This argument also fails because, as Dr. Scott Morton explained, "[a]s an economic matter, there is nothing inherent about vehicle manufacturers that makes them more likely than independent dealers to engage in unfair practices. Engaging in unfair practices harms a manufacturer's brand and can ruin its relationship with customers." ROA.1521. A manufacturer actually "has a greater incentive than independent dealers to ensure the long-term growth of its brand and relationship with customers, because a manufacturer can keep a customer even if the customer moves from one geographic location to another, whereas independent dealers are likely to lose customers who move." ROA.1521. "Moreover, numerous state and federal laws barring fraud and other unfair business practices apply to auto manufacturers just as they do to independent dealers or any other business," and "[a]s a result, every manufacturer has strong incentives to avoid such practices." ROA.1521; *see St. Joseph Abbey*, 712 F.3d at 225 ("Louisiana's Unfair Trade Practices and Consumer Protection Law already polices inappropriate sales tactics by all sellers of caskets."); *Craigmiles*, 312 F.3d at 226. As TADA's representative admitted, motor-vehicle sales in Texas are "very regulated," and Texas consumers are "well protected." ROA.3433–34. In short, "[t]here is no plausible explanation for why a vertically integrated car manufacturer would be any more likely to engage in unfair practices than an independent dealer." ROA.1521 (Dr. Scott Morton).

The notion that the Prohibition tamps down on fraud, waste, and abuse is backwards. First, by requiring Texas residents to purchase vehicles from direct-

sales-only automotive companies outside of the state's borders, the Prohibition forces vehicle sales to occur where the state lacks the legal and practical ability to address any deceptive or unfair practices. ROA.1448–49. Second, to the extent that defendants want to speculate about nefarious motives, it is actually *franchised dealers* that have an "inherent conflict of interest" when it comes to selling vehicles. Because dealers profit from warranty and recall services, they have an incentive to push consumers to buy vehicles more likely to require those services—for example, pushing gasoline-powered vehicles over lower-maintenance electric vehicles. *See* ROA.1580–84 (explaining that vehicle service is a critical profit center for independent dealers). Third, it is independent dealers, not manufacturers, that are notorious for engaging in fraudulent and abusive sales practices. *See* Federal Trade Commission, Combating Auto Retail Scams Trade Regulation Rule, 89 Fed. Reg. 590, 591–601 (2024) (detailing extensive history of abusive practices by dealerships, noting that industry is "at or near the top" of customer complaints, which represent just the "tip of the iceberg" of dealers' misconduct); Texas Attorney General, Buying a New or Used Car (warning consumers about dealers' shady practices);[12] *compare St. Joseph Abbey*, 712 F.3d at 225 (rejecting similar proffered basis where "funeral homes, not independent sellers, have been the problem for consumers with their bundling of product and markups of caskets.").

---

[12] *Available at* https://www.texasattorneygeneral.gov/consumer-protection/automotive-scams/buying-new-or-used-car.

**4.** TADA argued that independent dealers "provide a support network for consumers when a manufacturer goes out of business" because, "[b]y having a separate legal existence that earns revenues from services and related products, a dealer can continue to provide support for a period of time after the manufacturer fails." ROA.2135. This asserted interest is pure "fantasy." *St. Joseph Abbey*, 700 F.3d at 162. As discussed above, the Prohibition relates to sales and not warranty or recall service. To that point, Texas law does not require manufacturers with independent dealers to authorize them to play any role in warranty service or recalls, to provide them access to parts, or even give them access to service manuals. Texas law allows manufacturers to carry out service themselves, cutting any independent dealers they may have out of the loop entirely. *See* Tex. Occ. Code §§ 2301.603(a), 2301.605(a)(1); ROA.1826. Finally, it bears mention that Plaintiff Lucid Group USA, Inc., is not the manufacturer of Lucid vehicles but only the dealer. ROA.1461. If the manufacturer were to go under, Lucid Group USA, Inc., would be in the same position as independent franchised dealers whose manufacturers have gone out of business, given that franchised dealers are necessarily reliant on their manufacturers. *See* ROA.3078 (reporting that "[n]early all Saab dealers reached a dead end after SAAB bankruptcy in 2011").

**5.** TADA argued that "[d]ealers provide jobs, pay taxes, and provide support in local communities." ROA.2136. This asserted interest borders on unconstitutional. "[P]romotion of domestic business by discriminating against nonresident competitors is not a legitimate state" interest for purposes of the

rational-basis test. *Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 882 (1985). Direct-sales-only automotive companies also provide jobs, pay taxes, give to charity, and support local communities. As Dr. Scott Morton's explained, "this case is predicated on Lucid's desire to *expand* its sales network into Texas" and invest more in the state. ROA.1564. The only difference is that, unlike many dealers, Lucid and other automotive companies are not Texas corporations. That difference cannot constitutionally supply a rational basis for treating them differently. Even if discriminating in favor of locally owned dealers were a legitimate state interest, there would be no logical fit between the Prohibition and that interest, given that a growing number of independent dealers are owned by large corporations like AutoNation, Penske Automotive Group, Lithia Motors, and Berkshire Hathaway. *See* ROA.1479; ROA.1966; ROA.108–09.

**6.**    TADA claimed that "recent consumer surveys show that consumers overwhelmingly prefer purchasing vehicles from a franchised dealer instead of a manufacturer." ROA.2132. One is forgiven for wondering why, if consumers prefer franchised dealers, franchised dealers need laws forcing consumers to buy from them. Or why, if consumers prefer franchised dealers, Consumer Federation of America, Consumer Action, and Consumers for Auto Reliability and Safety all oppose direct-sales prohibitions and not a single consumer group supports them. ROA.1480. Their opposition to direct-sales prohibitions is shared by the U.S. Department of Justice and the Federal Trade Commission, which likewise have determined that they harm consumers. *See, e.g.*, ROA.1473–89.

It is also passing strange to claim that, because some consumers have a certain preference, states can prohibit businesses from offering consumers other options. No one would seriously contend that, because most consumers prefer Mexican restaurants, states should ban Italian restaurants. Or because most consumers prefer smartphones, states should ban dumbphones. So too here. "Consumers are made better off when given the right to choose the selling mode and vehicle that they prefer, rather than having their state government choose it for them." ROA.1525 (expert report of Dr. Scott Morton).

TADA's cited survey only underscores the utter irrationality of the Prohibition. The survey reports that 57 percent of consumers polled "prefer the traditional approach to car buying." *See* Mike Dovorany, *Despite Tesla's Retail Model Revolution, People Still Prefer Traditional Car Dealers*, Escalent (Sept. 23, 2021).[13] (The 20 percent who "prefer Tesla's direct retail model" are out of luck in Texas. *Id.*) The popularity of the "traditional approach to car buying" reflects the fact that many consumers "prefer that many of the phases of the car-buying process take place" in person, including purchase. *Id.* The entire point of this lawsuit is that Lucid seeks to satisfy that preference by allowing consumers to purchase a vehicle in person at its Studios in Texas. Yet the Prohibition irrationally makes it illegal for Lucid to satisfy that preference in Texas.

---

[13] *Available at* https://escalent.co/blog/despite-teslas-retail-model-revolution-people-still-prefer-traditional-car-dealers/. TADA did not produce the survey it cited and the survey appears to have no available documentation beyond the cited press release.

**7.**    Finally, below TADA asserted that "the ripple-effect from enacting exceptions for EV manufacturers or new market entrants on other portions of their legislative regime" constituted a legitimate state interest. ROA.2135. According to TADA, if an "exemption is granted for new market entrants selling EVs without franchises, legislators can rationally anticipate that other market participants will cry 'foul' and allege that they are now being treated differently than similarly-situated persons receiving the benefits of a newly-enacted exception." ROA.2135. But Lucid is in a different position than a manufacturer with franchisees: the state interest in preventing traditional manufacturers from abusing their franchisees is inapplicable to direct-sales-only automotive companies like Lucid. *See* pp. 21–22, *supra*.

TADA's argument boils down to the nonsensical proposition that there is a rational basis to subject persons to an irrational prohibition simply because the prohibition is rational as to other persons. That position is irreconcilable with the Supreme Court's holding that "the constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the prohibited class, is so different from others of the class as to be without the reason for the prohibition." *Carolene Prods. Co.*, 304 U.S. at 153–54.[14] That

---

[14] The only conceivable justification for subjecting persons to a prohibition that is otherwise irrational as applied to them would be if there are "administrative difficult[ies]" in distinguishing between them and the persons as to whom the statute is rational. *Carolene Prods. Co.*, 304 U.S. at 154. But defendants do not

perfectly describes Lucid's as-applied challenge. While it may make sense for Texas to prohibit traditional manufacturers from competing against their own franchisees, there is no rational basis to extend that prohibition to automotive companies like Lucid which have no franchisees.

*    *    *

"The great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey*, 712 F.3d at 226 (invalidating as irrational a Louisiana rule providing that only licensed funeral directors may sell caskets); *Craigmiles*, 312 F.3d at 220 (same). With all due respect, "reasonable minds" cannot disagree on any of the foregoing asserted state interests. ROA.4170 n.2. The record and basic logic dispel them all. If there is any difference between the Prohibition and the law invalidated by *St. Joseph Abbey*, it is that the Prohibition is even more irrational: while both laws undermined consumer welfare, the Prohibition does so while permitting manufacturers *to engage in the conduct it prohibits*—selling vehicles directly to consumers—so long as the vehicles were previously leased or rented or are sold out of state and then delivered to Texas. While little can be said in defense of Louisiana's casket rule, at least it pursued its irrationality rationally and did not allow rent- or lease-to-own casket sales.

---

and cannot claim that it is difficult to distinguish between manufacturers that have independent dealers and those that do not.

"Finding no rational relationship to any of the articulated purposes of the state, we are left with the more obvious … purpose to which [the Prohibition] is very well tailored": protecting the financial interests of the state's existing franchised dealers by entrenching their position and insulating them from competition by new market entrants. *Craigmiles*, 312 F.3d at 228. But "mere economic protection of a particular industry" is not a "legitimate governmental purpose." *St. Joseph Abbey*, 712 F.3d at 222. States cannot, consistent with the Due Process Clause, engage in "[t]he taking of wealth and handing it to others when it comes not as economic protectionism in service of the public good but as 'economic' protection of the rulemakers' pockets." *Id.* at 226–27. By insisting that Texas's Prohibition "not be irrational," the Court enforces that "vital core principle." *Id.*

## C.    *Tesla* **Does Not Control Lucid's As-Applied Due Process Claim**

*Tesla* does not, as the district court reasoned, compel the conclusion that there is a rational basis for the Prohibition "as a matter of law." ROA.4170 (quotation marks omitted). The Court in *Tesla* held that Tesla had not satisfied its "burden … to dispel the notion that fear of vertical integration is not a *conceivable* rational basis" for the Louisiana law it challenged as to all vehicle manufacturers. 113 F.4th at 531. *Tesla* does not control the determination whether Lucid satisfied its burden to negate possible legitimate state interests for the Texas law at issue here as applied to Lucid. A broader interpretation of *Tesla* would put the decision in conflict with controlling Supreme Court precedent and prior decisions of this Court.

**1.** Tesla is a direct-sales-only automotive company. *Tesla*, 113 F.4th at 511. As relevant here, Tesla challenged a Louisiana statute that prohibited it from selling vehicles directly to consumers and providing warranty as violative of the Equal Protection Clause. *Id.* at 518. (Tesla did not allege a claim under the Due Process Clause).

This Court affirmed the dismissal of Tesla's equal protection claim. *Id.* at 529–31. On appeal, Tesla did not clearly assert an as-applied challenge to the Louisiana law—the words "as applied" do not appear even once in its brief, *see* Tesla Appeal Br., ECF No. 58 (Case No. 23-30480)[15]—and the Court's opinion likewise did not clearly consider whether the Louisiana law was constitutional as applied to Tesla. To the contrary, the Court emphasized at the outset that it would *not* scrutinize the rationality of treating direct-sales-only automotive companies differently than independent dealers, stating that "[t]he legislative classification that we are examining is the class of *all* vehicle manufacturers." 113 F.4th at 530 (emphasis added).

The Court proceeded to hold that Louisiana had a rational basis for generally prohibiting manufacturers from serving as dealers. *Id.* It concluded

---

[15] While Tesla's complaint challenged the Louisiana law "[f]acially and as applied to Tesla," Am. Compl., ECF No. 151 (Case No. 2:22-cv-02982) (E.D. La.), Tesla's opposition to the motions to dismiss did not clearly frame its claim as an as-applied challenge, *see* Opp. to MTD, ECF No. 176. The district court opinion consequently treated Tesla's claim as a facial challenge. *Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*, 677 F. Supp. 3d 417, 455 (E.D. La. 2023) ("Tesla thus asks the Court to declare the laws unconstitutional and permanently enjoin the Commission from enforcing them.").

that "preventing vertical integration or analogous consolidations of monopoly power is a sufficient rational basis to uphold both the warranty-services ban and the direct-sales ban." *Id.* The Court explained that this conclusion was required by *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493 (5th Cir. 2001), which rejected an equal protection claim by Ford (a manufacturer with franchisees) to Texas's direct-sales prohibition. 264 F.3d at 510. The Court noted that *Ford* "sets out an open-ended array of possible harms of vertical integration." *Tesla*, 113 F.4th at 531.

The Court rejected Tesla's position that it was the state's burden to "explain why vertical integration is bad for consumers." *Id.* In light of *Ford*, the panel explained that "we can assume that the state has a legitimate interest in preventing firms from vertically integrating and abusing the resulting power not only on its own dealers, but other dealers, and yes even consumers down the run." *Id.* The Court reiterated that even if *Ford* "was principally concerned with abuse of power by a manufacturer against its dealers, *Ford* also has clear language indicating broader concerns with vertical integration, monopoly power, and state control of the automobile industry more broadly. All of these constitute legitimate state interests." *Id.* "It is Tesla's burden, not defendants', to dispel the notion that fear of vertical integration is not a *conceivable* rational basis." *Id.*

**2.**    The district court erred in interpreting *Tesla* to compel the conclusion that there is a rational basis for application of the Texas Prohibition to Lucid.

To start with, Lucid has always clearly maintained an as-applied challenge to the Prohibition. *See, e.g.*, ROA.1435. *Tesla*, by contrast, addressed a facial challenge to Louisiana's law.[16] The Court in *Telsa* directly stated that it was scrutinizing the rationality of Louisiana's law as applied to *all* manufacturers, not just direct-sales-only automotive companies. *Tesla*, 113 F.4th at 530. Treating *Tesla* as addressing the rationality of a direct-sales prohibition as applied to direct-sales-only automotive companies would disregard this careful caveat emphasized upfront in the Court's opinion. At a bare minimum, "because the *[Tesla]* opinion never stated whether an [as-applied challenge was considered], and … the record itself is unclear, it would be disorderly to say any binding, implicit holding arose" regarding an as-applied challenge. *Nivelo Cardenas v. Garland*, 70 F.4th 232, 243 (5th Cir. 2023) (cleaned up).

"[I]t is well-established that the facial upholding of a law does not prevent future as-applied challenges." *In re Cao*, 619 F.3d 410, 430 (5th Cir. 2010) (en banc). To be sure, "a plaintiff cannot successfully bring an as-applied challenge to a statutory provision based on the same factual and legal arguments expressly considered when rejecting a facial challenge to that provision." *Id.* (quotation marks omitted); ROA.4173. But Lucid does not rely on "the same factual and

---

[16] For a facial challenge, "the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "In adjudicating [an] as-applied challenge, [courts] consider the particularities of [the challenger's] circumstances to determine whether [the law] can be constitutionally applied to him." *Reed v. Goertz*, 136 F.4th 535, 542 (5th Cir. 2025) (cleaned up).

legal arguments expressly considered" in *Tesla* because the facial rationality of a direct-sales prohibition is distinct from the rationality of a direct-sales prohibition as applied to direct-sales-only automotive companies. Moreover, unlike Tesla, Lucid satisfied its burden to establish that the Prohibition is irrational as applied to Lucid. *See* pp. 20–34, *supra*. Both in its complaint and its motion for summary judgment, Lucid negated every possible state interest for the Prohibition. *See, e.g.*, ROA.28–33; ROA.1439–50.

In addition to these fundamental differences between Lucid's challenge and *Tesla*, two additional distinctions bear emphasis.

First is that the Louisiana law considered in *Tesla* differs materially from the Texas Prohibition at issue here. As discussed above, *see* pp. 20–23, *supra*, the Texas Prohibition cannot reasonably be described as one that prevents "vertical integration" in the automotive industry. Louisiana, unlike Texas, prohibits manufacturers from performing warranty service. Tesla also failed to create any record regarding the extent to which Louisiana addresses manufacturers' selling leased or rented vehicles, selling parts and accessories, establishing galleries where consumers can take demonstration drives, and selling and delivering vehicles to Louisianans through out-of-state dealerships. *See* Am. Compl., ECF No. 151 (Case No. 2:22-cv-02982) (E.D. La.). So unlike the Louisiana law at issue in *Tesla*, the Texas Prohibition cannot be said to prevent "vertical integration." *Tesla*, 113 F.4th at 530.

Second is that, unlike in *Tesla*, Lucid alleged, argued, and introduced evidence establishing that selling its vehicles through independent dealers is not

economically viable. *See, e.g.*, ROA.1463 (declaration of Lucid's Vice President of Sales and Service); ROA.1522–23 (expert report of Dr. Fiona Scott Morton); ROA.1485 (expert report of Herbet E. Walter). As a business matter, Lucid *cannot* sell its vehicles through independent dealers. That makes a direct-sales prohibition distinctly irrational as applied to Lucid.

**3.** A broader interpretation of *Tesla* would conflict with Supreme Court and prior Fifth Circuit precedent and thus cannot be maintained under the rule of orderliness. *See Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 234 (5th Cir. 2023) ("Under this circuit's rule of orderliness, one may not overturn another panel's decision, absent an intervening change in the law." (cleaned up)).

As an initial matter, *Tesla* cannot, consistent with *Carolene Products*, be interpreted as precluding the Court from considering the rationality of the Prohibition specifically as applied to Lucid for purposes of Lucid's substantive due process claim. Notably, *Tesla* did not even address a substantive due process claim.

*Carolene Products—the* seminal Supreme Court decision on rational-basis review—explained that "the constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the prohibited class, is so different from others of the class as to be without the reason for the prohibition." 304 U.S. at 153–54. This describes Lucid's as-applied challenge to a tee. Direct-sales-only automotive companies are "so

different from" manufacturers that use independent franchised dealers that Texas is "without the reason for the prohibition" as applied to them. *See* pp. 32–33, *supra*.

Consistent with *Carolene Products*, the Supreme Court and this Court often have considered as-applied substantive due process challenges, including when applying rational-basis review. *See, e.g.*, *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 329 (2006) (challenge to abortion law as applied to medical emergencies); *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997) (challenge to assisted suicide law as applied to competent, terminally ill adults); *Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 505 (5th Cir. 2006) (challenge to immigration rule as applied to lawful permanent residents who briefly leave the country); *Reed v. Goertz*, 136 F.4th 535, 542 (5th Cir. 2025) (challenge to post-conviction DNA procedures as applied to plaintiff).

*Tesla* likewise cannot, consistent with *St. Joseph Abbey*, be interpreted as compelling the conclusion that, as a matter of law, there is a rational basis for any direct-sales prohibition. *St. Joseph Abbey invalidated* a Louisiana prohibition on casket manufacturers selling their caskets directly to consumers, instead of selling through licensed funeral homes. 712 F.3d at 217. It explained that "although rational basis review places no affirmative evidentiary burden on the government, plaintiffs may nonetheless negate a seemingly plausible basis for the law by adducing evidence of irrationality." *Id.* at 223. And, as especially relevant here, it rejected the argument that states have an abstract "legitimate interest in regulating" an occupation. *Id.* at 220. Consistent with that holding, it

recognized that "[r]ational basis review is fact intensive." *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n,* 945 F.3d 206, 225 (5th Cir. 2019) (citing *St. Joseph Abbey*). Fact-intensive review is particularly warranted in cases such as this, where there is every reason to believe that the asserted state interests are a smokescreen for invalid economic protectionism.

At bottom, *Tesla*'s core holding is simply that Tesla failed to carry its burden in negating every conceivable rational basis for the Louisiana law it challenged on a facial challenge. The fact that Tesla failed to carry its burden does not categorically preclude future litigants, like Lucid, from satisfying such a burden in other cases, much less as to other laws.

**4.**    If the district court is correct that *Tesla* is controlling, then *Tesla* was wrongly decided and should be overruled en banc. The court interpreted *Tesla* to hold that "preventing vertical integration" is a legitimate state interest, such that any law preventing in any measure a manufacturer from "extending itself into distribution" is categorically rational. ROA.4169–70 (quotation marks omitted). Lucid disagrees with that interpretation of *Tesla*. *See* pp. 20–23, *supra*, (explaining that the "crucial" consideration is whether prohibiting vertical integration rationally prevents "companies from taking advantage of their incongruous market position" and "abusing the resulting power" (quoting *Tesla*, 1113 F.4th at 531)). To the extent that some statements in *Tesla* might be construed to suggest that "preventing vertical integration" in the abstract is a legitimate state interest, those statements are "dicta to which the rule of orderliness does not apply." *Martinelli*, 65 F.4th at 240.

41

Prohibiting vertical integration may be a *means* to accomplish a legitimate state interest in some circumstances, but it is not a legitimate state interest in itself. All laws will, by definition, pass rational-basis review if a state has a legitimate interest in the means by which they act. *See* Note, *Legislative Purpose, Rationality, and Equal Protection*, 82 Yale L.J. 123, 128 (1972) ("It is always possible to define the legislative purpose of a statute in such a way that the statutory classification is rationally related to it."). It would be nonsensical to uphold a law requiring ophthalmologists to graduate from law school because there is a "legitimate interest in establishing licensing requirements." Or a law prohibiting fast-casual restaurants from offering custom bowls because there is a "legitimate interest in controlling food preparation." "Legislative purpose so defined is nearly tautological." *Id.*; *cf. Delaware River Basin Comm'n v. Bucks Cnty. Water & Sewer Auth.*, 641 F.2d 1087, 1099–1100 (3d Cir. 1981) ("A statute's classifications will invariably be rationally related to a purpose so defined, since the 'purpose' is, in effect, a restatement of the classification."). One might as well say that there is a legitimate state interest in passing laws and call it a day.

In order to survive rational basis review, a challenged law must be supported by a "*legitimate* state purpose," not just any purpose. *Zobel v. Williams*, 457 U.S. 55, 63 (1982) (holding that an objective "to reward citizens for past contributions" is "not a legitimate state purpose"). A legitimate state interest must, at a bare minimum, be an objective that is independent of the law itself— *i.e.*, it cannot simply be a restatement of what the law does. For example, the Supreme Court in *U. S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973), invalidated

a statute that denied food-stamp benefits to households including unrelated individuals. The Supreme Court rejected the assertion that the statute served a "purpose to discriminate against hippies," explaining that this supposed purpose was insufficient "in and of itself and without reference to some independent considerations in the public interest." *Id.* at 534–35 (cleaned up); *see also U.S. R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 180 (1980) (Stevens, J., concurring) ("[I]f the analysis of legislative purpose requires only a reading of the statutory language in a disputed provision, … judicial review will constitute a mere tautological recognition of the fact that Congress did what it intended to do.").

As noted, *St. Joseph Abbey* rejected the argument states have an abstract "legitimate interest in regulating" an occupation. 712 F.3d at 220. The Court explained that "[o]ur analysis does not proceed with abstraction for hypothesized ends and means do not include post hoc hypothesized facts." *Id.* at 223. Thus, the assertion of an abstract interest in ordering a market cannot allow states to "escape the pivotal inquiry of whether there is [] a rational basis" for its regulation. *Id.* To the extent that *Tesla* is interpreted to hold that there is an abstract state interest in "preventing vertical integration"—even if "preventing vertical integration" is not a rational means of advancing the public interest—it is wrong.

## II.    The Prohibition Violates Lucid's Equal Protection Rights

The district court further erred in granting defendants' motions for summary judgment and denying Lucid's motion for summary judgment on Lucid's claim that the Prohibition violates the Equal Protection Clause.

**A.    Lucid Demonstrated the Prohibition Violates Its Equal Protection Rights**

The Prohibition violates Lucid's Equal Protection rights. To establish an equal protection claim, plaintiffs must show that "two or more classifications of similarly situated persons [are] treated differently" under the challenged law. *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 468 (5th Cir 2021) (quotation marks omitted). "Once that threshold showing is made, the court determines the appropriate level of scrutiny for our review. If neither a suspect class nor a fundamental right is implicated, the classification need only bear a rational relationship to a legitimate governmental purpose." *Id.* (quotation marks omitted).

1.    Lucid is similarly situated to Texas's existing independent dealers for purposes of the Prohibition. ROA.1451. Lucid seeks to engage in the exact same business as those dealers: selling cars in Texas directly to consumers. The district court seemingly accepted Texas's argument that Lucid was not similarly situated to existing dealers because Lucid is a manufacturer and the dealers are dealers. *See* ROA.4171; ROA.1841 ("[T]he Prohibition explicitly treats all manufacturers the same.").[17] That holding reflects two errors, one technical and one doctrinal.

---

[17] The court held that Lucid's claim failed on the "independent ground" that it did not satisfy the similarly-situated requirement. ROA.4171. The court reasoned that Lucid was not similarly situated because "a classification treating manufacturers and dealers differently" survives "rational basis review." ROA.4171. If the similarly-situated holding turns on its rational-basis holding, it is not an "independent ground" for rejecting Lucid's claim.

First is that, as a technical matter, plaintiff Lucid Group USA, Inc., is *not* a manufacturer. Lucid Group USA, Inc. "is the sales and service entity that owns, operates, and controls retail locations and service centers in the United States." ROA.1461. A separate entity designs and manufacturers Lucid vehicles. ROA.1461. So Lucid Group USA, Inc., engages in *exactly the same business* as the independent dealers that Texas permits to sell vehicles: it owns and operates dealerships in seven states and would do so in Texas but for the Prohibition.

Second is that courts cannot rely on the challenged classification itself to hold that a plaintiff is not similarly situated and thus no scrutiny of the classification's rationality is required. By definition, plaintiffs and those with whom they claim to be similarly situated will fall into different classes. But the Supreme Court explained in *Williams v. Vermont* that "[a] State cannot deflect an equal protection challenge by observing that in light of the statutory classification all those within the burdened class are similarly situated," because the existence of a classification "has no bearing on the legitimacy of that classification in the first place." 472 U.S. 14, 27 (1985); *see, e.g.*, *Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 933 n.11 (5th Cir. 1988) (citing *Williams* and holding that a municipality could not "answer [the plaintiff's] equal protection claim merely by arguing that it has treated all persons within the burdened class the same; that is, that it has refused to annex everyone who will not make the required payments").[18] It would turn the Equal Protection Clause

---

[18] Occasionally opinions merge the "similarly situated" inquiry with the rational-basis inquiry. *See, e.g.*, *Mahone*, 836 F.2d at 933 n.11 ("The real question … is

on its head to hold that the existence of the challenged classification means that no scrutiny is required.

Contrary to the district court's approach, the "similarly situated" inquiry does not ask whether two classes of persons are alike in the abstract. Instead, it "focuses on whether the plaintiffs are similarly situated to another group *for purposes of the challenged government action.*" *Yates v. Stalder*, 217 F.3d 332, 334 (5th Cir. 2000) (emphasis added). Thus, in *Big Tyme Investments*, this Court held that a bar was "clearly" similarly situated restaurants for purposes of a pandemic-era order that required bars to close but permitted restaurants to remain open, even though the two classes of establishments were different categories of businesses operating under different types of permits. 985 F.3d at 468. And, in *St. Joseph Abbey*, this Court held that Louisiana's casket rule violated Equal Protection even though it treated all funeral homes the same and all non-funeral homes the same. 712 F.3d at 215.

The fact that Lucid falls on a different side of a statutory classification than Texas's existing independent dealers therefore does not mean that Lucid is not similarly situated to those dealers for purposes of the challenged Prohibition. Indeed, the Court in *Tesla* did not question whether Tesla was similarly situated

---

whether landowners who refuse to pay money to other District developers are 'similarly situated' to landowners who make the payments. The question can only be answered by performing the rationality analysis."); *see generally* Giovana Shay, Similarly Situated, 18 Geo. Mason L. Rev. 581, 616 (2011) (noting that the two prongs are often collapsed into each other). The substantive result is the same, and the key point is that existence of the challenged classification is never a reason to avoid scrutiny.

to dealers and instead proceeded directly to determining whether Tesla had negated every conceivable rational basis for Louisiana's law. 113 F.4th at 530; *see also Ford*, 264 F.3d at 510 (same).

**2.**    The rational-basis inquiry for purposes of the Equal Protection Clause parallels that under the Due Process Clause, requiring that a state's disparate treatment of similarly situated persons "rationally relate to the state interests it articulates." *St. Joseph Abbey*, 712 F.3d at 222–23 & n.38. The Prohibition therefore fails rational basis review for the same reasons discussed in Part I.B, *supra*. Texas has no rational basis to distinguish between, on the one hand, the independent dealers that it allows to own and operate dealerships and, on the other, the direct-sales-only automotive companies like Lucid that it does not. These two classes both sell vehicles to consumers and are subject to all the same rules and regulations respecting business practices, qualifications, consumer protection, health and safety, and so forth. They differ only in their political strength at the state level, and that is no rational basis for the state to restrain trade.

**B.**    *Tesla* **Does Not Control Lucid's Equal Protection Claim**

*Tesla* does not control Lucid's Equal Protection Claim for the reasons discussed in Part I.C, *supra*. Lucid additionally notes that *Tesla* cannot, consistent with Supreme Court precedent, be construed as holding that plaintiffs cannot bring as-applied claims under the Equal Protection Clause.

The words "as applied" do not appear even once in *Tesla*. The Supreme Court upheld an as-applied equal protection claim in *City of Cleburne, Tex. v.*

47

*Cleburne Living Ctr.*, 473 U.S. 432, 447–50 (1985) ("The judgment of the Court of Appeals is affirmed insofar as it invalidates the zoning ordinance as applied to the Featherston home."); *see also Williams v. Illinois*, 399 U.S. 235, 242 (1970) ("[A] law nondiscriminatory on its face may be grossly discriminatory in its operation."). *Carolene Products* likewise makes clear that its statement that "the constitutionality of a statute … may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support" applies to equal protection claims, as the decision cites an equal protection case in support of this principle. 304 U.S. at 153–54 (citing *Morf v. Bingaman*, 298 U.S. 407, 413 (1936)). Consistent with *Cleburne* and *Carolene Products*, this Court has repeatedly considered as-applied equal protection claims, including when applying rational-basis review. *E.g.*, *Malagon de Fuentes*, 462 F.3d at 506 (challenge to immigration rule as applied to lawful permanent residents who briefly leave the country); *Arceneaux v. Treen*, 671 F.2d 128, 131 (5th Cir. 1982) (challenge to dual-employment prohibition as applied to holders of low-level, nonelective government jobs); *Maceluch v. Wysong*, 680 F.2d 1062, 1067 (5th Cir. 1982) (challenge to medical licensing scheme as applied to osteopaths); *Walsh v. Louisiana High Sch. Athletic Ass'n*, 616 F.2d 152, 160 (5th Cir. 1980) (challenge to athletics rule as applied to Orleans Parish). The Court even has explained that as-applied equal protection claims are preferred because they "enable[] courts to avoid making unnecessarily broad constitutional judgments." *Howard v. City of Garland*, 917 F.2d 898, 900 (5th Cir. 1990) (quoting *Cleburne*, 473 U.S. at 447).

This confirms that *Tesla* must be interpreted to address only a facial challenge to the Louisiana law. *See* pp. 34–39, *supra*. *Tesla*'s explicit refusal to scrutinize the rationality of the law as applied to Tesla makes sense in the context of a facial challenge. For purposes of a facial challenge, "[t]he fact that [a statute] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Supreme Court] ha[s] not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment." *Salerno*, 481 U.S. at 745. If *Tesla* were interpreted to address an as-applied challenge, however, the decision's approach would squarely conflict with Supreme Court and prior Circuit precedent.

Tesla's facial holding does not, for the reasons explained above, answer the question of whether it is rational for Texas to prohibit direct-sales-only automotive companies like Lucid from selling vehicles directly to consumers. For the reasons explained, it is not.

*     *     *

The "ghost of *Lochner*" does not "lurk[] about" merely because Lucid insists that the Prohibition "not be irrational—the outer-most limits of due process and equal protection." *St. Joseph Abbey*, 712 F.3d at 227. Rather, courts have the "solemn and inescapable duty, in an appropriate case, of deciding whether state action is so arbitrary and unreasonable as to be unconstitutional"—a duty which provides a "salutary check on the power and authority of a state legislature" even as it concerns "subjects as the health and welfare of the people of the state." *England v. Louisiana State Bd. of Med.*

*Examiners*, 263 F.2d 661, 663 (5th Cir. 1959). Judicial scrutiny is even more appropriate where, as here, the challenged regulation does not involve health or welfare at all, constrains consumer choice, and constitutes a naked transfer of wealth from Texas consumers to the state's powerful dealers. Because the Prohibition violates Lucid's rights under the Due Process and Equal Protection Clauses, the district court erred in refusing to invalidate it.

## Conclusion

The Court should reverse the judgment below.

Dated: August 14, 2025

Respectfully submitted,

/s/ *Andrew M. Grossman*

BILLY M. DONLEY
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1382
bdonley@bakerlaw.com

ANDREW M. GROSSMAN
KRISTIN A. SHAPIRO
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., NW,
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

*Counsel for Lucid Group USA, Inc.*

**<u>Certificate of Service</u>**

I certify that on August 14, 2025, I caused the foregoing brief to be filed with the Court electronically using the CM/ECF system, which will send a notification to all counsel of record.


Dated: August 14, 2025         */s/ Andrew M. Grossman*
                                      Andrew M. Grossman

**<u>Certificate of Compliance</u>**

I certify that this brief complies with the type-volume limitation set by Fed. R. App. P. 32(a)(7) because it contains 12,822 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fifth Cir. R. 32.2.


Dated: August 14, 2025              */s/ Andrew M. Grossman*
                                    Andrew M. Grossman