No. 25-50319

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

---

LUCID GROUP USA, INCORPORATED,
*Plaintiff – Appellant*,

v.

MONIQUE JOHNSTON, IN HER OFFICIAL CAPACITY AS DIRECTOR OF THE MOTOR VEHICLE DIVISION OF THE TEXAS DEPARTMENT OF MOTOR VEHICLES; DANIEL AVITIA, IN HIS OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR OF THE TEXAS DEPARTMENT OF MOTOR VEHICLES; CORRIE THOMPSON, IN HER OFFICIAL CAPACITY AS THE DIRECTOR OF THE ENFORCEMENT DIVISION OF THE TEXAS DEPARTMENT OF MOTOR VEHICLES,
*Defendants – Appellees,*

TEXAS AUTOMOBILE DEALERS ASSOCIATION,
*Intervenor – Appellee.*

---

On Appeal from the United States District Court
For the Western District of Texas, Austin Division
Civil Action No. 1:22-cv-01116-RP

---

### TEXAS AUTOMOBILE DEALERS ASSOCIATION'S APPELLEE'S BRIEF

---

Robert T. Mowrey
 *robert.mowrey@troutman.com*
Thomas G. Yoxall
 *tom.yoxall@troutman.com*
W. Scott Hastings
 *scott.hastings@troutman.com*
Daron L. Janis
 *daron.janis@troutman.com*
Chase T. Cobb
 *chase.cobb@troutman.com*

**TROUTMAN PEPPER LOCKE LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201
(214) 740-8000

**COUNSEL FOR APPELLEE
TEXAS AUTOMOBILE
DEALERS ASSOCIATION**

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in Rule 28.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualifications or recusal.

**Plaintiff-Appellant**

Lucid Group USA, Inc.

**Attorneys for Plaintiff-Appellant**

Andrew Michael Grossman
Kristin Shapiro
Baker & Hostetler LLP
1050 Connecticut Avenue N.W.
Suite 1100
Washington, D.C. 20036
Billy M. Donley
Rachel Palmer Hooper
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002

**Defendants-Appellees**

Monique Johnston

Daniel Avitia

Corrie Thompson

**Attorneys for Defendants-Appellees**

Daniel Ortner
Jacob Przada
Kelsey Warren
Office of the Texas Attorney General
P.O. Box 12548
Austin, TX 78711

Zachary Louis Rhines
Office of the Texas Attorney General
300 W. 15th Street, 6th Floor
Austin, TX 78701

| **Intervenor-Appellee** | **Attorneys for Intervenor-Appellee** |
|---|---|
| Texas Automobile Dealers Association | Robert T. Mowrey<br>Thomas G. Yoxall<br>W. Scott Hastings<br>Daron L. Janis<br>Chase T. Cobb<br>TROUTMAN PEPPER LOCKE LLP<br>2200 Ross Avenue, Suite 2800<br>Dallas, Texas 75201 |

| **Amici** | **Attorneys for Amici** |
|---|---|
| Pacific Legal Foundation | Anastasia P. Boden<br>Andrew R. Quinio<br>Erin E. Wilcox<br>Pacific Legal Foundation<br>555 Capitol Mall, Suite 1290<br>Sacramento, CA 95814 |
| Professor Daniel Crane<br>(trial court) | J. Christopher Byrd<br>Chris Byrd Law Firm<br>P.O. Box 359<br>2631 Bulverde Rd., Suite 105<br>Bulverde, TX 78163 |
| American for Prosperity Foundation<br>(trial court only) | Michael E. Lovins<br>Lovins Troslcair, PLLC<br>1301 S. Capital of Texas Highway,<br>Building A, Suite 136<br>Austin, TX 78746 |

Law and Economics Professors
Roger D. Blair
Steve Calandrillo
Daniel A. Crane
Michael DeBow
Max Huffman
Kathryn Judge
Mark A. Lemley
Geoffrey A. Manne
Scott Masten
Alex T. Tabarrok
Alexander "Sasha" Volokh
Lawrence J. Wright

Connor R. Harvey
Wright Close & Barger
One Riverway Place
Suite 2200
Houston, Texas  77056

*/s/ Robert T. Mowrey*
Robert T. Mowrey

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Intervenor-Appellee Texas Automobile Dealers Association ("TADA") does not believe that oral argument is needed to resolve this appeal. Appellant Lucid Group USA, Inc. ("Lucid") presents a constitutional challenge to a Texas statute that this Court has affirmed multiple times on appeal. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493 (5th Cir. 2001); *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717 (5th Cir. 2004). This Court also recently upheld a similar Louisiana statute against a constitutional challenge. *See Tesla, Inc. v. La. Ass'n of Auto. Dealers*, 113 F.4th 511 (5th Cir. 2024). The Washington Court of Appeals similarly rejected a constitutional challenge from Lucid that is nearly identical to the due process and equal protection issues presented here. *See Lucid Grp. USA v. Dep't of Licensing*, 559 P.3d 545, 557–58 (Wash. Ct. App. 2024). This Court should have little difficulty concluding that the district court correctly entered summary judgment rejecting Lucid's constitutional claims. In short, Lucid is directing its economic policy arguments to the wrong forum. There is no legal or factual basis for this Court to depart from its binding precedent upholding existing Texas law.

## **TABLE OF CONTENTS**

TABLE OF CONTENTS ............................................................................ vi

INDEX OF AUTHORITIES ................................................................... viii

STATEMENT OF JURISDICTION ......................................................... 1

STATEMENT OF THE ISSUES .............................................................. 1

STATEMENT OF THE CASE ................................................................... 1

I.      The Franchise Dealership Model Prevailed Over the Manufacturer-
        Direct Sales Model Based on Market Forces and the Need for Better,
        More Diversified Customer Services. ........................................... 2

II.     Lucid Seeks to Deviate from Market Experience Based on Unproven
        Assertions About Pricing, but Lucid Admits Its Strategy Is Subject to
        Significant Risk and Expense. ...................................................... 4

III.    Consumer Service and Safety Are Significant Issues for Legislatures. ......... 9

IV.     Other Recent Market Entrants Have Switched to Using Dealerships
        Because a Direct-Sales Model Proved Too Challenging to Achieve. ........... 13

V.      Federal and State Authorities Adopted Legislation to Prevent
        Manufacturers from Using Their Market Position to Take Advantage
        of the Dealerships that Invested to Provide the Services Customers
        Wanted. ..................................................................................... 15

VI.     Lucid Seeks to Change Texas Law Based on Arguments It Never
        Presented to the Texas Legislature. ............................................. 18

VII.    Course of Proceedings .............................................................. 19

SUMMARY OF THE ARGUMENT ...................................................... 20

ARGUMENT ......................................................................................... 22

I.      The Rational Basis Standard of Constitutional Scrutiny ............... 22

        A.      Summary Judgment Standard .......................................... 22

B.     Rational Basis Is a Highly Deferential Standard ...............................22

II.     Controlling Authority Forecloses Lucid's Claims.........................................23

A.     Tesla Forecloses Lucid's As-Applied Challenge.................................23

B.     Lucid Cannot Escape Controlling Authority by Labeling Its Claims as an "As-Applied" Challenge.................................................25

C.     Lucid's Reliance on St. Joseph Abbey Is Misplaced. .......................28

III.     Lucid's Due Process Claim Fails as a Matter of Law ...................................30

A.     The Due Process Clause Does Not Guaranty the Right to Use a Preferred Method for Doing Business....................................................31

B.     Due Process Protections for Occupation-Based Liberty Interests Apply Only if a Party Is Completely Foreclosed from the Market....................................................................................................34

C.     Even If Lucid Had a Protected Liberty Interest, Texas Law Easily Passes the Rational Basis Test....................................................38

IV.     Lucid's Equal Protection Claim Fails as a Matter of Law............................42

CONCLUSION ....................................................................................................45

CERTIFICATE OF SERVICE ............................................................................47

CERTIFICATE OF COMPLIANCE ...................................................................48

# INDEX OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. City of Harahan*,
    95 F.4th 908 (5th Cir. 2024) ...................................................34

*Allstate Ins. Co. v. Abbott*,
    495 F.3d 151 (5th Cir. 2007) ...........................................28, 39

*Burkette v. Lutheran Gen. Hosp.*,
    595 F.2d 255 (5th Cir. 1978) ...........................................36, 37

*Burlington N. R. Co. v. Ford*,
    504 U.S. 648 (1992)...................................................................44

*In re Cao*,
    619 F.3d 410 (5th Cir. 2010) (en banc) .............................26

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010)...................................................................26

*Cowan v. Corley*,
    814 F.2d 223 (5th Cir. 1987) ...........................................35, 36

*Craigmiles v. Giles*,
    312 F.3d 220 (6th Cir. 2002) .............................................29

*Exxon v. Maryland*,
    437 U.S. 117 (1978)...........................................................31, 32

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993)...................................................................22

*Ferguson v. Skrupa*,
    372 U.S. 726 (1963)...................................................................32

*FM Props. Operating Co. v. City of Aus.*,
    93 F.3d 167 (5th Cir. 1996) .................................................22

*Ford Motor Co. v. Tex. Dep't of Transp.*,
  264 F.3d 493 (5th Cir. 2001) ........................................................................*passim*

*Ghedi v. Mayorkas*,
  16 F.4th 456 (5th Cir. 2021) ................................................................................34

*Greater Hou. Small Taxicab Co. Owners v. City of Hou.*,
  660 F.3d 235 (5th Cir. 2011) ................................................................................23

*Harris v. Hahn*,
  827 F.3d 359 (5th Cir. 2016) ................................................................................43

*Int'l Franchise Ass'n v. City of Seattle*,
  803 F.3d 389 (9th Cir. 2015) ................................................................................43

*Int'l Truck & Engine Corp. v. Bray*,
  372 F.3d 717 (5th Cir. 2004) ................................................................v, 20, 28

*Jackson Women's Health Org. v. Currier*,
  760 F.3d 448 (5th Cir. 2014) ................................................................................38

*Johnson v. Rodriguez*,
  110 F.3d 299 (5th Cir. 1997) ................................................................................23

*Justice v. Hosemann*,
  771 F.3d 285 (5th Cir. 2014) ................................................................................26

*Lucid Grp. USA v. Dep't of Licensing*,
  559 P.3d 545 (Wash. Ct. App. 2024)................................................................v, 29

*Malagon de Fuentes v. Gonzales*,
  462 F.3d 498 (5th Cir. 2006) ................................................................26, 43, 44

*Martin v. Mem'l Hosp. of Gulfport*,
  130 F.3d 1143 (5th Cir. 1997) ................................................................................23

*Mass. Bd. of Retirement v. Murgia*,
  427 U.S. 307 (1976)................................................................................................44

*National Pork Producers Council v. Ross*,
  598 U.S. 356 (2023)................................................................................................31

*N.Y.C. Transit Auth. v. Beazer*,
  440 U.S. 568 (1979)......................................................................44

*Penry v. Lynaugh*,
  492 U.S. 302 (1989) (Scalia, J., dissenting) ......................................26

*Reed v. Goertz*,
  136 F.4th 535 (5th Cir. 2025) .........................................................26

*Reyes v. N. Tex. Tollway Auth. (NTTA)*,
  861 F.3d 558 (5th Cir. 2017) .............................................16, 22, 23

*San Jacinto Savs. & Loan v. Kacal*,
  928 F.2d 697 (5th Cir. 1991) ....................................................37, 38

*Soriano v. Neshoba City. Gen. Hosp. Bd. of Trs.*,
  486 F. App'x 444 (5th Cir. 2012) ....................................................37

*St. Joseph Abbey v. Castille*,
  712 F.3d 215 (5th Cir. 2013) ....................................................*passim*

*Tesla, Inc. v. La. Ass'n of Auto. Dealers*,
  113 F.4th 511 (5th Cir. 2024) ...................................................*passim*

*Tesla, Inc. v. La. Auto. Dealers Ass'n*,
  677 F. Supp. 3d 417 (E.D. La. 2023)................................................29

*Texas v. Thompson*,
  70 F.3d 390 (5th Cir. 1995) ......................................................37, 38

*Truax v. Raich*,
  239 U.S. 33 (1915).......................................................................35

*United States v. Carolene Products Co.*
  304 U.S. 144 (1938).....................................................................25

*Walsh v. La. High Sch. Athletic Ass'n*,
  616 F.2d 152 (5th Cir. 1980) .........................................................45

*Washington v. Glucksberg*,
  521 U.S. 702 (1997).....................................................................26

*Wheeler v. Miller,*
    168 F.3d 241 (5th Cir. 1999) ................................................................43

*Williams v. Vermont,*
    742 U.S. 14 (1985) ................................................................................43

*Williamson v. Lee Optical,*
    348 U.S. 483 (1955) .............................................................23, 33, 34

*Yates v. Stalder,*
    217 F.3d 332 (5th Cir. 2000) ..............................................................43

**Statutes and Rules**

28 U.S.C. §1291 ...........................................................................................1

28 U.S.C. §1331 ...........................................................................................1

Fed. R. Civ. P. 12(b)(6) ............................................................................35

Fed. R. Civ. P. 56(a) ...............................................................................22

Ala. Code §8-20-4(3)(s) ..........................................................................16

Ark. Code §23-112-403(a)(3)(A) ............................................................16

Colo. Rev. St. §44-20-126(2)(g) .......................................................16, 17

Fla. Stat. §320.645(1) ..............................................................................16

Iowa Code §322.3(15) ..............................................................................16

Ky. Rev. Stat. §190.070(2)(j) ..................................................................16

Md. Code, Transp. §15.305(f) .................................................................16

Mich. Compl. Laws §445.1574(h) & (i) ..................................................16

Mont. Code §61-4-208(3)(a) ...................................................................16

Neb. Rev. St. §60-1438.01(2)(a)-(c) .......................................................16

N.M. St. §57-16-5(V) ...............................................................................16

S.C. CODE ANN. §56-15-45(A)(1)–(3)........................................................16

PA. CONS. STAT. ANN. 63 §818.310(c)(6)...............................................17

43 TEX. ADMIN CODE §215.181 ..........................................................41, 43

TEX. FIN. CODE §348.002 ...................................................................41

TEX. FIN. CODE §348.501 ...................................................................41

TEX. OCC. CODE §2301.001 .................................................................33

TEX. OCC. CODE §2301.002(8)..............................................................41

TEX. OCC. CODE §2301.002(37).............................................................41

TEX. OCC. CODE §2301.251(a)..............................................................41

TEX. OCC. CODE §2301.476(c) ........................................................*passim*

W. VA. CODE §17A-6A-10(b)(11)-(12)(A)-(C)...............................................16

WIS. STAT. ANN. §218.0121(2m)...........................................................16

**Legislative Materials**

H.B. 229, 2019 Reg. Sess. (W.Va. 1999) ...................................................17

H.B. 1050, 79th Reg. Sess. (Tex. 2005) ...................................................17

H.B. 1653, 84th Reg. Sess. (Tex. 2015) ...................................................17

H.B. 2149, 79th Reg. Sess. (Tex. 2005) ...................................................17

H.B. 2602, 86th Reg. Sess. (Tex. 2019) ...................................................17

H.B. 3351, 83rd Reg. Sess. (Tex. 2013) ...................................................17

H.B. 3828, 84th Reg. Sess. (Tex. 2015) ...................................................17

H.B. 4097, 87th Reg. Sess. (Tex. 2021) ...................................................17

H.B. 4379, 87th Reg. Sess. (Tex. 2021) ...................................................17

S.B. 1400, 87th Reg. Sess. (Tex. 2021) ...................................................17

S.B. 1415, 86th Reg. Sess. (Tex. 2019) .................................................17

S.B. 1572, 85th Reg. Sess. (Tex. 2017) .................................................17

S.B. 2279, 85th Reg. Sess. (Tex. 2017) .................................................17

Wis. Assemb. B. 439, 105th Reg. Sess. (Wis. 2021)................................17

## Other Authorities

Andrew Chien, Nate Savona, Fabian Brandt, and David Whinfrey, *Why US Dealerships Remain a Cost Effective Choice*, OLIVER WYMAN https://www.oliverwyman.com/our\expertise/insights/ 2024/sep/why-us-auto-dealerships-remain-cost-effective-choice.html ............................................6

James Cobb & Norman Mayersohn, *Why Do We Keep Buying Vehicles at Dealerships?*, CAR & DRIVER (Oct. 1, 2015), https://www.caranddriver.com/news/a15352113/why-do-we-keep-buying-vehicles-at-dealerships/ ..........................................................39

RALPH C. EPSTEIN, THE AUTOMOBILE INDUSTRY—ITS ECONOMIC AND COMMERCIAL DEVELOPMENT 135 (Chicago: A.W. Shaw Company 1920) ....2, 3

Eileen Falkenberg Hull, *Lucid Gravity Designed to Minimize Prod. Problems*, NEWSWEEK (Jan. 6, 2024) .................................................14

*The Ford Pinto Grimshaw v. Ford Motor Co. 1981*, AM. MUSEUM OF TORT L., https://www.tortmuseum.org/ford-pinto/...........11, 39

Charles Mason Hewitt, Jr., AUTOMOBILE FRANCHISE AGREEMENTS 18–19 (Indiana University School of Business, Study No. 39, 1956).......................3

JAMES M. RUBENSTEIN, MAKING AND SELLING CARS: INNOVATION AND CHANGE IN THE U.S. AUTOMOTIVE INDUSTRY 267 (The Johns Hopkins University Press, 2001) ..........................................................3

Christian J. Scali, Halbert Rasmussen, and Monica Baumann, *An American Solution: Automotive Franchise Laws Serve Local Communities and Consumers*, 40 FRANCHISE L. J. 665 (2021) ..........................10

*Tesla Reliability and Repair Costs—The True Story*, TOP SPEED (Sept. 13, 2023), https://www.topspeed.com/tesla-reliability-and-repair-costs-the-true-story/# .........................................................................................10

Thomas G. Marx, *The Development of the Franchise Distribution System in the U.S. Automobile Industry*, 59 BUS. HIST. REV. 465 (1985) .......................4

*VinFast Celebrates Grand Opening of First California Dealership in San Diego*, VINFAST (Aug. 20, 2025), https://vinfastauto.us/newsroom/press-release/vinfast-celebrates-grand-opening-of-first-california-dealership-in-san-diego.................................13

## STATEMENT OF JURISDICTION

The district court had federal question jurisdiction under 28 U.S.C. §1331. This Court has appellate jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

This case presents a constitutional challenge to TEX. OCC. CODE §2301.476(c), which provides in relevant part: "a manufacturer or distributor may not directly or indirectly: (1) own an interest in … (2) operate or control … or (3) act in the capacity of … a dealer or dealership." The issues presented are:

1.     Whether the district court correctly granted summary judgment rejecting Lucid's due process challenge to Section 2301.476(c).

2.     Whether the district court correctly granted summary judgment rejecting Lucid's equal protection challenge to Section 2301.476(c).

## STATEMENT OF THE CASE

The manufacture and distribution of motor vehicles is heavily regulated, and has been for a long time. Lucid's position as a relatively new market entrant is not unique. All manufacturers started as new market entrants at one point in their lifecycle. Some, like Ford, Mercedes, and Toyota, have survived over the long term. Others, like Saturn, Oldsmobile, and Suzuki have failed. Still others, like General Motors and Chrysler, required governmental assistance to survive during difficult

times.[1]  Lucid and its hired economist argue as if selling motor vehicles is the same as selling groceries in a supermarket.  *See* ROA.2891–2892.  It is not.  Licensing regulations and decisions relating to dealerships focus not just on economics, but also on non-economic issues relating to consumer safety and access to necessary support services.  Government regulation of the industry, including the licensing, sale, and distribution of motor vehicles, is well-established.

I.   THE FRANCHISE DEALERSHIP MODEL PREVAILED OVER THE MANUFACTURER-DIRECT SALES MODEL BASED ON MARKET FORCES AND THE NEED FOR BETTER, MORE DIVERSIFIED CUSTOMER SERVICES.

Lucid's desire to sell motor vehicles direct to consumers is not a new strategy.  "One would naturally expect the manufacturing company to operate branches if it can[.]" RALPH C. EPSTEIN, THE AUTOMOBILE INDUSTRY—ITS ECONOMIC AND COMMERCIAL DEVELOPMENT 135 (Chicago:  A.W. Shaw Company 1920) (hereinafter "Epstein").  During the early 1900s, almost all motor vehicle manufacturers sold (or tried to sell) their vehicles directly to consumers.  ROA.2164.  Manufacturers also tried numerous other ways to sell their vehicles, including through dealerships, franchises, agents, distributors, direct mail, and virtually any other method that could be considered.  ROA.2164.[2]  Even as manufacturers were

---

[1]   The multi-billion-dollar government bailouts of General Motors and Chrysler were widely publicized and are discussed in the report from the Treasury Department's Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") at ROA.3084.

[2]   "Virtually all manufacturers sold their cars directly to the consumer" in the early days of the automobile industry, and "virtually every type of distribution device was experimented with

2

trying to sell their vehicles direct to consumers in large cities, they began relying on independent dealers to reach smaller communities. ROA.2178–2179 (discussing early Ford distribution strategies); *see also* JAMES M. RUBENSTEIN, MAKING AND SELLING CARS: INNOVATION AND CHANGE IN THE U.S. AUTOMOTIVE INDUSTRY 267 (The Johns Hopkins University Press, 2001) (excerpt at ROA.2992). Ultimately, real-world experience showed that independent dealers who had their own financial incentives were more competent at selling automobiles and providing service than managers running a company store. ROA.2179–2182 (discussing Epstein at 133–36 and its findings); ROA.2985–2990 (Epstein excerpt).

By the 1920s, independent franchisees became the most common method for selling automobiles. ROA.2164. Franchised dealers also proved necessary to provide customer services that manufacturers were not as well equipped to handle directly, such as trading in used vehicles, providing services, and warranty coverage. ROA.2166 ("Dealers were handling more used than new cars, and as a result, such sale became a unique trading proposition. Changes in consumer demand greatly increased the importance of dealer service and warranty coverage."). As the sale and distribution of automobiles became more complex and unique, flexibility became critically important and was "far beyond the capabilities of manufacturers" to handle

---

during this period." Charles Mason Hewitt, Jr., AUTOMOBILE FRANCHISE AGREEMENTS 18–19 (Indiana University School of Business, Study No. 39, 1956) (hereinafter "Hewitt").

in a one-size-fits-all model. *See* Thomas G. Marx, *The Development of the Franchise Distribution System in the U.S. Automobile Industry*, 59 BUS. HIST. REV. 465 at 474 (1985) (reprinted at ROA.2974). Manufacturers had to rely more heavily on dealers to provide the services consumers needed and demanded. *Id.*; ROA.2165–2166.

Today, dealers provide the range of services consumers need, including trade-ins, maintenance, repairs, and assistance with financing. ROA.2168–2175; ROA.2482–2485; ROA.2499–2500. Dealerships provide expanded access to consumers (including repair services and used car sales), diversification of services (including trade-ins), better repair networks (including recalls and warranty work), and longer product life cycles (resulting in better retained values for consumers). ROA.2168–2175. Dealers remain instrumental in serving and investing in smaller communities. ROA.2305–2307. Dealerships also promote consumer benefits from competition on pricing, efficiencies relating to service, added services such as trade-ins, creating a market for used cars, broader and better funding sources, and advertising focused on Texas markets and consumers. ROA.2528–2534.

II. LUCID SEEKS TO DEVIATE FROM MARKET EXPERIENCE BASED ON UNPROVEN ASSERTIONS ABOUT PRICING, BUT LUCID ADMITS ITS STRATEGY IS SUBJECT TO SIGNIFICANT RISK AND EXPENSE.

Lucid's arguments against the franchised dealer model are based primarily on its belief that franchised dealers increase costs to consumers. But Lucid formed that

belief without conducting any studies or hiring any third-party consultants to assess its beliefs.   ROA.2560–2561; ROA.2563–2565.   Lucid offered no evidence to support its theories, not even from data regarding its sales and experience selling direct to consumers in the seven states where Lucid claims to be acting as a dealer.[3] *See* Appellant's Br. at 1.

Lucid's self-serving belief is contradicted by Edward M. Stockton, an industry expert with over 25 years-experience, who opined that Lucid's pricing arguments are based on unproven assumptions upon which there is conflicting evidence. ROA.2161.  He explained: "there are reasons to believe retailing costs would be higher for manufacturers than independent dealers," especially considering dealers' superior knowledge of retail market conditions and the incentives applicable to retailers who are independent of the manufacturer.  ROA.2181–2184.

Other industry experts agree with Stockton.  Dr. Donald J. House, Sr., an economist with over 40 years-experience, also concluded: "The assertion that vertical integration by manufacturers will result in lower vehicle prices is not supportable and is misleading."  ROA.2234 (¶7); ROA.2244–2246.  The Phoenix

---

[3]   Throughout its brief, Lucid falsely claims that it offered "evidence" that selling cars through independent dealerships was not economically viable.  *See* Appellant's Br. at 15, 19, 38–39. Lucid's "evidence" consists entirely of (a) Lucid's self-determination on this point without conducting any studies and (b) the opinions of its hired experts who similarly conducted no studies to support their opinion.  *Id.* at 39.  No matter how many times Lucid repeats these bald assertions, it does not transform them into competent evidence.

Center for Advanced Legal & Economic Public Policy Studies published its analysis (which was not prepared for litigation) showing that intra-brand competition for motor vehicles has lowered consumer prices. ROA.2406–2434.[4] Likewise, SIGTARP published its findings after the bailout of GM and Chrysler, in which it concluded that fewer dealerships resulted in less competition, higher prices to consumers, and ultimately, more profits to the struggling manufacturer. ROA.3095–3115.

Even Lucid's own economist, Dr. Fiona Scott Morton, admitted it is not known whether Lucid's vertically-integrated sales model would result in lower prices for consumers. *See* ROA.2900–2901 ("[I]f we took Lucid's vertically-integrated model and the existing franchise model, … is it for sure known that the franchise model sets a higher price than the vertically-integrated model? No. . . . [I]t's not a certainty, it is just probable."); *cf.* ROA.2154 (Stockton Report at ¶4(iii) ("[I]f, in practice, different relative marginal distribution costs occurred, this could reverse the direction of Professor Morton's findings."). Morton's concession directly contradicts Lucid's argument to this Court that "application of the

---

[4]    A recent report from members of the Automotive and Industrial Goods group at Oliver Wyman also reached the conclusion that the use of traditional dealerships did not increase the costs of motor vehicles for consumers. *See* Andrew Chien, Nate Savona, Fabian Brandt, and David Whinfrey, *Why US Dealerships Remain a Cost Effective Choice*, OLIVER WYMAN https://www.oliverwyman.com/our-expertise/insights/2024/sep/why-us-auto-dealerships-remain-cost-effective-choice.html (last visited Sept. 19, 2025).

prohibition to direct-sales-only manufacturers *only* drives up prices for consumers." Appellant's Br. at 24 (emphasis added).

Contrary to Lucid's arguments on appeal, the Department of Justice did *not* conclude that "forcing manufacturers to sell through independent dealers costs consumers an average of $2,225 more per vehicle due to the added dealer markup (in year 2000 dollars)." *See* Appellant's Br. at 24; *see also id.* at 3 (arguing "according to a DOJ analysis"). The "advocacy piece" Lucid cites is available at: https://www.justice.gov/atr/economic-effects-state-bans-direct-manufacturer-sales-car-buyers. It begins with a clear statement: "[T]he views expressed herein are entirely those of the author and are not purported to reflect those of the United States Department of Justice." *Id.* Moreover, the alleged cost savings were not even the conclusion of the author. The author cited an unpublished study from someone at Goldman Sachs as allegedly supporting the conclusion asserted. *Id.* at n.10. This type of hearsay within hearsay within hearsay is not reliable evidence to justify a judicial change in the law.

In short, Lucid conducted no studies and offered no market data into evidence relating to prices to support the economic theories it advocates in this case. ROA.2880 (Lucid's expert admitting she conducted no studies of Lucid's pricing). And even if Lucid had done those things, "price is not the only determinant of consumer welfare." ROA.2161.

Lucid also publicly recognizes that there are significant risks associated with its chosen strategy for selling motor vehicles direct to consumers. In its annual filings with the SEC, Lucid freely admits it has limited experience manufacturing, selling and servicing its vehicles, and that the lack of a dealership network to assist in those activities is one of the risk factors it faces in its operations, specifically citing the following examples:

- "our limited operating history"

- "we may be unable to control the substantial costs associated with our operations"

- "we will not have a third-party retail product distribution and full-service network"

- "we may not be able to develop, manufacture, distribute, market and sell our vehicles successfully"

- "we have limited experience servicing our vehicles and their integrated software"

- "insufficient reserves to cover future warranty and part replacement needs or other vehicle repair requirements"

ROA.2648–2649; ROA.2919–2920.[5]   Regarding its lack of a traditional dealer network, Lucid explains it "will be expensive and time consuming" for Lucid to build its sales, marketing, and service networks, ROA.2653 & ROA.2924, which are

---

[5]   These statements are quoted from Lucid's 2022 and 2023 annual reports. Lucid's publicly-filed annual report for 2024 contains similar statements of risks and concerns.

among the reasons existing manufacturers have historically opted to use dealership networks instead of direct sales to build a reliable market for their vehicles. Lucid further wrote: "there can be no assurance that our service arrangements will adequately address the service requirements of our customers to their satisfaction . . . ." ROA.2938. In short, Lucid is engaged in an experiment in an industry with "significant barriers to entry." ROA.2648. There is no evidence or reason to believe that Lucid could succeed in gaining price advantages from a vertically-integrated network, as its economist has hypothesized.

III. CONSUMER SERVICE AND SAFETY ARE SIGNIFICANT ISSUES FOR LEGISLATURES.

Lucid's pricing experiments should not come at the expense of consumer safety and service. As it argued in the district court, Lucid contends that EVs will need fewer services and repairs than gas-powered motor vehicles. *See* Appellant's Br. at 6. However, Lucid offers no evidence to support its claims, nor has it conducted any studies of this issue. ROA.2567–2568.

In contrast, Consumer Reports found that EVs were among the least reliable motor vehicles being sold. ROA.3027–3028; ROA.3033 ("poor reliability remains an issue" in 2023); *see also* ROA.2897 (recognizing Consumer Reports as a reliable source). Tesla had been plagued with a host of problems, and "[o]f the 11 EV models on which [Consumer Reports] has sufficient data, only four have average or better predicted reliability." ROA.3028; *see also* ROA.3055–3062 (reporting on

9

increasing Tesla service problems as more cars are being sold). And in 2023, Consumer Reports found "[o]n average, new EVs have 79 percent more problems than [internal combustion engine] vehicles." ROA.3033.[6]

Lucid is not immune from these problems and already has had many recalls in its limited time of operations. ROA.2566–2567; ROA.2608; ROA.5038; ROA.5045. With problems plaguing EVs, legislators are better equipped to set policy and decide how best to protect consumers based on full data and the ability to conduct investigations into the pros and cons of a particular regulation. ROA.2239–2240 (explaining reports that find EVs have "a 37% greater level of problems than the internal combustion engine vehicles" and there is a "higher cost of parts and labor in servicing EV vehicles").

History and experience also show that manufacturers cannot always be trusted to put the interests of consumers first. *See* Christian J. Scali, Halbert Rasmussen, and Monica Baumann, *An American Solution: Automotive Franchise Laws Serve Local Communities and Consumers*, 40 FRANCHISE L. J. 665, 675 (2021) ("Historically, manufacturers have been accused of attempting to keep down the tail

---

[6] "J.D. Power and Consumer Reports both rank Tesla at the bottom of the pack when reliability is tested. It's reported that Tesla vehicles have an average of 171 mechanical issues per 100 vehicles. For reference, the average number for most automakers hovers around 120 problems per 100 vehicles." *See Tesla Reliability and Repair Costs—The True Story*, TOP SPEED (Sept. 13, 2023), https://www.topspeed.com/tesla-reliability-and-repair-costs-the-true-story/# (reprinted at ROA.3040).

costs of warranty repairs by willfully not recognizing defects, sometimes with disastrous results.") (reprinted at ROA.3130). The story of the Ford Pinto is well publicized. *See, e.g.*, *The Ford Pinto Grimshaw v. Ford Motor Co. 1981*, AM. MUSEUM OF TORT L., https://www.tortmuseum.org/ford-pinto/ (last visited Sept. 16, 2025). And more recently, Tesla has been accused of prioritizing sales over service. ROA.3055–3062. Tesla has also been accused of engaging in tactics to suppress customer complaints regarding driving ranges for its vehicles. ROA.3065–3075.

In the district court, Lucid tried to discount concerns over its ability to perform service and repairs by emphasizing its over-the-air updates, its one and only service facility in Texas (located in Houston), and its global mobile fleet. *See* ROA.1523. Setting aside the fact that not all repairs can be handled with a software update, or the fact that help is often needed where there is no reliable internet coverage, ROA.2243 (citing Edmunds), Lucid's physical service capabilities are woefully inadequate for Texas and its consumers.[7] ROA.2938 (Lucid admitting "[t]here can be no assurance that our service arrangements will adequately address the servicing requirements of our customers"); ROA.2515–2517 ("Lucid is not providing what we would call full after-sale services."). Lucid's only Texas repair facility is in

---

[7] Lucid is also unequivocally prohibited from performing warranty-repair work in Texas. As explained in more detail below, only licensed dealers may perform warranty-repair services. *See infra* Argument(III)(C). Lucid cannot be a licensed dealer; therefore, its performance of warranty-repair work in the state is illegal. *See, e.g.*, TEX. OCC. CODE §2301.476(c) (prohibiting manufacturers from acting in the capacity of a dealer).

Houston, which is hours away from rural communities and even other metropolitan consumer markets.  ROA.26.  Lucid also has only 47 mobile repair vehicles in its global repair fleet, which would not be adequate to cover the State of Texas even if lawful and even if all those mobile repair vehicles were located in Texas instead of other states or countries.  ROA.2833; *see also* ROA.2239 (explaining that mobile service "is rarely efficient compared to a host of dealerships and independently owned collision and repair shops").  In response to Lucid's surveys, customers reported a wide range of issues.  *See* ROA.4339–4340 (summarizing issues); *see also* ROA.4706; ROA.5029–5052.  Lucid conducted no studies or comparisons of its vehicles to others when making its self-serving assertion regarding the reliability of its vehicles.  ROA.3497–3498.

Legislators and regulators have every right to consider manufacturer conflicts of interests relating to warranty, service, and repair issues when deciding how to craft or adjust Texas law.  It is rational to conclude that independent dealers are necessary to provide the diversity of services consumers need and want (including trade-ins, repair services, warranty services, insurance, etc.) and the consistent level of services that benefit small towns, and not just large cities.  Lucid may wishfully think it can do better than other industry innovators and, thus, should be given an exemption from existing laws.  But the fact that Ford and other early manufacturers tried and failed to create direct sales models, and the reasons why those efforts failed,

12

provide a relevant and rational basis for the Legislature's long-standing prohibition against manufacturer-direct sales of new motor vehicles in the State.

IV. OTHER RECENT MARKET ENTRANTS HAVE SWITCHED TO USING DEALERSHIPS BECAUSE A DIRECT-SALES MODEL PROVED TOO CHALLENGING TO ACHIEVE.

Similar to what happened in the early days of the motor vehicle industry, some recent EV manufacturers (*e.g.*, VinFast and Fisker) started their operations with a plan to sell their vehicles direct to consumers only to switch to a franchised dealer model once they learned that vertical integration was not sustainable.[8]  ROA.2578–2582; ROA.2615–2617; ROA.3009–3025.  That change is supported by many commentators who have recognized that automobile manufacturers need help from independent dealers to be able to fund the sale and distribution of vehicles.  *See* ROA.3206–3215.  Well-established automobile manufacturers have also abandoned their efforts to vertically integrate their sales in modern times.  In the early 2000s, "GM shuttered a plan for direct sales after realizing it couldn't afford the idea." ROA.3207.  Ford also sold its company-owned stores in 2001 "after the manufacturer lost market share in each region the stores operated in."  ROA.3207.

---

[8]  Fisker's switch to using dealerships may have come too late, as Fisker filed for bankruptcy in mid-2024.  VinFast, by contrast, is now selling vehicles using dealerships in fourteen states. *VinFast Celebrates Grand Opening of First California Dealership in San Diego*, VINFAST (Aug. 20, 2025), https://vinfastauto.us/newsroom/press-release/vinfast-celebrates-grand-opening-of-first-california-dealership-in-san-diego.

Even Tesla's Elon Musk has said he would consider using franchised dealers in the future if the fit is right. *See* ROA.2886.

Although Lucid may think it is "obvious" that a "direct-sales-only automotive company" does not raise the same concerns as traditional manufacturers selling through dealerships, *see* Appellant's Br. at 22, Lucid is ignoring history of how manufacturers can change over time. As discussed above, poor economic performance has driven other manufacturers, EV and traditional alike, to abandon vertically-integrated sales models. Lucid has already lost billions of dollars pursuing its current strategy of selling direct to consumers, never earned a profit in any year, and "expects to incur increasing expenses and substantial losses for the foreseeable future." ROA.2594–2595; ROA.2602; ROA.2648. The demand for Lucid has not come close to Lucid's rosy growth projections. ROA.2243–2244. Public reports state that Lucid is losing over $227,000 per automobile sold. *See* Eileen Falkenberg Hull, *Lucid Gravity Designed to Minimize Prod. Problems*, Newsweek (Jan. 6, 2024), https://www.newsweek.com/lucid-gravity-designed-minimize-production-problems-1853859 (reprinted at ROA.2997); ROA.2606–2607.

In light of these realities, Lucid has not foreclosed the possibility that it too could switch to a franchised dealer sales model. Lucid's economist, Morton, admitted she had not even considered what would happen if Lucid wanted to change its sales strategy based on its market experiences (as so many have done

before).  ROA.2887-2888.  And when asked if Lucid would consider changing its sales strategy if it continues losing money, Lucid's corporate representative testified "I don't know . . . if that were to happen, we would have discussions about how to handle it."  ROA.2585.  Lucid has even experimented with other changes to its sales model, such as accepting trade-ins and providing financing options.  ROA.2586-2594.

Unlike Lucid and its economist, who have blindly assumed without proof that its direct sales model is vastly superior to a franchised dealer model in every possible way, both for itself and for consumers, rational legislators can conclude that "they have seen this story before and know how it ends" with manufacturers needing dealers to survive.  Such legislators are not required to ignore history, and certainly not when it is repeating itself.

V. FEDERAL AND STATE AUTHORITIES ADOPTED LEGISLATION TO PREVENT MANUFACTURERS FROM USING THEIR MARKET POSITION TO TAKE ADVANTAGE OF THE DEALERSHIPS THAT INVESTED TO PROVIDE THE SERVICES CUSTOMERS WANTED.

History has shown that the franchise dealer model prevailed over manufacturer-direct sales in the market both in the early decades of the motor vehicle industry, and even more recently as several new market entrants tried to forge the same direct-sales path that failed long ago.  Over time, federal and state legislators have stepped in to regulate the relationships between manufacturers and dealers, because many manufacturers engaged in "opportunistic, bad behavior … because

they were in a much stronger bargaining position than dealers." ROA.2166–2167. That behavior led to increased regulation and licensing of motor vehicle sales and distribution. ROA.2159; ROA.2167–2168. "Today, every state has a law governing car manufacturer/dealer relationships." ROA.2168. Lucid's economist even recognizes that there is nothing irrational about enacting legislation in light of historical experiences. ROA.2883. Although some may argue about the pros and cons regarding particular legislation, it is up to legislators and elected officials to weigh the merits of such arguments. *See Reyes v. N. Tex. Tollway Auth., (NTTA)*, 861 F.3d 558, 566 (5th Cir. 2017).

Many states adopted (and still have) laws prohibiting manufacturers from selling directly to consumers. *See, e.g.*, ALA. CODE §8-20-4(3)(s); ARK. CODE §23-112-403(a)(3)(A); FLA. STAT. §320.645(1); IOWA CODE §322.3(15); KY. REV. STAT. §190.070(2)(j); MD. CODE, TRANSP. §15.305(f); MICH. COMPL. LAWS §445.1574(h) & (i); MONT. CODE §61-4-208(3)(a); NEB. REV. ST. §60-1438.01(2)(a)-(c); N.M. ST. §57-16-5(V); S.C. CODE ANN. §56-15-45(A)(1)–(3); TEX. OCC. CODE §2301.476(c); W. VA. CODE §17A-6A-10(b)(11)-(12)(A)-(C); WIS. STAT. ANN. §218.0121(2m).

Some states have created an exception from their former laws prohibiting direct sales to consumers to benefit EV manufacturers. *See, e.g.*, COLO. REV. ST. §44-20-126(2)(g); PA. CONS. STAT. ANN. 63 §818.310(c)(6). Those states still prohibit non-EV manufacturers from selling directly to consumers. Thus, Colorado

lowered the barrier to entry for some startup motor vehicle manufacturers, giving EV manufacturers preferential treatment over, rather than equal treatment with, non-EV startups.  Pennsylvania took such preferential treatment to another level by crafting its legislation allowing an EV manufacturer to own dealerships to apply only to Tesla.  *See* PA. CONS. STAT. ANN. 63 §818.310(c)(6)(i)(E) (limiting this exception to manufacturers that sold EVs "for a period of not less than 12 months prior to the effective date of this clause").

Other states have expressly refused to create such an exception for EV manufacturers.  *See, e.g.*, H.B. 229, 2019 Reg. Sess. (W.Va. 1999); Wis. Assemb. B. 439, 105th Reg. Sess. (Wis. 2021); Tex. H.B. 4379, 87th Reg. Sess. (Tex. 2021).[9]  This history shows that reasonable legislators can reach differing conclusions on whether direct sales bans should apply to new manufacturers seeking to enter a market without using dealers.  Just because some states have granted an exception from existing laws does not mean courts are compelled to impose exceptions on other states.

---

[9]    Some manufacturers have been unsuccessfully lobbying for legislative changes to the Texas motor vehicle regulatory system. *See, e.g.*, S.B. 1400, 87th Reg. Sess. (Tex. 2021); H.B. 4379, 87th Reg. Sess. (Tex. 2021); H.B. 4097, 87th Reg. Sess. (Tex. 2021); H.B. 2602, 86th Reg. Sess. (Tex. 2019); S.B. 2279, 85th Reg. Sess. (Tex. 2017); S.B. 1572, 85th Reg. Sess. (Tex. 2017); H.B. 3828, 84th Reg. Sess. (Tex. 2015); H.B. 1653, 84th Reg. Sess. (Tex. 2015); H.B. 3351, 83rd Reg. Sess. (Tex. 2013); H.B. 2149, 79th Reg. Sess. (Tex. 2005); H.B. 1050, 79th Reg. Sess. (Tex. 2005).  During this time, the Legislature amended relevant motor vehicle statutes where appropriate, but not to remove the restriction on manufacturers and distributors selling directly to consumers. *See, e.g.*, S.B. 1415, 86th Reg. Sess. (Tex. 2019).

VI.  LUCID SEEKS TO CHANGE TEXAS LAW BASED ON ARGUMENTS IT NEVER PRESENTED TO THE TEXAS LEGISLATURE.

Lucid and its experts admit they did not present their arguments from this case to the Texas Legislature even though Lucid recognizes it is the Legislature's role to make policy determinations.  ROA.2569–2575; ROA.2605–2602; ROA.2609; ROA.2889–2890; ROA.2911–2913.  In contrast, TADA advocates policies in defense of existing Texas law that it has highlighted for the Legislature on many occasions.  ROA.2286–287; ROA.2298–2300; ROA.2394–2399; ROA.2462–2470. Texas motor vehicle dealers provide tremendous economic benefits to the State, including jobs, revenues, investment, and contributions to local communities. ROA.2462–2466. Texas consumers also benefit from competition, better pricing, and better access to services.  ROA.2462–2466.  The National Association of Automobile Dealers has also provided extensive discussions of dealer benefits to consumers.  *See* ROA.2319; ROA.2442; ROA.3160.

Changing Texas law to allow Lucid to sell direct to consumers is a risky proposition for Texas legislators and consumers.  Not only are Lucid's economic theories speculative at best, Lucid ignores the non-economic reasons why dealers are important for motor vehicle sales and distribution.

18

VII.  COURSE OF PROCEEDINGS

Lucid filed this lawsuit on November 1, 2022, against Monique Johnston (Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles), Daniel Avitia (Executive Director of the Texas Department of Motor Vehicles), and Corrie Thompson (Director of the Enforcement Division of the Texas Department of Motor Vehicles) (collectively, the "State Appellees").  ROA.19. TADA intervened to assist the State Appellees in defending the Texas statute at issue. ROA.225, 520.

Following discovery, all parties moved for summary judgment.  ROA.1427 (Lucid), ROA.828 (State Appellees), & ROA.2113) (TADA).  All parties opposed the other side's motions.  ROA.3234 (State Appellees), ROA.3394 (Lucid), & ROA.3436 (TADA).  The parties also filed reply briefs.  ROA.3918 (Lucid), ROA.3941 (TADA), & ROA.3967 (State Appellees).

The district court referred the cross-motions for summary judgment to the magistrate for a report and recommendation on April 4, 2024.  The magistrate issued her report and recommendation upholding TEX. OCC. CODE §2301.476(c) against Lucid's constitutional challenge.  ROA.4000.  The magistrate recommended granting summary judgment to the State Appellees and TADA, and denying Lucid's motion for summary judgment.  ROA.4000.

Lucid filed objections to the magistrate's report on August 12, 2024. ROA.4020. The State Appellees and TADA opposed Lucid's objections. ROA.4054, 4075. Lucid filed a reply. ROA.4124. TADA and the State Appellees filed sur-replies. ROA.4141, 4148. The district court adopted the magistrate's report on March 31, 2024, with a written opinion. ROA.4159.

The district court entered its final judgment on March 31, 2024. ROA.4177. Thereafter, Lucid appealed. ROA.4179.

## SUMMARY OF THE ARGUMENT

The district court correctly upheld TEX. OCC. CODE §2301.476(c) against Lucid's constitutional challenges. Not only has this Court expressly upheld Section 2301.476(c) against constitutional challenges twice (in *Ford* and *Int'l Truck*) because it is supported by rational bases for its enactment, this Court also recently upheld a similar Louisiana provision against constitutional challenge in *Tesla* for the same reason.

Against the overwhelming weight of authority, Lucid asks this Court to ignore precedent because Lucid claims it is making an "as-applied" challenge. Lucid also contends that this Court's decision in *St. Joseph Abbey* should control over *Ford*, *Int'l Truck*, and *Tesla*. Lucid is wrong on both points. Calling its challenge "as-applied" does not free Lucid from binding, applicable precedent. Moreover, the Court's decision in *St. Joseph Abbey*, addressing casket sales in Louisiana, is

20

materially distinguishable and does not control over this Court's precedent directly addressing Section 2301.476(c).

Even if the Court were to revisit the merits of whether Section 2301.476(c) is constitutional, the Court should once again conclude that the law is supported by many rational bases for its enactment. History shows that manufacturers can (and often and still do) change their business models over time. The fact that Lucid currently does not use dealerships to distribute its vehicles is not a real distinction from other manufacturers, many of whom tried to sell directly on their own, before changing to their current dealership-based models. Lucid's direct-sales-only approach is a malleable business model, unlike other types of characterization (such as race or national origin) which are not subject to change over time. The Constitution does not protect Lucid's self-chosen business model.

In short, Lucid has failed to meet its burden to show that Section 2301.476(c) is unconstitutional under either its substantive due process or equal protection claims. The district court's judgment should be affirmed.

## **ARGUMENT**

I.     THE RATIONAL BASIS STANDARD OF CONSTITUTIONAL SCRUTINY

### **A.     Summary Judgment Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### **B.     Rational Basis Is a Highly Deferential Standard**

The well-known rational basis standard of review applies to Lucid's claims. *Reyes*, 861 F.3d at 561 (rational basis "is the default for substantive due process claims that do not implicate a fundamental right"); *Ford*, 264 F.3d at 510 (rational basis applies to an equal protection challenge in the "areas of social and economic policy").

Under the rational basis standard, a law should be upheld against a constitutional challenge "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Ford*, 264 F.3d at 510 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). "The interest the government asserts to show rationality need not be the actual or proven interest, as long as there is a connection between the policy and a 'conceivable' interest." *Reyes*, 861 F.3d at 563 (quoting *FM Props. Operating Co. v. City of Aus.*, 93 F.3d 167, 175 (5th Cir. 1996)). This is a "notoriously deferential standard." *Id.* at 561–62. A law survives a rational basis challenge if legislators could believe the law in question could rationally address

the "evil at hand," even if it is not the perfect way of addressing the problem for all circumstances. *St. Joseph Abbey v. Castille*, 712 F.3d 215, 221 (5th Cir. 2013) (citing *Williamson v. Lee Optical*, 348 U.S. 483 (1955), which upheld the statute requiring an ophthalmologist or optometrist prescription before an optician may fit or replace lenses because "some persons would benefit from seeing a doctor"). "Legislation need not pursue its permissible goal by using the least restrictive means of classification; consequently, the Equal Protection Clause is not violated 'merely because the classifications made . . . are imperfect.'" *Greater Hou. Small Taxicab Co. Owners v. City of Hou.*, 660 F.3d 235, 239 (5th Cir. 2011) (quoting *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997)). "[I]t is of no consequence that the state's method is over-inclusive or under-inclusive, so long as its legitimate goal may be attained by the means chosen." *Martin v. Mem'l Hosp. of Gulfport*, 130 F.3d 1143, 1149 (5th Cir. 1997).

In short, this case is not an appropriate vehicle to second-guess reasonable state legislative choices. *Reyes*, 861 F.3d at 566. That is, it is not the role for the courts "to fine tune" regulatory systems; that is the role for the political process. *Id.*

## II. CONTROLLING AUTHORITY FORECLOSES LUCID'S CLAIMS

### A. *Tesla* Forecloses Lucid's As-Applied Challenge.

Throughout its brief, Lucid tries to avoid this Court's binding decision in *Tesla* by arguing that "*Tesla* explicitly refused to consider whether there was a rational

basis for applying the law specifically to direct-sales-only automotive companies." Appellant's Br. at 3. Lucid's argument misconstrues the one that was before this Court in *Tesla*, which the Court summarized as follows:

> Tesla avers that *Ford* upheld a regime that prevented manufacturers from competing with *their own* dealerships. … Scholarly *amici* point out that *Ford* "was decided long before a single mass-market electric vehicle was sold in the United States and at a time when every car manufacturer sold through franchised dealers." Neither of those factors is present here.

113 F.4th 511, 530–31 (citations omitted). Many of the amici who unsuccessfully advocated for that distinction in *Tesla* have appeared in the "Brief of Amici Curiae Legal and Economic Scholars in Support of Appellant Lucid Group USA, Inc."[10] And in *Tesla*, those amici argued in Section II of their brief that "as applied to non-franchising manufacturers, direct sales prohibitions amount to nothing but the protection of a discrete interest group from economic competition, and lack any rational basis." *See* Tesla Amici Brief at 4–5, 20–28. After reciting Tesla and its amici's position, the Court rejected their argument on the merits, explaining:

> The crucial element of *Ford* was not abuse of one's own dealers but the "prevent[ion of] vertically integrated companies from taking advantage of their incongruous market position and . . . frauds, unfair practices, discrimination, impositions, and other abuses of our citizens." That

---

[10] Eight out of twelve of the amici who joined that brief were also authors / advocates of the "Brief of Legal and Economic Scholars as Amici Curiae in Support of Appellant" filed in support of Tesla on October 19, 2023, in Case No. 23-30480. *See* Brief of Amici Curiae L. and Econ. Scholars in Support of Appellant Lucid Group USA, Inc., *Tesla, Inc. v. La. Ass'n of Auto. Dealers*, 113 F.4th 511 (5th Cir. 2024) (No. 23-30480) (the "*Tesla Amici* Brief").

language is broad. And taken in the context of even broader language, *Ford* readily controls this case.

113 F.4th at 531 (citations omitted).  The Court was unpersuaded that Tesla could avoid precedent by selling vehicles direct to consumers instead of using dealers.

The same result follows here.  At footnote 22 in *Tesla*, this Court expressly cited the district court decision in this case denying a motion to dismiss the complaint, recognizing that "at least one district court has drawn this distinction" that *Tesla* and its *amici* advocated.  *Id.* at n.21.  But this Court rejected that argument without qualification, thereby rejecting this distinction, and the district court subsequently followed this Court's lead when entering summary judgment against Lucid.  Lucid cannot avoid binding precedent by invoking the mantra of an "as-applied" challenge to Texas law.

## B.   Lucid Cannot Escape Controlling Authority by Labeling Its Claims as an "As-Applied" Challenge

Lucid repeatedly states it is pursuing an "as-applied" challenge to Texas law, as if invoking those words frees it from this Court's binding precedent repeatedly upholding Texas and Louisiana laws relating to manufacturer sales of motor vehicles.[11]  The Supreme Court explains, however:  "the distinction between facial

---

[11]   Lucid repeatedly invokes *United States v. Carolene Products Co.*, emphasizing that "the constitutionality of a statute, valid on its face, may be assailed by proof of facts tending to show that the statute as applied to a particular article is without support in reason because the article, although within the prohibited class, is so different from others of the class as to be without the reason for the prohibition[.]"  304 U.S. 144, 153–54 (1938).  But Lucid ignores the remainder of the quote in which the Court wrote:  "the effect of such proof depends on the

and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010). The distinction between a facial challenge and an as-applied challenge to a statute goes to the breadth of the remedy requested, but it does not change the plaintiff's burden when challenging duly-enacted legislation. *See Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014) (citing *Citizens United*, 558 U.S. at 331).

Although "the facial upholding of a law does not prevent future as-applied challenges," characterizing the challenge as an as-applied challenge does not make it one. *See In re Cao*, 619 F.3d 410, 430 (5th Cir. 2010) (en banc). When the Court rejects a facial challenge to a statute, that holding precludes subsequent challenges asserting the same legal principles." *Id.* (quoting *Penry v. Lynaugh*, 492 U.S. 302, 354 (1989) (Scalia, J., dissenting)). Here, Lucid is asking this Court to reconsider

---

relevant circumstances of each case, as for example the administrative difficulty of excluding the article from the regulated class." *Id.* at 154. The Court continued: "But by their very nature such inquiries, where the legislative judgment is drawn in question, must be restricted to the issue whether any state of facts either known or which could reasonably be assumed affords support for it." *Id.* Courts and juries cannot substitute their judgment for that of the legislature. *Id.* This is an incredibly high burden, which is why the courts upheld the challenged laws in many cases Lucid cited as examples where as-applied challenges were considered. *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 735 (1997); *Malagon de Fuentes v. Gonzales*, 462 F.3d 498, 504–06 (5th Cir. 2006); *Reed v. Goertz*, 136 F.4th 535, 542 (5th Cir. 2025).

the economic wisdom of the challenged motor vehicle sales laws, which is precisely what this Court has repeatedly refused to do in prior cases. Merely labeling their challenge as an "as-applied" one does not open the door for Lucid or its hired economist to try once again to obtain judicial exceptions to Texas law that the Texas Legislature has refused to adopt.

That is especially so given that Lucid never presented any evidence to elevate its claims above a facial challenge, no matter what Lucid calls them. As the district court recognized, Lucid repeatedly faulted the magistrate judge in this case for failing to address its as-applied challenge the same way it now attempts to fault the district judge for supposedly doing the same. ROA.4175. In reality, "the real fault lies with Lucid for failing to develop a particularized record to support such a challenge." ROA.4175. Throughout the litigation, Lucid conceded "multiple times . . . that its own practices were not overly relevant to the Court's analysis of the [relevant dealer laws]." ROA.4174–4175. For example, Lucid admitted that topics such as the economics of its own business operations had "nothing to do" with the rationality of the laws at issue. ROA.4175. Lucid thus failed to present any evidence showing how those laws "specifically and uniquely challenge[d Lucid] as compared to others," as would be required to allow the court to "craft a narrowly tailored and circumscribed remedy." ROA.4174–4175.

27

**C.     Lucid's Reliance on *St. Joseph Abbey* Is Misplaced.**

Faced with the overwhelming weight of authority from this Court, including *Tesla*, *Ford*, and *Int'l Truck*, Lucid rests its case largely on *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013), which does not involve the prohibition at issue here or vertical integration generally. *See* Appellant's Br. at 2 (calling the Louisiana law banning casket sales "indistinguishable" from the Texas law challenged here). Ultimately, *St. Joseph Abbey* stands for the unremarkable proposition that a law lacks a rational basis when it is supported by nothing more than "fantasy." *Id.* at 223.

There are many other key differences that distinguish *St. Joseph Abbey* from this case. For instance, the challenged law in that case was not democratically enacted through a state legislature; it was approved through "the Louisiana Board of Funeral Directors." *Id.* at 217. The law did not promote legitimate consumer interests by preventing "firms with superior marketing position" from "entering a downstream market," like the prohibition at issue here. *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 162 (5th Cir. 2007) (citing *Ford*, 264 F.3d at 500).

Caskets of course are nothing like automobiles. Caskets are not heavily regulated and do not require substantial investments. *See St. Joseph Abbey*, 712 F.3d at 217–18, 226 (describing the lack of regulation of Louisiana casket sales). And the consumers who occupy them do not have to worry about health and safety or the need for ongoing services and repair. *See id.* at 223–27 (finding no record evidence

28

to show a difference in third-party casket sales compared to funeral home sales). The Court also noted the lack of any similar laws anywhere in the United States: a stark contrast to the many laws prohibiting direct automobile sales. *See id.* at 218. Further showing that caskets are not like automobiles and that *St. Joseph Abbey* is unrelated to vertical integration issues, the Court did not even cite *Ford*, *Exxon*, or their progeny.[12]

Given these profound differences, it is unsurprising that the Court found no minimal basis on which to uphold the law at issue in *St. Joseph Abbey*, which amounted to pure economic protectionism. *See id.* at 226–27. Yet, even this economic protectionism could have been upheld if grounded in a legitimate public interest. *See id.* at 222–23. The problem was that the law served no interest except securing profits to funeral homes at the public's expense. *See Tesla, Inc. v. La. Auto. Dealers Ass'n*, 677 F. Supp. 3d 417, 457 (E.D. La. 2023), *aff'd in relevant part*, 113 F.4th 511 (5th Cir. 2024) (distinguishing *St. Joseph Abbey*). Indeed, when the Washington Court of Appeals rejected Lucid's due process and equal protection challenges, it expressly distinguished *St. Joseph Abbey* from the current issues. *See Lucid Grp. USA*, 559 P.3d at 557–58.

---

[12]  Lucid's reliance on *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002), is misguided for the same reasons—it is a case about casket sales.

Given these vast differences between *St. Joseph Abbey* and this case, the rule of orderliness does not apply here. *See* Appellant's Br. at 39; *see also* Pacific Legal Foundation Amicus Br. at 18. But if that rule applies, the earlier decision to address the issues presented here is *Ford*, which would be this Court's binding precedent.

### III.    LUCID'S DUE PROCESS CLAIM FAILS AS A MATTER OF LAW

Even if the Court were to consider the merits of Lucid's due process challenge, the Court should easily affirm the district court's judgment. Lucid pursues its due process claim based on an alleged interference with its liberty interest in "the right to pursue an occupation of one's choice." Appellant's Br. at 10. However, Lucid's true claim is that it wants to pursue its "occupation" using its preferred method for engaging in that business—by selling motor vehicles direct to consumers. *See id.* at 5 ("Lucid determined early on that the franchised-dealer model … was not a viable way to market its vehicles."). The due process clause does not guaranty that parties will be allowed to engage in the occupation of their choice in the exact manner they wish to pursue that opportunity. Instead, the due process clause is only triggered when a party has been completely foreclosed from the market, which the district court found, is not implicated here. But even if Lucid could show an interference with its claimed liberty interest, the law at issue here easily satisfies the rational basis standard of review.

### A.    The Due Process Clause Does Not Guaranty the Right to Use a Preferred Method for Doing Business

In *National Pork Producers Council v. Ross*, the Supreme Court confirmed that the Constitution does not require states to defer to a company's "preferred way of doing business." 598 U.S. 356, 364 & 383–85 (2023). The Court explained:

> In a functioning democracy, policy choices … usually belong to the people and their elected representatives. They are entitled to weigh the relevant "political and economic" costs and benefits for themselves, and "try novel social and economic experiments" if they wish. Judges cannot displace the cost-benefit analyses embodied in democratically adopted legislation guided by nothing more than their own faith in "Mr. Herbert Spencer's Social Statics,"—or, for that matter, Mr. Wilson Pond's Pork Production Systems[.]

*Id.* at 382. This principle is well-established in substantive due process precedent.

In *Exxon v. Maryland*, the Supreme Court upheld a vertical integration restriction on the sale of gasoline against a substantive due process challenge analogous to the present case, explaining that such a challenge required "little discussion." 437 U.S. 117, 124 (1978). *Exxon* involved a challenge to a Maryland statute that prohibited producers or refiners of petroleum products from operating retail gas stations. *Id.* at 120 n.1. Maryland enacted the statute "to protect independent retail service dealers from the vertically integrated oil companies" after encountering concerns regarding how some gasoline producers and refiners (*i.e.*, the manufacturers) were allocating gas among retail service stations. *Id.* at 120 & 133 n.25.

31

Similar to Lucid here, Continental Oil and its subsidiary only sold gas in Maryland through company-owned stores; they did not use independent dealers. *Id.* at 122 n.6. Thus, Continental Oil was not inequitably allocating its gas among retail sellers, which was the concern that led Maryland to act. "Testimony presented by these [direct-sale only] refiners indicated that company ownership is essential to their method of private brand, low-priced competition." *Id.* at 123. Continental Oil argued that Maryland's statute requiring it to use independent retail stores violated due process. *Id.* at 124 n.12. The Supreme Court disagreed. *Id.* at 124–25.

The Court held that the evidence "may cast some doubt on the wisdom of the statute, but it is, by now, absolutely clear that the Due Process Clause does not empower the judiciary 'to sit as a 'superlegislature to weigh the wisdom of legislation' . . . .'" *Id.* at 124 (quoting *Ferguson v. Skrupa*, 372 U.S. 726, 731 (1963)). Continental Oil argued that Maryland's law was "irrational and that it would frustrate rather than further the State's desired goal of enhancing competition." *Id.*; *see also id.* at 133 (claiming the law "will have an anticompetitive effect"). The Supreme Court dismissed such arguments as "rest[ing] simply on an evaluation of the economic wisdom of the statute[.]" *Id.* at 124. "Regardless of the economic efficacy of the statute, [the Court had] no hesitancy in . . . reject[ing] appellants' due process claims." *Id.* at 124–25. The Court found that the law at issue was reasonably related to "the State's legitimate purpose in controlling the gasoline retail market." *Id.* at 125. Texas

similarly has a legitimate purpose in protecting the "general economy of the state and the public interest and welfare of its citizens" and "to ensure a sound system of distributing and selling motor vehicles through: (1) licensing and regulating manufacturers, distributors, converters, and dealers of motor vehicles; and (2) enforcing [Chapter 2301 of the Texas Occupations Code] as to other persons to provide for compliance with manufacturer's warranties and to prevent fraud, unfair practices, discrimination, impositions, or other abuse of the people of this state." TEX. OCC. CODE §2301.001.

The Supreme Court's decision in *Williamson v. Lee Optical*, 348 U.S. 483 (1955), is also instructive. There, the Court upheld an Oklahoma statute that "forbade opticians to fit or replace eyeglass lenses in frames without a lens prescription from an ophthalmologist or optometrist." *St. Joseph Abbey*, 712 F.3d at 221 (discussing *Williamson*). Because "the legislature might have concluded that some persons would benefit from seeing a doctor when replacing a lens," the Supreme Court upheld the Oklahoma statute under the rational basis test. *Id.* Opticians may have preferred doing business by fitting or replacing eyeglass lenses without new prescriptions from an ophthalmologist or optometrist. *Williamson*, 348 U.S. at 487. But even if the legislature's requirement was viewed as "a needless, wasteful requirement in many cases … it is for the legislature, not the courts, to balance the advantages and

disadvantages of [that] requirement." *Id.*; *see also id.* at 487–88 ("the law need not be in every respect logically consistent with its aims to be constitutional").

The same instructions apply here. Lucid does not have a protected right to conduct business using its preferred methods or approach to its operations. It is for the legislature to balance the advantages and disadvantages of economic regulations such as those at issue here. Thus, the entire premise of Lucid's due process challenge is wrong. Lucid is not suing over a protected liberty interest.

## B. Due Process Protections for Occupation-Based Liberty Interests Apply Only if a Party Is Completely Foreclosed from the Market.

Not only is the premise of Lucid's due process challenge wrong, but Lucid seeks to base its claim on a mistaken view of controlling due process precedent. This Court explains that: "a plaintiff's liberty interest in pursuing a specific profession is only violated if he has been completely prevented from working in that field." *Adams v. City of Harahan*, 95 F.4th 908, 916 (5th Cir. 2024); *see also Ghedi v. Mayorkas*, 16 F.4th 456, 467 (5th Cir. 2021) (a plaintiff must establish he has been "effectively foreclosed" "from practicing his chosen profession to show a deprivation"). Here, the district court correctly concluded that Lucid was not foreclosed from engaging in business in the Texas market; Lucid just needs to comply with the laws applicable to all other motor vehicle manufacturers. *See id.* at 10 (citing ROA.4168–4169,

ROA.4008). Lucid's decision not to comply with existing Texas law is Lucid's own choice, and not a constitutional violation.

Nevertheless, Lucid tries to distinguish these authorities by arguing that Texas law "directly and completely forecloses Lucid from selling cars in Texas." Appellant's Br. at 18. To support this argument, Lucid mistakenly relies upon *Truax v. Raich*, 239 U.S. 33 (1915). *Truax* addressed an equal protection challenge to an Arizona law that facially discriminated against non-citizen, lawful inhabitants of the state. *Id.* at 38–39. If enforced, the Arizona law would have given preferential treatment to citizens over non-citizens. *Id.* at 41–43. *Truax* did not address the scope of a due process-based right to pursue an occupation claim, which is the purpose for which Lucid is trying to use it. *See* Appellant's Br. at 18. Moreover, those who were being discriminated against in *Truax*, would have been prevented from working under circumstances that other similarly-situated persons were not. Yet, Lucid does not argue that *Truax* is relevant to the equal protection claim Lucid presents in this case. An equal protection claim involving a suspect classification has no bearing on the scope of the due process rights at issue here.

None of Lucid's other due process authorities support an actionable claim. For example, in *Cowan v. Corley*, this Court held that a pre-discovery dismissal under Fed. R. Civ. P. 12(b)(6) was not appropriate when a plaintiff had stated a factual basis for interference with his liberty interest, even though he had incorrectly alleged it was an

interference with his property interest.  814 F.2d 223, 227–28 (5th Cir. 1987).  The Court recognized that a claim that a plaintiff "has been denied the opportunity to pursue his livelihood," implicates a liberty interest for purposes of the due process clause.  *Id.* at 227.  However, contrary to Lucid's citation, the Court did not hold that the plaintiff was "deprived of a protected liberty interest even though he could still operate three wreckers."  Appellant's Br. at 18.  Instead, the Court held that the plaintiff stated a claim sufficient to reach the discovery phase based on allegations "that [wrecker] assignments were not being made on an even-handed basis."  814 F.2d at 225.  After raising that grievance with the sheriff, the plaintiff "allege[d] that he was summarily expelled from the association without warning or hearing," which meant that he was no longer being allowed to provide wrecker services on public property in Montgomery County.  *Id.*  The Court concluded that, while discovery was appropriate, "the right to engage in the occupation of one's preference is not absolute. Within the strictures of due process both property and liberty interests may be constrained. Ultimately, that may prove to be the situation in the matter now before us. On that we express no opinion."  *Id.* at 228.  Here, the district court gave Lucid its opportunity to conduct discovery prior to dismissing Lucid's claims, even though Lucid's allegations were far less intrusive than those at issue in *Cowan v. Corley.*

Lucid's overstatement of its due process authorities is pervasive in its brief.  For example, Lucid cites *Burkette v. Lutheran Gen. Hosp.*, 595 F.2d 255, 256 (5th Cir.

1978) for the proposition that "denial of hospital privileges deprives physicians of a protected liberty interest because it 'seriously limit[s]' their private practice." Appellant's Br. at 18. But that is not what this Court held. The denial of hospital privileges is not automatically a deprivation of a protected liberty interest. *See, e.g.*, *Soriano v. Neshoba City. Gen. Hosp. Bd. of Trs.*, 486 F. App'x 444 (5th Cir. 2012) (addressing denial of hospital privileges as an issue of *procedural* due process).[13] In *Burkette*, the Court merely recognized that the denial of privileges "may" gave rise to a claim for interference with a liberty interest, but because the plaintiff's claim failed for numerous reasons (including that the plaintiff was neither in private practice nor seeking privileges to admit patients), the Court did not need to explain further in its three-paragraph opinion. 595 F.2d at 256.

Similarly, Lucid's reliance on *San Jacinto Savs. & Loan v. Kacal*, 928 F.2d 697 (5th Cir. 1991), and *Texas v. Thompson*, 70 F.3d 390, 392–93 (5th Cir. 1995), is misplaced. Each of those cases involved state actors engaging in conduct to harass or interfere with the plaintiff's rights. *See Thompson*, 70 F.3d at 393 (describing claim as involving state actors making false allegations to plaintiff's customers about legal violations to destroy the plaintiff's business); *Kacal*, 928 F.2d at 703 (describing claim as based on police harassment, threats, and defamation against plaintiff's customers).

---

[13] Lucid did not plead a procedural due process violation in this case. Indeed, Lucid had every opportunity to present its arguments to the Texas Legislature, which is the proper method to seek the changes in law that Lucid prefers.

*Kacal* and *Thompson* do not address challenges to laws adopted through the legislative process. Thus, *Kacal* and *Thompson* provide no guidance for this case.

Finally, Lucid mischaracterizes Appellees' position in this case as asserting that "a state may prohibit protected activity within its borders because other states permit the activity." Appellant's Br. at 16. Neither TADA nor the State Appellees made that contention. Instead, TADA asserted that Texas is not required to permit certain activity just because a neighboring state allows it. A state law is not irrational just because different states reach differing conclusions on the types of conduct they regulate or the extent of such regulations.[14] Indeed, another fallacy in Lucid's mischaracterization is that Texas has regulated "protected" activity—Lucid's business model of selling direct to consumers is not a constitutionally protected business model.[15]

### C.    Even If Lucid Had a Protected Liberty Interest, Texas Law Easily Passes the Rational Basis Test.

If the Court reaches the merits of the rational basis test, the Court should conclude that Section 2301.476(c) withstands constitutional scrutiny. *See Allstate*, 495

---

[14]    At multiple places in its brief, Lucid makes the misleading assertion that Texas allows manufacturers to sell directly to Texas consumers. *See* Appellant's Br. at 2, 23. Texas unequivocally prohibits manufacturers from selling their vehicles directly to consumers in Texas. *See* TEX. OCC. CODE §2301.476. The fact that Texas has not tried to regulate outside of its borders is not "permission" to engage in conduct elsewhere. Texas cannot set policy or permit conduct in California, any more than California can dictate the limits of Texas law.

[15]    Unlike the authority Lucid cites to support its position, this case does not involve a fundamental right or a heightened degree of scrutiny. *See* Appellant's Br. at 16 (citing *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 455–56 (5th Cir. 2014)).

F.3d at 164 (recognizing that a vertical integration restriction benefits consumers). <u>Car & Driver</u> summed up some of the benefits of dealers as follows:

> A dealer who is independent of the automaker would, in theory, assure a broad inventory, provide competent repairs, and be an upstanding member of the local community, treating neighbors fairly and perhaps sponsoring beer-league softball or a kids' soccer team. And customers can comparison-shop Chevy dealers easier than if they are taking on Chevrolet itself.

See James Cobb & Norman Mayersohn, *Why Do We Keep Buying Vehicles at Dealerships?*, CAR & DRIVER (Oct. 1, 2015), https://www.caranddriver.com/news/a15352113/why-do-we-keep-buying-vehicles-at-dealerships/ (reprinted at ROA.3197). There are many rational reasons why legislators agree and support a prohibition against manufacturers operating a dealership, including:

> 1.    dealership networks provide expanded consumer access to products and services, beyond what a new market entrant can provide, *see* ROA.3208–3211;

> 2.    manufacturers encounter conflicts of interest that have led to inferior service and repairs, *see, e.g.*, ROA.3055–3062; ROA.3130; *The Ford Pinto Grimshaw v. Ford Motor Co. 1981*, AM. MUSEUM OF TORT L. https://www.tortmuseum.org/ford-pinto/(last visited Sept. 16).

> 3.    EV manufacturers have poor track records with customer service and repairs, *see* ROA.3004; ROA.3027–3028; ROA.3033; ROA.3040; ROA.3055–3062; ROA.3065–3075;

> 4.    dealership networks expand repair service options, preventing manufacturers from monopolizing the service market and giving consumers the benefit of competition over service, *see* ROA.2234 (concluding "Lucid has established conditions that support its monopolization of parts and after-market services"); ROA.2238, 2239;

5.    companies evolve over time and, although many start off wanting to sell direct to consumers (*i.e.*, Ford, General Motors, VinFast), they realize they need dealerships to survive;[16] *see* ROA.2578–2582; ROA.2615–2617; ROA.3009–3025;

6.    dealers protect some consumers when a manufacturer goes out of business, *see* ROA.2915; ROA.3077; ROA.2312–2315;

7.    dealers provide jobs, pay taxes, and provide support in local communities, ROA.2158–2159; ROA.2302–2307;[17]

8.    manufacturers cannot generate the consumer cost savings they claim, as discussed in Fact Section II above.

Under the rational basis test, Appellees bear no burden to prove that these assertions are true, *see Tesla*, 114 F.4th at 531, even though TADA believes they are.  Lucid's burden was to show that these reasons are wholly irrational.

Lucid failed to meet its burden.  Not only is Lucid's economic speculation subject to much reasonable dispute, as discussed above, Lucid makes other legally erroneous arguments overstating the scope of activities it is allowed to perform under Texas law.[18]  For example, Lucid argues that "Texas permits Lucid to perform service,

---

[16]  Reasonable legislators do not ignore (and are certainly not required to ignore) these lessons of history in crafting state policy. If a manufacturer sells direct to consumers today, it may end up needing and competing against dealerships in the future, as happened with Ford in the first half of the 1900s.  A reasonable legislator may act to stop the cycle before it repeats itself in Texas in the 2020s.

[17]  Lucid mischaracterizes this point as allegedly discriminatory in favor of local business.  *See* Appellant's Br. at 29–30.  But as Lucid points out, many dealers are not local, such as AutoNation, Penske, and others.  *See id.*  Thus, when TADA has emphasized that dealerships provide opportunities to local Texas communities, TADA is focused on all independent dealerships that provide such benefits, and not just those based in Texas.

[18]  As another example of its mischaracterization of Texas law, Lucid contends that it may sell vehicles directly to consumers in Texas after previously leasing those vehicles. *See* Appellant's

including warranty service, on Lucid vehicles." Appellant's Br. at 23. However, Lucid's expert admits that warranty work is a service traditionally performed by a dealer. ROA.2914; *see also* TEX. OCC. CODE §2301.002(8) (defining "dealership" to include a place where "repairs" are made) & §2301.002(37) (defining "warranty work" as expenses that are "incurred by a franchised dealer" in complying with a manufacturer's or distributor's warranty). Texas law unequivocally prohibits manufacturers from acting in the capacity of a dealer. TEX. OCC. CODE §2301.476(c). Moreover, Texas law prohibits unlicensed persons, such as Lucid Group USA, Inc., from "perform[ing] or offer[ing] to perform repair services on a motor vehicle under a franchise and a motor vehicle manufacturer's warranty." TEX. OCC. CODE §2301.251(a). Thus, manufacturers and their unlicensed affiliates are prohibited from performing warranty repairs. If Texas law allows a manufacturer to perform some warranty repairs, there is nothing irrational about the State also concluding that a dealership network is necessary for consumers to obtain warranty repairs without being at the mercy of the manufacturer seeking to maximize its profits at the expense of cutting corners on consumer repairs.

---

Br. at 2, 7, 23, 33. Lucid does not address the limits imposed on the ability to sell previously leased vehicles. *See* 43 TEX. ADMIN CODE §215.181 (limiting such sales to the lessee or to a duly licensed dealer). Lucid also does not address the Texas Finance Code's limitations on Lucid's ability to lease vehicles with purchase options. *See* ROA.3456 at n.10 (discussing TEX. FIN. CODE §§348.002 & 348.501). Thus, when Lucid argues that it can "lease-to-own" vehicles in Texas, Lucid is making a bald assertion without addressing the intricacies of the limitations imposed by the Texas Finance Code.

There is also nothing irrational about legislators considering the ripple-effect from enacting exceptions for EV manufacturers or new market entrants on other portions of their legislative regime. If an exemption is granted for new market entrants selling EVs without franchises, legislators can rationally anticipate that other market participants will cry "foul" and allege that they are now being treated differently than similarly-situated persons receiving the benefits of a newly-enacted exception. A rational legislator can anticipate the risks of future litigation and threats to an existing legislative regime if exceptions are granted to a few new actors. Of course, as soon as Lucid tries to avoid this concern by highlighting that it is seeking different treatment because it does not have franchises already, Lucid is admitting it is not similarly situated to other manufacturers and dealers, which is the death-knell for an equal protection challenge. *See Ford*, 264 F.3d at 510 (the Equal Protection Clause prohibits treating similarly-situated persons differently).

## IV.   LUCID'S EQUAL PROTECTION CLAIM FAILS AS A MATTER OF LAW.

The Equal Protection Clause does not prohibit classifications. *Harris v. Hahn*, 827 F.3d 359, 365 (5th Cir. 2016). Instead, an equal protection challenge to economic legislation focuses on whether a classification drawn by the state meets the rational basis test.[19]  *Ford*, 264 F.3d at 510. "[T]he Equal Protection Clause essentially directs

---

[19]  In *Tesla*, the Court wrote that "[t]he legislative classification that we are examining is the class of all vehicle manufacturers." 114 F.4th at 530. That was the first step in the equal protection analysis. Lucid quotes that phrase multiple times in its brief. Appellant's Br. at 3 & 35. But

that all persons similarly situated be treated alike." *Ford*, 264 F.3d at 510 (quoting

*Wheeler v. Miller*, 168 F.3d 241, 252 (5th Cir. 1999)). "Thus, '[i]t is clearly established

that a state violates the equal protection clause when it treats one set of persons

differently from others who are similarly situated.'" *Id.* (quoting *Yates v. Stalder*, 217

F.3d 332, 334 (5th Cir. 2000)).   But laws that draw distinctions between business

models are not discriminatory.  *See Int'l Franchise Ass'n v. City of Seattle*, 803 F.3d

389, 400 (9th Cir. 2015) (recognizing that ordinance drawing a distinction based on

the chosen "business model" was not discriminatory; it is a "facially-neutral

classification").   Stated differently, "the Constitution does not protect against a law

having a negative impact" on some persons or businesses.  *Malagon de Fuentes*, 462

F.3d at 507.  It is well established that the Equal Protection Clause is not violated just

because a law may be viewed as overinclusive or broader than necessary to satisfy the

state's goals.  *See Burlington N. R. Co. v. Ford*, 504 U.S. 648, 653 (1992); *see also*

*N.Y.C. Transit Auth. v. Beazer*, 440 U.S. 568, 590–92 (1979) (upholding employment

ban on all narcotics users even if some are not a safety risk); *Mass. Bd. of Retirement*

---

repeating it does not justify ignoring the rest of the *Tesla* opinion where the Court conducted a rational basis analysis, including considering and rejecting, the arguments Lucid and its amici raise here.  *See* Argument Section I.D above.  Here, as in *Tesla*, the law at issue is focused on a classification (manufacturer v. dealer) that exists separate from the legislation at issue.  *See Williams v. Vermont*, 742 U.S. 14, 27 (1985) ("The classification must reflect pre-existing differences; it cannot create new ones that are supported by only their own bootstraps.").

*v. Murgia*, 427 U.S. 307, 315–16 (1976) (upholding mandatory retirement age of 50 for state police even though some older than 50 are still physically fit to be an officer).

"[W]here people are not similarly-situated, equal treatment is not required." *Malagon de Fuentes*, 462 F.3d at 507. Manufacturers and dealers are not similarly situated, as this Court has already held in *Ford*, 264 F.3d at 510. Likewise, a vertically-integrated manufacturer is not similarly situated to a dealer. *See id.* The fact that Lucid may pursue a different business model than other manufacturers does not change the fact that Lucid is being treated the same as all other manufacturers. *See id.* at 510–11 (rejecting the argument that Ford and General Motors were treated differently for equal protection purposes because they were using different business models). Here, Lucid's corporate representative admits Lucid is being treated the same as other manufacturers. ROA.2576–2577. At best, Lucid is arguing that the classification drawn by the Legislature is overinclusive to the extent that it applies to manufacturers who do not use dealers. But such an argument fails to meet the high burden to show that the state's classification and licensing system for manufacturers and dealers is so irrational that it cannot be enforced. In short, Texas law treats each and every manufacturer in the same way whether an EV or a traditional manufacturer and Lucid can make no good faith argument to the contrary that can withstand the rational basis test.

Perhaps recognizing that Lucid is being treated the same as other manufacturers, Lucid argues that it "is similarly situated to Texas's existing independent dealers."

44

Appellant's Br. at 44.  But it is not.  Lucid focuses entirely on the corporate form of Lucid, which set up Lucid Group USA, Inc. as its sales and services entity in the corporate family.  *Id.* at 45.  It is not "independent" of the manufacturer.  Moreover, if a manufacturer could evade existing Texas law by setting up an affiliated entity to handle its sales and distributions, it would eviscerate Texas's long-standing law requiring separation between manufacturers and dealers.  Lucid's form over substance argument does not free Lucid from complying with existing Texas law.[20]

A state is not required to create exemptions from generally-applicable laws just because one party claims or allegedly can show that its conduct does not fall within the evils a statute was intended to address.  *See Walsh v. La. High Sch. Athletic Ass'n*, 616 F.2d 152, 161 (5th Cir. 1980) (denying an exemption for Lutheran High School even though recruitment was not an issue in the past or likely in the future).  But even if Lucid believes it should receive such an exemption, there are many rational reasons for the state to apply Section 2301.476(c) to Lucid too, for the reasons explained above.

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

Respectfully submitted,

*/s/ Robert T. Mowrey*
Robert T. Mowrey

---

[20] Texas rejected such a form-over-substance argument in Section 2301.476(a)(1) where "manufacturer" for purposes of Section 2301.476 is defined to include "representative[s]," "affiliate[s]," and persons who "directly or indirectly through an intermediary, [are] controlled by, or [are] under common control with, a manufacturer."

Texas Bar No. 14607500
*robert.mowrey@troutman.com*
Thomas G. Yoxall
 Texas Bar No. 00785304
 *tom.yoxall@troutman.com*
W. Scott Hastings
 Texas Bar No. 24002241
 *scott.hastings@troutman.com*
Daron L. Janis
 Texas Bar No. 24060015
 *daron.janis @troutman.com*
Chase T. Cobb
 State Bar No 24116208
 *chase.cobb@troutman.com*
**TROUTMAN PEPPER LOCKE LLP**
2200 Ross Avenue, Suite 2800
Dallas, Texas 75201

**COUNSEL FOR APPELLEE TEXAS
AUTOMOBILE DEALERS
ASSOCIATION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2025, I filed the Texas Automobile Dealers Association's Appellee's Brief through the Fifth Circuit's CM/ECF filing system to all counsel of record.


*/s/Robert T. Mowrey*
Robert T. Mowrey

## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this Appellee's Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 11,193 words, excluding parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft for Microsoft 365 in Times New Roman 14-point font.

*/s/ Robert T. Mowrey*
Robert T. Mowrey

October 15, 2025