No. 25-50319

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

Lucid Group USA, Inc.,

*Plaintiff – Appellant*,

v.

Monique Johnston, in her official capacity as Director of the Motor Vehicle Division of the Texas Department of Motor Vehicles; Daniel Avitia, in his official capacity as Executive Director of the Texas Department of Motor Vehicles; Corrie Thompson, in her official capacity as the Director of the Enforcement Division of the Texas Department of Motor Vehicles,

*Defendants – Appellees*,

Texas Automobile Dealers Association,

*Intervenor – Appellee*.

On Appeal from the United States District Court for the Western District of Texas, Civil Action No. 1:22-cv-1116-RP

**Reply Brief of Appellant Lucid Group USA, Inc.**

BILLY M. DONLEY
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1382
bdonley@bakerlaw.com

ANDREW M. GROSSMAN
KRISTIN A. SHAPIRO
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., NW,
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

*Counsel for Lucid Group USA, Inc.*

## Certificate of Interested Persons

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

Further, pursuant to Federal Rule of Appellate Procedure 26.1, the undersigned counsel of record certifies that Appellant's parent company is Atieva, Inc., and no publicly traded company owns 10% or more of Appellant's stock.

**A.    Appellant**

Lucid Group USA, Inc.

**B.    Attorneys for Appellant**

Andrew Michael Grossman
Kristin Shapiro
Baker & Hostetler LLP
1050 Connecticut Avenue N.W., Suite 1100
Washington, D.C. 20036

Billy M. Donley
Rachel Palmer Hooper
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, TX 77002

**C.    Appellees**

Monique Johnston

Daniel Avitia

Corrie Thompson

**D.    Attorneys for Appellees**

Daniel Ortner

Jacob Przada
Kelsey Warren
Office of the Texas Attorney General
P.O. Box 12548
Austin, TX 78711

Zachary Louis Rhines
Office of the Texas Attorney General
300 W. 15th Street, 6th Floor
Austin, TX 78701

**E.    Intervenor-Appellee**

Texas Automobile Dealers Association

**F.    Attorneys for Intervenor-Appellee Texas Automobile Dealers Association**

W. Scott Hastings
Chase Tyler Cobb
Daron L. Janis
Robert Thompson Mowrey
Thomas George Yoxall
Troutman Pepper Locke, LLP
2200 Ross Avenue, Suite 2800
Dallas, TX 75201

**G.    Amici**

Pacific Legal Foundation

Professor Daniel Crane

Americans For Prosperity Foundation

Legal and Economic Scholars

**H.    Attorneys for Amicus Pacific Legal Foundation**

Anastasia P. Boden
Andrew R. Quinio
Erin E. Wilcox

Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, CA 95814

**I.    Attorney for Amicus Professor Daniel Crane**

J. Christopher Byrd
Chris Byrd Law Firm
P.O. Box 359
2631 Bulverde Rd., Suite 105
Bulverde, TX 78163

**J.    Attorney for Amicus Americans For Prosperity Foundation**

Michael E. Lovins
Lovins Troslcair, PLLC
1301 S. Capital of Texas Highway, Building A, Suite 136
Austin, TX 78746

**K.    Attorney for Amicus Legal and Economic Scholars**

Conor Harvey
Wright, Close, Barger & Guzman, LLP
1 Riverway Dr., Suite 2200
Houston, TX 77056

/s/ Andrew M. Grossman
Andrew M. Grossman
*Attorney of record for Plaintiffs-Appellants*

# **Table of Contents**

Certificate of Interested Persons......................................................... i

Table of Contents......................................................................... iv

Table of Authorities ..................................................................... v

Introduction ............................................................................. 1

Argument ................................................................................ 2

I.    The Prohibition Violates Lucid's Due Process Rights ......................... 2

      A. Lucid Has a Protected Liberty Interest ............................. 2

      B. Lucid's As-Applied Challenge Is Not Foreclosed by Precedent ......... 4

      C. Lucid Demonstrated that Texas Lacks a Rational Basis for
         Application of the Prohibition to Lucid ......................... 11

II.   The Prohibition Violates Lucid's Equal Protection Rights................... 23

Conclusion ............................................................................ 26

## Table of Authorities

### Cases

*Adams v. City of Harahan*,
95 F.4th 908 (5th Cir. 2024) ..................................................................... 3

*Burkette v. Lutheran Gen. Hosp.*,
595 F.2d 255 (5th Cir. 1979) .................................................................... 4

*Califano v. Jobst*,
434 U.S. 47 (1977) .................................................................................... 8

*Coleman Motor Co. v. Chrysler Corp.*,
525 F.2d 1338 (3d Cir. 1975) ................................................................. 12

*Craigmiles v. Giles*,
312 F.3d 220 (6th Cir. 2002) ........................................................... 22, 23

*Exxon v. Maryland*,
437 U.S. 117 (1978) ......................................................................... 4, 9, 10

*Ford Motor Co. v. Texas Dep't of Transp.*,
264 F.3d 493 (5th Cir. 2001) ............................................................. 6, 24

*Ford Motor Co. v. United States*,
405 U.S. 562 (1972) ......................................................................... 12, 13

*Ghedi v. Mayorkas*,
16 F.4th 456 (5th Cir. 2021) ..................................................................... 3

*Golden Glow Tanning Salon, Inc. v. City of Columbus, Miss.*,
52 F.4th 974 (5th Cir. 2022) ..................................................................... 4

*Int'l Franchise Assn. v. City of Seattle*,
803 F.3d 389 (9th Cir. 2015) ................................................................. 24

*Int'l Truck & Engine Corp. v. Bray*,
372 F.3d 717 (5th Cir. 2004) ................................................................... 6

*Jackson v. Raffensperger*,
308 Ga. 736 (2020) ................................................................................ 25

*Justice v. Hosemann*,
    771 F.3d 285 (5th Cir. 2014) ................................................................ 9

*Mahone v. Addicks Util. Dist. of Harris Cnty.*,
    836 F.2d 921 (5th Cir. 1988) ............................................................... 23

*Maldonado v. Houstoun*,
    157 F.3d 179 (3d Cir. 1998)................................................................. 24

*Martin v. Mem'l Hosp. at Gulfport*,
    130 F.3d 1143 (5th Cir. 1997)................................................................ 3

*Metro. Life Ins. Co. v. Ward*,
    470 U.S. 869 (1985) ............................................................................ 19

*Nat'l Pork Producers Council v. Ross*,
    598 U.S. 356 (2023) ......................................................................... 4, 9

*Reed v. Goertz*,
    136 F.4th 535 (5th Cir. 2025) ................................................................ 9

*San Jacinto Sav. & Loan v. Kacal*,
    928 F.2d 697 (5th Cir. 1991) ................................................................. 3

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013) ........................................ 1, 5, 10, 14, 18, 23

*State of Tex. v. Thompson*,
    70 F.3d 390 (5th Cir. 1995) .................................................................. 3

*Tesla, Inc. v. Louisiana Auto. Dealers Ass'n*,
    113 F.4th 511 (5th Cir. 2024) ......................................................... 4–7, 24

*United States v. Carolene Prods.*,
    304 U.S. 144 (1938) ...................................................................... 6, 8, 25

*Williams v. Vermont*,
    472 U.S. 14 (1985)............................................................................. 24

*Williamson v. Lee Optical*,
    348 U.S. 483 (1955) .................................................................... 4, 9, 10

**Constitutional and Statutory Authorities**

Tex. Occ. Code § 2301.603 ........................................................... 14

Tex. Occ. Code § 2301.605 ........................................................... 14

Tex. Occ. Code § 2301.652 ....................................................... 15, 21

U.S. Const. amend. XIV, § 1 ................................................. passim

**Other Authorities**

Andrew Chien, Nate Savona, Fabian Brandt, and David Whinfrey,
    *Why US Dealerships Remain a Cost Effective Choice* ....................................... 15

DOJ, Economic Analysis Group, Competition Advocacy Paper,
    Economic Effects of State Bans on Direct Manufacturer Sales to
    Car Buyers (May 2009) ........................................................... 16

Joint Letter of the Antitrust Division of the U.S. Department of Justice
    and the Federal Trade Commission on Franchised Dealer
    Requirements to Sell and Service Motor Vehicles and Nebraska
    Legislative Bill (Mar. 14, 2019) ......................................... 13, 16

## **Introduction**

Defendants devote most of their briefs to arguing the Court need not scrutinize the rationality of the Prohibition because it does not deprive Lucid of a protected interest, Lucid is not similarly situated to the State's incumbent dealers, and the case is controlled by established precedent. Defendants are wrong on all points, and their strained effort to avoid even rational-basis review of the Prohibition is incredibly telling. It is like a student hoping his teacher will not grade a test he knows he has flunked.

Indeed, defendants offer shockingly little defense of the rationality of applying Texas's Prohibition to direct-sales-only automotive companies like Lucid. Defendants primarily repeat boilerplate arguments that Lucid already addressed in its opening brief without actually engaging with any of Lucid's points. That failure is not an oversight on defendants' part. *It is because defendants have no answers.* Defendants' asserted bases for the Prohibition do not withstand even a modicum of scrutiny. While rational basis review is deferential, it cannot be satisfied simply by stringing together a series of non sequiturs. This Court has explained that "[t]he great deference due state economic regulation does not demand judicial blindness to the history of a challenged rule or the context of its adoption nor does it require courts to accept nonsensical explanations for regulation." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013). If Texas wishes to override consumer choice and pick for itself who gets to compete, it must do so evenhandedly and according to a legitimate state interest. Because it has not done so here, the decision below should be reversed.

## Argument

### I.    The Prohibition Violates Lucid's Due Process Rights

Defendants fail to defend the district court's rejection of Lucid's due process claim. The Prohibition clearly deprives Lucid of a protected interest, and it does so without any rational basis.

#### A.    Lucid Has a Protected Liberty Interest

Defendants do not dispute Lucid's alternative argument (at 19–20) that the Prohibition deprives Lucid of the freedom to contract, the freedom to sell its property, and the ability to obtain a license, all of which are protected interests. Given these concessions, defendants' argument that the Prohibition does not deprive Lucid of its interest in pursuing an occupation of its choice is irrelevant.

Regardless, defendants' circumscribed view of the Due Process Clause's protection of occupational liberty is unsupportable. Defendants repeat the district court's reasoning that Lucid is not "completely prevented" from doing business. State Br. 29; TADA Br. 34.  Defendants argue that Lucid can still sell its vehicles through independent dealers or in other states. *See* State Br. 29; TADA Br. 34. Lucid's opening brief already explained (at 15–17) why that argument makes no sense, and defendants have no response. The Prohibition completely prevents Lucid from selling cars in Texas. The fact that independent dealers can sell cars does not alter the fact that Lucid cannot.

If defendants' position were correct, a law prohibiting new agents from selling real estate in Texas would not deprive them of a protected liberty interest because they could either work with an existing agent to finalize their clients'

transactions or sell real estate outside of Texas. Defendants cite no authority supporting this absurd position. As Lucid explained (at 17), *Ghedi v. Mayorkas*, 16 F.4th 456 (5th Cir. 2021), and *Adams v. City of Harahan*, 95 F.4th 908 (5th Cir. 2024), address alleged *incidental* burdens on the ability to pursue an occupation, which are categorically distinct from laws like the Prohibition that directly regulate an occupation.

Defendants do not dispute that their position would create two intra-circuit conflicts. Their position conflicts with *Martin v. Memorial Hospital at Gulfport*, 130 F.3d 1143, 1148–49 (5th Cir. 1997), which recognizes that state actions preventing people from doing business in an "area" impinge liberty interests.[1] And their position conflicts with decisions holding that regulations which "remove or *significantly alter*" the ability to engage in an occupation impinge liberty interests. *San Jacinto Sav. & Loan v. Kacal*, 928 F.2d 697, 701–03 (5th Cir. 1991) (emphasis added); *State of Tex. v. Thompson*, 70 F.3d 390, 392–93 (5th Cir. 1995) (same).

TADA only offers immaterial factual distinctions of Lucid's cited cases, where it addresses them at all. For example, TADA notes (at 37–38) that *San Jacinto* and *Thompson* challenged "state actors engaging in conduct" and not "laws adopted through the legislative process" but offers no reason why this

---

[1] Contrary to TADA's mischaracterization (at 38), Lucid does not argue that "Texas is … required to permit certain activity just because a neighboring state allows it." Lucid is responding to the district court's obviously wrong holding that the Prohibition does not deprive Lucid of a liberty interest because Lucid can sell vehicles in other states.

distinction matters. If conduct which "significantly alters" plaintiffs' ability to engage in business impinges a liberty interest, so too does a law which "significantly alters" that ability. *See also Burkette v. Lutheran Gen. Hosp.*, 595 F.2d 255, 256 (5th Cir. 1979) (explaining that a "denial of staff privileges" that "may *seriously limit* [a physician's] opportunity to engage in private practice" constitutes a deprivation (emphasis added)).[2]

Finally, the State cites (at 29) *Golden Glow Tanning Salon, Inc. v. City of Columbus, Mississippi*, 52 F.4th 974 (5th Cir. 2022), for the proposition that the right to work is not "fundamental." Deprivations of "fundamental" rights are subject to strict scrutiny, whereas deprivations of other interests are subject to rational-basis review. *See id.* at 979. Lucid has always conceded that the Prohibition is subject to rational-basis review, which is precisely the level of scrutiny applied by *Golden Glow Tanning Salon*.

## B.    Lucid's As-Applied Challenge Is Not Foreclosed by Precedent

Defendants incorrectly argue that the Court need not scrutinize the Prohibition's rationality because the case is controlled by existing precedent.

1.    Lucid's opening brief (at 34–41) already explained why this case is not controlled by *Tesla, Inc. v. Louisiana Automobile Dealers Ass'n*, 113 F.4th 511 (5th Cir. 2024). Even the State admits (at 13) that *Tesla's* ultimate holding was

---

[2] TADA cites *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ("*NPPC*"), *Exxon v. Maryland*, 437 U.S. 117 (1978), and *Williamson v. Lee Optical*, 348 U.S. 483 (1955), for the proposition that "Lucid does not have a protected right to conduct business using its preferred methods." TADA Br. 31–34. None of these cases address what constitutes a protected interest.

4

simply that Tesla failed to satisfy its "burden … to dispel the notion that fear of vertical integration is not a *conceivable* rational basis" for the Louisiana law. *Id.* at 531. Nothing in that holding forecloses Lucid from satisfying its burden in this case. Contrary to the State's argument (at 13), unlike Tesla, Lucid has never "attempt[ed] to shift the burden and force Texas to explain why vertical integration is bad for consumers." (Quotation marks omitted.)

What is more, the State largely does not dispute Lucid's point (at 38) that—unlike Louisiana's more comprehensive law—Texas law cannot reasonably be described as preventing vertical integration. Texas permits direct-sales-only automotive companies like Lucid to lease new vehicles, to sell those previously leased vehicles to the lessee, to do the same with rented vehicles, to sell vehicle parts and accessories, to service vehicles (including warranty and recall service), and to establish galleries where consumers can take demonstration drives and then purchase a vehicle through a Lucid out-of-state dealership (including over the phone or online), which Lucid can then deliver to Texas. *See* Lucid Br. 7–8. Given the State's admission that Texas law permits Lucid to do everything an independent dealer does but for actually selling new vehicles in Texas, *see* ROA.1826; ROA.27–28; State Br. 28, Texas's Prohibition does not meaningfully prevent "vertical integration." *Tesla*, 113 F.4th at 530. Neither *Tesla* nor any of this Court's other precedent addressed anything approaching this nonsensical "matrix of [Texas] law" which "sheds much light on the disconnect between" the Prohibition and defendants' asserted state interests. *St. Joseph Abbey*, 712 F.3d at 226.

The State's contention (at 10–12) that this case is controlled by *Ford Motor Co. v. Texas Department of Transportation*, 264 F.3d 493 (5th Cir. 2001), and *International Truck & Engine Corp. v. Bray*, 372 F.3d 717, 721 (5th Cir. 2004), is even less availing. As relevant here, *Ford* rejected a facial equal protection claim brought by Ford—a manufacturer with franchisees—to Texas's law "classifying manufacturers differently than dealers." 264 F.3d at 510. The Court explained that "there is certainly evidence from which a reasonable legislator could believe § 5.02C(c) would further the State's legitimate interest in preventing manufacturers from utilizing their superior market position to compete against dealers." *Id.* at 504. This reasoning tracks the historical purpose of direct-sales bans: to prevent manufacturers from competing unfairly against their own franchisees that have made investments in their brands. That purpose is inapplicable to automotive companies, like Lucid, which have no franchisees. *International Truck* is even further afield, as it merely repeats this reasoning in the context of a dormant Commerce Clause claim. *See* 372 F.3d at 728.

Defendants argue that even if *Tesla* is not dispositive, it at least forecloses Lucid's as-applied challenge. *See* State Br. 14; TADA Br. 25–26. The State points out (at 12, 14) that *Tesla* explicitly refused to consider whether there was a rational basis for applying Louisiana's law to "non-franchising car manufacturers." *Tesla*, 113 F.4th at 530. The State interprets this language to foreclose all as-applied challenges under the rational-basis test. The State admits (at 15 n.5) that its ambitious interpretation of *Tesla* conflicts with *United States v. Carolene Products*, 304 U.S. 144 (1938), not to mention numerous decisions considering

6

as-applied rational-basis challenges. *See* Lucid Br. 40, 48–49 (collecting cases). The better view is that *Tesla* was addressing a facial challenge because that is what Tesla asserted. *See* Lucid Br. 35 & n.15 (discussing record).

TADA takes the opposite approach, contending (at 24–26) that *Tesla* actually addressed the rationality of Louisiana's law as applied to direct-sales-only automotive companies. That might surprise the panel, which specifically emphasized that "[t]he legislative classification that we are examining is the class of all vehicle manufacturers." *Tesla*, 113 F.4th at 530. To be sure, the panel later rejected Tesla's distinction of *Ford* and explained that "we can assume that the state has a legitimate interest in preventing firms from vertically integrating and abusing the resulting power not only on its own dealers, but other dealers, and yes even consumers down the run." *Id.* at 531. This language simply indicates that the Court will assume that a direct-sales prohibition which covers all manufacturers, including direct-sales-only manufacturers, has a rational basis unless and until a plaintiff negates every potential state interest. That position comports with the rational-basis standard, which puts the burden on the challenger to negate potential interests. In no manner does this reasoning foreclose Lucid from negating every possible interest here.

This point is confirmed by the very next sentence: "It is Tesla's burden, not defendants', to dispel the notion that fear of vertical integration is not a *conceivable* rational basis." *Id.* Unlike Tesla, Lucid has satisfied its burden for the reasons discussed below. *See* pp. 11–23, *infra*; *see* Lucid Br. 20–34.

**2.**    Defendants next argue that "overinclusive" laws necessarily satisfy rational-basis review. State Br. 15; TADA Br. 23. If that were right, then there could be no as-applied rational-basis challenges because the government could always argue that law is just overbroad. But defendants' argument is only half true. *Sometimes*, but not always, imperfect or overinclusive laws may satisfy rational-basis review. In facial challenges, laws are scrutinized based on "reference to characteristics typical of the affected classes rather than by focusing on selected, atypical examples." *Califano v. Jobst*, 434 U.S. 47, 55 (1977). Under this standard, an imperfect classification will be upheld against a facial challenge so long as it is rational in the mine run of circumstances.

By contrast, in as-applied challenges, plaintiffs can challenge a law by arguing that they are "so different from others of the class as to be without the reason for the prohibition." *Carolene Prods.*, 304 U.S. at 153–54. Courts will consider the "relevant circumstances of each case," including "the administrative difficulty of excluding the article from the regulated class." *Id.* at 154. If, for example, it were difficult to distinguish persons for whom the statute lacks a rational basis from the general class of regulated persons, then that difficulty might supply a rational basis for an otherwise overinclusive classification. *See Califano*, 424 U.S. at 56–57 ("The exception, like the general rule itself, is simple to administer. It requires no individualized inquiry into degrees of hardship or need."). But defendants do not and cannot make any such argument here.

Defendants relatedly argue that whether a challenge is as-applied only affects the breadth of the remedy and not the merits. State Br. 15; TADA Br. 26.

But their own cited authority makes clear that, when considering as-applied challenges, courts consider the constitutionality of a law specifically as applied to the "[p]articularized facts" of the case. *Justice v. Hosemann*, 771 F.3d 285, 292 (5th Cir. 2014); *see also Reed v. Goertz*, 136 F.4th 535, 542 (5th Cir. 2025).

**3.** Finally, TADA cites (at 31–33) *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023) ("*NPPC*"); *Exxon v. Maryland*, 437 U.S. 117 (1978); and *Williamson v. Lee Optical*, 348 U.S. 483 (1955), for the proposition that the Due Process Clause "does not require states to defer to a company's preferred way of doing business." (Quotation marks omitted.) *NPPC* addresses a dormant Commerce Clause challenge to California's law banning certain pork products from being sold in the state. 598 U.S. at 363. The case considers whether the law impermissibly burdens interstate commerce and does not apply the rational-basis standard. The portion of the case TADA cites did not even garner a majority. *See id.* at 382 (§ IV.B).

TADA's reliance on *Exxon* fares no better. *Exxon* considered, among other things, a facial due process challenge to Maryland's law prohibiting petroleum producers and refiners from operating gas stations. 437 U.S. at 121. The law was "an outgrowth of the 1973 shortage of petroleum," during which "gasoline stations operated by producers or refiners had received preferential treatment during the period of short supply." *Id.* The Court held that the law had a rational basis because the legislature was "[r]esponding to evidence that producers and refiners were favoring company-operated stations in the allocation of gasoline and that this would eventually decrease the competitiveness of the retail

market." *Id.* at 124. *Exxon* is analogous to Texas's interest in prohibiting traditional manufacturers from unfairly competing against their own franchisees, which is not implicated by direct-sales-only automotive companies like Lucid. While (as TADA notes, at 32) a few of the *Exxon* plaintiffs sold their petroleum exclusively through company-owned stations, they pressed only a facial claim challenging the "entire statute," *id.* at 123, and that was all the Court considered.

*Lee Optical* is similarly inapposite. The decision held that Oklahoma had a rational basis for requiring opticians from fitting or duplicating lenses without a prescription from an ophthalmologist or optometrist. 348 U.S. at 485. The Court reasoned that the law was supported by a legitimate state interest in protecting public health, as "in some cases the directions contained in the prescription are essential," and the legislature additionally "may have concluded that eye examinations were so critical … that every change in frames and every duplication of a lens should be accompanied by a prescription from a medical expert." *Id.* at 487. This merely confirms the well-established principle that economic legislation is subject to rational-basis review.

Neither *Exxon* nor *Lee Optical* speaks to whether the Prohibition at issue here has a rational basis. If the defendants had anything other than "nonsensical explanations" for it, *St. Joseph Abbey*, 712 F.3d at 226, they would not need to go to such lengths to evade rational-basis scrutiny.

**C.    Lucid Demonstrated that Texas Lacks a Rational Basis for Application of the Prohibition to Lucid**

Lucid's opening brief (at 20–33) already addressed defendants' asserted bases for the Prohibition. Defendants' inability to engage with Lucid's points only underscores the Prohibition's irrationality.

1.    Lucid already addressed (at 20–23) defendants' argument about vertical integration. Defendants repeat boilerplate phrases like that Texas has an interest in "preventing vertical integration and anti-competitive monopolies." State Br. 22. But defendants fail to respond to Lucid's analysis showing why a direct-sales-only automotive company simply selling its own cars does not raise any concerns related to vertical integration or monopoly power. Indeed, defendants do not dispute that the automobile market is highly competitive, and the idea that *blocking* a competitor from the Texas market improves competition is absurd.

Defendants' suggestion that "vertical integration" in itself is harmful lacks any basis in economics or reality. Amicus Pacific Legal Foundation (at 20–26) thoroughly explains why Supreme Court precedent makes clear that an abstract interest in preventing vertical integration is not a legitimate state interest. Contrary to defendants' position, it is well understood that vertical integration generally produces positive efficiencies and raises concerns only in certain situations. *See* Lucid Br. 21–22. Specifically, vertical integration might harm competition if it enables a firm to leverage "cross-sector advantages in ways that are potentially anticompetitive," ROA.3322, or "use its dominance in one line of

11

business to establish dominance in another," ROA.3304. Lucid explained (at 20–23) why, as a categorical matter, neither of these concerns are presented here, and defendants have no meaningful response.

The State argues (at 20) only that "it was plainly rational for Texas to fear that manufacturers might leverage their competitive advantage to drive independent dealers out of business." This reasoning may make sense with respect to traditional manufacturers with franchisees, given the fear that manufacturers might leverage franchisees' investments in their brands to unfairly compete against them, but it is inapplicable to direct-sales-only automotive companies. To the extent the State believes that permitting Lucid to sell its vehicles without using independent dealers would result in a "competitive advantage" that could "drive independent dealers out of business," there is nothing anti-competitive about Lucid adopting a business model that outcompetes incumbents by providing a better product and service for consumers at a better price. Indeed, the State's argument tacitly admits that dealers are a deadweight loss to consumers and society. This rationale amounts to simple protectionism, which is no legitimate state interest.

The State's cited examples only confirm Lucid's analysis. *Coleman Motor Co. v. Chrysler Corp.*, 525 F.2d 1338, 1347 (3d Cir. 1975), involved a traditional manufacturer competing against its own franchisee. *Ford Motor Co. v. United States*, 405 U.S. 562 (1972), involved a dominant manufacturer's acquisition of a spark-plug producer, which raised the concern that "when a company in a competitive market integrates with a firm in an oligopolistic one, the merger can

have 'the result of transmitting the rigidity of the oligopolistic structure' of one industry to the other." ROA.3307 (quoting *Ford Motor Co.*, 405 U.S. at 568). This concern likewise is categorically inapplicable to a direct-sales-only manufacturer simply selling its own vehicles. Indeed, "[t]he two government agencies tasked with enforcing US competition laws, the Federal Trade Commission … and the US Department of Justice, support the conclusion that bans on direct sales by vehicle manufacturers harm competition and consumers." ROA.1524 (citing Joint Letter of the Antitrust Division of the U.S. Department of Justice and the Federal Trade Commission on Franchised Dealer Requirements to Sell and Service Motor Vehicles and Nebraska Legislative Bill 51 (Mar. 14, 2019) ("Joint Letter")).[3]

TADA argues (at 39) that "dealership networks expand repair service options, preventing manufacturers from monopolizing the service market and giving consumers the benefit of competition over service." To reiterate, the Prohibition has *nothing* to do with vehicle service, and the Prohibition is the only provision of Texas law at issue in this case. Moreover, Texas law allows manufacturers to perform warranty or recall service and to sell parts and accessories. Lucid currently "operates a facility in Houston where it provides warranty and repair service to Lucid owners." ROA.1465.[4]

---

[3] *Available at* https://www.justice.gov/atr/page/file/1146236/download.

[4] The State admits that manufacturers can service vehicles in Texas, including providing warranty and recall work. *See* ROA.1826; ROA.27–28; State Br. 28. Indeed, Texas law *requires* manufacturers to provide warranty service: "A manufacturer, converter, or distributor shall make repairs necessary to conform a

Lucid further explained (at 23) that the overall structure of Texas law betrays the lie that the Prohibition is needed to address supposed vertical-integration concerns. The State admits that Lucid can do *every single thing an independent dealer can do* but make an initial sale of a new vehicle. *See* p. 5, *supra*. Even TADA admits (at 41 n.18) that Lucid can lease brand new Lucid vehicles in Texas to a consumer and then subsequently sell that vehicle to the consumer. So Lucid can lease and then sell its vehicles to consumers, but it cannot just sell them? Nothing about that makes sense. Defendants also do not dispute that Lucid can sell parts and accessories in Texas. *See* ROA.1826. Texans can also visit Lucid "galleries" in Texas and then order a Lucid vehicle through an out-of-state Lucid-owned dealership—including over the phone or internet from their homes in Texas—which Lucid can then deliver in Texas. ROA.1466; *see* Lucid Br. 7–8.

In other words, Texas law permits vehicle manufacturers to be vertically integrated in all respects other than the one (new vehicle sales) that just happens to be highly profitable for the state's powerful dealers lobby. "This matrix of [Texas] law … sheds much light on the disconnect between" the Prohibition and defendants' asserted concerns regarding vertical integration. *St. Joseph Abbey*, 712 F.3d at 226.

2.    Lucid already addressed (at 23–26) defendants' argument about intrabrand competition. As Lucid explained, intrabrand competition can benefit consumers in the sense that it reduces the degree to which dealers can add

---

new motor vehicle to an applicable manufacturer's, converter's, or distributor's express warranty." Tex. Occ. Code § 2301.603(a); *see also id.* § 2301.605(a)(1).

exorbitant markups, but it does not reflect a savings to the consumer compared to a business model that does not impose dealer markups in the first place. Lucid also explained that precisely because intrabrand competition limits their markups, dealers have successfully lobbied Texas to limit intrabrand competition by restricting manufacturers' ability to establish new franchises. *See* Tex. Occ. Code § 2301.652. Defendants have no response to either of these points, and their suggestion that a barrier to entry which prevents competitors from selling new vehicles in Texas somehow increases competition is frivolous.

TADA speculates (at 5) that if independent dealers were more efficient at selling cars, then that efficiency might produce a cost savings. There is no plausible reason why Lucid would be less efficient than an independent dealer at selling its own vehicles. Ford's reported per-vehicle distribution costs are $2,000 higher than those of direct-sales-only automotive companies. ROA.1568 (rebuttal expert report of Dr. Fiona Scott Morton). TADA's own cited source—a study commissioned by the National Automobile Dealers Association—estimates that selling through independent dealers costs approximately $400 more per vehicle. *See* Andrew Chien, Nate Savona, Fabian Brandt, and David Whinfrey, *Why US Dealerships Remain a Cost Effective Choice* 12–13.[5] Common sense provides a good

---

[5] *Available at* https://www.oliverwyman.com/our-expertise/insights/2024/sep/why-us-auto-dealershipsremain-cost-effective-choice.html. The study later asserts that dealers have a greater "added value" because "the margin-based compensation strategy of traditional franchised dealers seems to provide greater incentive for sales staff to maximize additional revenue." *Id.* at 16. In other words, the NADA study admits that dealers use high-pressure sales tactics to upsell consumers and further increase prices.

reality check: If dealers really were better at selling cars than manufacturers, dealers would not need to spend millions of dollars lobbying states to force manufacturers to use them.[6]

Even assuming *arguendo* that dealers were more efficient, that still would not supply a rational basis for the Prohibition. The key point is that there is nothing pro-competitive about preventing direct-sales-only automotive companies from selling their own vehicles. On the contrary, forcing the motor vehicle industry to adopt a one-size-fits-all business model stifles competition and consumer choice. *See* Joint Letter, p. 3, *supra*.

The disconnect between the Prohibition and intrabrand competition is also striking. Texas law does not require manufacturers to authorize multiple dealers who might compete with one another. A manufacturer could, for example, authorize only a single Texas dealership, multiple dealerships all owned by the same entity, or only a few dealerships located in non-competing geographic markets, as many high-end manufacturers have done. ROA.1507; ROA.1640.

---

[6] TADA criticizes (at 7) Lucid's citation of a DOJ analysis explaining that direct-sales bans cost consumers an average of $2,225 more per vehicle (in year 2000 dollars). *See* DOJ, Economic Analysis Group, Competition Advocacy Paper, Economic Effects of State Bans on Direct Manufacturer Sales to Car Buyers 4 (May 2009). TADA is correct that this estimate is based on a Goldman Sachs report. As the paper explains, that report is "[t]he most comprehensive estimate of the savings in the vehicle order-to-delivery cycle from build-to-order, direct manufacturer sales." *Id.* The views expressed in the paper are consistent with the official position of the Antitrust Division of the Department of Justice. *See* Joint Letter, p. 3, *supra*.

These facts make plain that the purpose of the Prohibition is not to foster competition, but to protect the State's incumbent dealers from competition.

3.    Lucid already addressed (at 26–28) defendants' arguments about "waste, fraud, and abuse," including with respect to warranty repairs. State Br. 22–23; TADA Br. 39. As Lucid explained, the Prohibition has nothing to do with vehicle service or fraud. "There is no plausible explanation for why a vertically integrated car manufacturer would be any more likely to engage in unfair practices than an independent dealer." ROA.1521 (expert report of Dr. Scott Morton). Defendants also do not dispute that, to the extent they want to speculate about conflicts of interest, it is *dealers* which are conflicted with respect to selling vehicles because dealers profit more from vehicles that require more warranty and recall repairs. *See* Lucid Br. 28.

The State argues (at 22) that, as in *Lee Optical*, the "Texas Legislature may rationally believe that having two independent points of contact in the car-buying process … would benefit consumers." But *Lee Optical* turned on the expertise added by ophthalmologists and optometrists, and cars are not medical equipment nor do Texas's dealer-licensing requirements have anything to do with expert advice. The expert in selling Lucid vehicles is Lucid. The only dealer-licensing requirement that Lucid cannot satisfy is the requirement that dealers be independent of manufacturers. This is the same bad argument the Court rejected in *St. Joseph Abbey*, where the state argued that consumers would benefit from the casket-selection advice of licensed funeral directors, but the Court reasoned

17

that "extensive training the law requires of budding funeral directors does not include instruction on caskets." 712 F.3d at 224.

Also like *St. Joseph Abbey*, it is dealers that historically "have been the problem for consumers," *id.* at 225, as the Legal and Economic Scholars amicus brief explains (at 16–18). *See also* Lucid Br. 28. The fact that Texas affords independent dealers the "exclusive right of sale adds nothing to protect consumers and puts them at a greater risk of abuse including exploitative prices." *St. Joseph Abbey*, 712 F.3d at 226.

4.      Lucid already addressed (at 29–30) TADA's argument that "dealers provide jobs, pay taxes, and provide support in local communities." TADA Br. 40. As Lucid explained, direct-sales-only automotive companies also provide jobs, pay taxes, and provide support in local communities. Lucid in fact filed this suit precisely because it seeks to *expand* its presence in Texas. Moreover, a growing number of independent dealers are owned by national corporations. There is no reason why the manager of an AutoNation or any other Texas dealership would "better understand the process for obtaining financing, insurance, licensing information, and employment or residency verification" than the manager of a Lucid Studio in Texas, if Lucid were permitted to sell vehicles in Texas. State Br. 25 (quotation marks omitted).

Lucid also explained that this asserted interest borders on unconstitutional. The State even says the quiet part out loud, arguing that the Prohibition "favor[s] companies with a deeper local connection." State Br. 24–25. This discrimination against nonresident businesses violates the dormant Commerce

18

Clause and is not a legitimate state interest. *See Metro. Life Ins. Co. v. Ward*, 470 U.S. 869, 882 (1985).

5.    Lucid already addressed (at 32–33) defendants' ripple-effect argument, which rests on the illogical premise that there is a rational basis to subject persons to an irrational prohibition simply because the prohibition is rational as to other persons. Unlike manufacturers with franchisees, the State obviously has no interest in preventing direct-sales-only automotive companies like Lucid from unfairly competing against their non-existent franchisees.

TADA argues (at 42) that by "highlighting that it is seeking different treatment because it does not have franchises already, Lucid is admitting it is not similarly situated to other manufacturers and dealers, which is the death-knell for an equal protection challenge." This makes no sense. The entire point of Lucid's case is that it is different from manufacturers with franchisees. And that point has no bearing on whether Lucid is similarly situated to the dealers that Texas permits to sell cars. *See* pp. 23–25, *infra* (addressing similarly-situated prong).

For its part, the State argues (at 25) that "[m]anufacturers and dealers have entered into thousands of franchising relationships in Texas in reliance on the franchise law requirement and would be harmed if TxDMV is enjoined from enforcing it." That is nonsensical. Lucid does not seek to invalidate the entirety of Texas's direct-sales prohibition. Lucid argues that the law is invalid only as applied to direct-sales-only automotive companies. Texas law regulating the

relationship between manufacturers and their franchisees will not be affected by this case.

6.    Defendants argue that dealers "provide a robust selection of services" like trade-ins and financing options. State Br. 24; TADA Br. 39. But nothing in Texas law requires dealers to offer such ancillary services. Regardless, direct-sales-only automotive companies can offer trade-ins and financing options just like independent dealers. Defendants do not dispute that, as an economic matter, a manufacturer's incentive to serve customers well is as strong or stronger than an independent dealer's. *See* ROA.1520–22 (expert report of Dr. Scott Morton). If consumers want trade-ins and financing, they will vote with their dollars and manufacturers and dealers alike will be incentivized to offer those services. On that point, it is undisputed that Lucid accepts trade-ins and assists with financing. ROA.1987.[7]

The State relatedly argues (at 25) that "[t]he dealership model also leads to increased accessibility to cars in smaller communities since local dealers take on the risk and supply capital to open dealerships in areas that otherwise might not be as attractive to the manufacturer." The Prohibition, however, is unrelated to the number of dealerships a manufacturer opens. Bugatti only has a dealership in Houston, for example, and Austin Martin, Bentley, Lamborghini, Lotus, and

---

[7] TADA further argues (at 40) that "dealers protect some consumers when a manufacturer goes out of business." This cursory statement is the extent of TADA's analysis, and Lucid's opening brief (at 29) already explains why this argument is irrational.

Rolls Royce all have dealerships only in Austin, Dallas, and Houston. ROA.1602–1791.

If anything, requiring manufacturers to use independent dealers makes it harder for them to open additional dealerships because Texas law protects dealers from intrabrand competition. *See* Tex. Occ. Code § 2301.652; ROA.1564–65 (rebuttal expert report of Dr. Scott Morton explaining why Prohibition does not support broader retail capacity). Moreover, Texas law drastically reduces the accessibility of Lucid vehicles to Texans, who must purchase Lucid vehicles out-of-state. *See id.* Lucid is challenging the Prohibition because it seeks to make its vehicles *more* accessible to Texans.

7.    Defendants also make the curious argument that Texas has a legitimate interest in requiring manufacturers to use independent dealers because dealers are good for manufacturers. State Br. 23–24 ("Requiring independent dealers … reduces the risk that manufacturers like Lucid go out of business."); TADA Br. 40 ("[C]ompanies evolve over time and … realize they need dealerships to survive."). If dealers were good for Lucid or other direct-sales-only automotive companies, dealers would not need state laws forcing manufacturers to use them.

In any event, Lucid has already explained (at 5–6) why it is not economically feasible for it to use independent dealers. *See also, e.g.*, ROA.1463 (declaration of Lucid's Vice President of Sales and Service); ROA.1522–23 (expert report of Dr. Scott Morton); ROA.1578 (expert report of Herbet E. Walter). Far from "spread[ing] out [the] costs and risks" of Lucid's business, State Br. 23, if

Lucid were to try to establish a network of independent dealers, the revenue from the sales of Lucid's vehicles would not only have to cover the expenses of those dealers, but also cover the additional profit margin that they would require. This makes selling cars harder, not easier. *See* ROA.3094, ROA.3115 (SIGTARP report explaining "broad consensus" that GM and Chrysler's bloated dealership networks threatened the manufacturers' viability). In short, there is no rational connection between the Prohibition and any legitimate state interest in "helping" direct-sales-only manufacturers.

8.     Having failed to identify any legitimate interest served by the Prohibition, the State suggests (at 20) that the Court should nevertheless hold that there is a rational basis because defendants "produced expert witnesses, multiple studies, industry reports, and legislative testimony." ROA.4170. Because of these record materials, the State contends (at 20) that "reasonable minds can disagree" about whether there is a rational basis. But the actual arguments set out in those materials are addressed above, where Lucid explains why they are irrelevant, illogical, or both. Respectfully, reasonable minds cannot disagree about any of the foregoing bases, just like reasonable minds could not disagree about the asserted bases in *St. Joseph Abbey* or *Craigmiles v. Giles*, 312 F.3d 220 (6th Cir. 2002), even though the defendants in those cases also introduced record materials. The key point is that there, as here, none of the materials offered a coherent rationale for the challenged laws.

*        *        *

Defendants' justifications for the Prohibition strike with "the force of a five-week-old, unrefrigerated dead fish." *Craigmiles*, 312 F.3d at 225 (quotation marks omitted). Nothing in *Tesla* requires the Court to accept defendants' illogical arguments. To the extent that *Tesla* requires such blind deference, it cannot be squared with *St. Jospeh Abbey* and should not be followed under the rule of orderliness, or overruled. The law of this circuit is clear: "[M]ere economic protection of a particular industry" is not a "legitimate governmental purpose." *St. Joseph Abbey*, 712 F.3d at 222. Having negated every other potential interest for the Prohibition, bare economic protectionism is all that is left.

## II.    The Prohibition Violates Lucid's Equal Protection Rights

Defendants' equal protection arguments likewise fail.

1.    Defendants contend that Lucid is not "similarly situated" to the dealers that Texas permits to sell cars because Lucid is affiliated with a manufacturer. *See* State Br. 8; TADA Br. 44. Defendants do not dispute that their approach to the similarly-situated prong would render every equal protection claim a nullity.

Whenever plaintiffs challenge statutory classifications as violative of equal protection, by definition the plaintiffs will fall on a different side of the classification than the persons with whom they claim to be similarly situated. In defendants' view, these plaintiffs would always fail the similarly-situated prong and the classifications would escape scrutiny. This Court has already rejected such facile reasoning. *See Mahone v. Addicks Util. Dist. of Harris Cnty.*, 836 F.2d 921, 933 n.11

(5th Cir. 1988) (citing *Williams v. Vermont*, 472 U.S. 14, 27 (1985)); *Maldonado v. Houstoun*, 157 F.3d 179, 187 (3d Cir. 1998) ("[T]he appropriate comparison is between those persons subject to the classification and those persons who are similarly situated *but for the classification*." (emphasis added)). Defendants cite *Ford* and *Tesla*, *see* State Br. 9; TADA Br. 44, but neither of those decisions even questioned whether manufacturers seeking to sell directly are similarly situated to dealers. *See Tesla*, 113 F.4th at 530; *Ford*, 264 F.3d at 510.

TADA (at 43) also cites *International Franchise Association v. City of Seattle*, 803 F.3d 389 (9th Cir. 2015), but that case proves Lucid's point. The plaintiff challenged a minimum-wage ordinance that had a slower phase-in for small businesses. *Id.* at 397. The ordinance classified franchisees of a large franchisor as not small, regardless of the size of the franchisee. *Id.* The Ninth Circuit rejected the plaintiff's equal protection claim not under the similarly-situated prong, but because there was "a rational relationship between franchisees and their classification as large employers." *Id.* at 407. Under defendants' approach, the claim should have failed at the outset because the ordinance treated all franchisees alike and all non-franchisees alike.

Moreover, TADA recognizes (at 45) that the plaintiff here is *not* a manufacturer, but a dealer affiliated with a manufacturer. TADA's only response (at 45) is that "if a manufacturer could evade existing Texas law by setting up an affiliated entity to handle its sales and distributions, it would eviscerate Texas's long-standing law requiring separation between manufacturers and dealers." To state the obvious, the similarly-situated prong is just one element of an equal

24

protection claim. Lucid's argument that the Prohibition lacks a rational basis is confined to automotive companies that have no independent dealers. A decision in Lucid's favor would have no effect on the application of Texas law to traditional manufacturers with independent dealers. Regardless, the analysis would be essentially the same for a combined entity that both manufactures and markets Lucid vehicles. After all, Lucid sells its vehicles directly to consumers in many states, engaging in precisely the same business as Texas's franchised dealers—indeed, its dealerships directly compete with some of the same companies licensed as dealers in Texas, like AutoNation. *Compare Jackson v. Raffensperger*, 308 Ga. 736, 741 (2020) ("We have consistently treated individuals who perform the same work as being similarly situated for equal protection purposes.").

**2.**     Defendants agree with Lucid that the rational-basis inquiry for due process and equal protection claims is the same. *See* State Br. 30; TADA Br. 45. The Prohibition lacks a rational basis for the reasons discussed above. *See* pp. 11–23, *supra*.

TADA states (at 44) that "[a]t best" Lucid has established that "the classification drawn by the Legislature is overinclusive to the extent that it applies to manufacturers who do not use dealers." Yes, that is precisely Lucid's point. Direct-sales-only automotive companies like Lucid are "so different from others of the class [of manufacturers] as to be without the reason for the prohibition," and irrationally applying the Prohibition to them violates their constitutional rights. *Carolene Prods.*, 304 U.S. at 153–54.

## Conclusion

The Court should reverse the judgment below.

Dated: November 5, 2025

BILLY M. DONLEY
BAKER & HOSTETLER LLP
811 Main Street, Suite 1100
Houston, TX 77002
(713) 646-1382
bdonley@bakerlaw.com

Respectfully submitted,

*/s/ Andrew M. Grossman*

ANDREW M. GROSSMAN
KRISTIN A. SHAPIRO
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Ave., NW,
Washington, D.C. 20036
(202) 861-1697
agrossman@bakerlaw.com

*Counsel for Lucid Group USA, Inc.*

## Certificate of Service

I certify that on November 5, 2025, I caused the foregoing brief to be filed with the Court electronically using the CM/ECF system, which will send a notification to all counsel of record.

Dated: November 5, 2025        */s/ Andrew M. Grossman*
                                      Andrew M. Grossman

## Certificate of Compliance

I certify that this brief complies with the type-volume limitation set by Fed. R. App. P. 32(a)(7) because it contains 6,494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fifth Cir. R. 32.2.

Dated: November 5, 2025          */s/ Andrew M. Grossman*
                                 Andrew M. Grossman